Durpee, Judge,
delivered the opinion of the court:
This is an action to recover $1,180,375.20 deducted by defendant from a total of $17,307,183.07 which plaintiff was entitled to receive under a contract[1] for the manufacture of *823 military vehicles for defendant. Defendant has asserted affirmative defenses and counterclaims against plaintiff which arose out of earlier vehicle procurement contracts, and thereby contends that plaintiff has been paid in full by offset.
In support of this offset, defendant first contends that plaintiff was paid $249,919.41 by defendant, under one of the earlier contracts primarily in dispute, for Federal excise taxes, but that plaintiff retained these monies despite the fact that plaintiff had been relieved from paying said taxes by the Bureau ,of Internal Bevenue. We will refer to this hereafter as the Excise Tax Issue.
Defendant, by counterclaim, also claims entitlement to $490,533.08 which it contends it would have recovered in price redetermination proceedings under Contract 1216 had not such proceedings been thwarted by misrepresentations by plaintiff. This will be referred to as the Price Bedetermination Issue.
Defendant further contends in support ,of its offsets that during the performance of the same earlier contract,[2] plaintiff received a refund of $1,529,737.90 from its subcontractor, the Bockwell Spring and Axle Company for the use of defendant, but that plaintiff did not pay this' to defendant. Two counterclaims in the respective sums of $35.09 and $24,806.21 are also involved in this issue which will hereinafter be referred to as the Bockwell Issue, and which will be dealt with now.
THE ROCKWELL ISSUE
During the period 1950 through 1957 plaintiff produced many thousands of motorized heavy-duty military vehicles and parts pursuant to a series of contracts between it as prime contractor, and defendant. The earlier contracts are not directly involved in this case except by way of background. Essentially, they provided for retroactive or prospective price redetermination, upward or downward, within specified limitations hereinafter referred to.
Contract 297 was executed on June 30,1951, between plain *824 tiff and defendant, and contained an additional provision for price redetermination of plaintiff’s subcontracts with, suppliers of truck components, including axles. This contract contained a “pass through” provision that if the price of any subcontract was redetermined during a period when the prime contract price was fixed, the prime contract price would be correspondingly increased or decreased, notwithstanding the provision of the price redetermination article. Under this latter provision, the prime contract price remained fixed for a 90-day period following price revision.
During the entire period covered by this litigation, the sole source of axles for the trucks involved was Rockwell Spring and Axle Company and its predecessor corporation, Timken Axle Company. Under Contracts 11447 and 11448 dated May 18,1951, defendant furnished facilities for manufacturing military truck axles at Timken’s new Newark, Ohio, plant. Timken, in turn, agreed to maintain a specified axle capacity and to price redetermination to be negotiated by defendant at prices Timken charged prime contractors for axles.
On June 26, 1952, plaintiff and defendant executed Contract 983 which contained price increase or decrease rede-termination clauses, retroactive or prospective, and a repricing of subcontracts article, including the “pass through” provision, as in Contract 297.
On March 31, 1953, Contract 1216 for 854 trucks was executed by plaintiff and defendant. It contained a price redetermination article, under which contract prices could be redetermined downward only, but both prospectively and retroactively. Unlike Contracts 8292,[3] 297 and 983, Contract 1216 contained no repricing of subcontracts article and no provision with respect to passing through price refunds received by plaintiff from suppliers to defendant during the period when the prime contract price was fixed.
On July 3, 1953, defendant sent plaintiff an invitation to bid on 3,750 trucks, stating that only one producer of these trucks would remain in production after December 31, 1953, *825 and that in determining which producer would be retained, “price would be the most important consideration.”
Plaintiff , submitted its bid proposal, which was accepted by the execution of Supplement 3 to Contract 1216 on September 11, 1953. Supplement 3 eliminated the retroactive, downward price redetermination in the original Contract 1216 and provided only prospective downward price rede-termination. Like original Contract 1216, it contained no provision for repricing of subcontracts or “pass through” to defendant of any refunds received by plaintiff from subcontractors.
The crux of the Eockwell Issue results from the omission in Contract 1216, as amended, of these hitherto included contract provisions. Plaintiff contends that this omission establishes that defendant thereby waived any claim for refunds received by plaintiff fr,om subcontractors arising from repricing of their subcontracts. Defendant contends that this provision for repricing of subcontracts was not included in Supplement 3 to Contract 1216 because in the earlier Contracts 297,983 and 8292, plaintiff had advised the Chicago Ordnance District in July of 1952, that various subcontractors, including Timken, had objected to the inclusion of this clause in their subcontracts or purchase orders. Timken objected to such price redetermination provision being included in purchase orders because it was already subject to price redetermination under its own Contract 11448 with defendant’s Detroit Ordnance District. As to these earlier contracts, the Chicago Ordnance District then, in order to facilitate production, authorized plaintiff to place its orders for axle sets with Timken unconditionally on the basis that such orders would be repriced by the Detroit Ordnance District under its Contract 11448 with Timken.
During the negotiations leading to Supplement 3 to Contract 1216, plaintiff was again informed by defendant that Timken was subject to price redetermination under its Contract 11448 with the Detroit Ordnance District, which would continue to administer the contract and any price redeter-mination proceedings thereunder.
Prior to the merger of Timken with Standard Steel Spring Co. to form Eockwell Spring and Axle Company on Oc *826 tober 1, 1953, no formal price redetermination proceedings liad been held under Timken’s Contract 11448 with defendant. However, Timken in order to divest itself of excess profits, had first issued credit memoranda to the prime contractors, and later made advance payments to the Renegotiation Board. These latter payments went into general receipts of the United States Treasury, and were not available to Ordnance for further procurement purposes. Standard however, under a similar contract, had followed instructions of the Detroit Ordnance District by making voluntary refunds, in anticipation of price redetermination proceedings, to its prime contractors, who in turn remitted said refunds to Army Ordnance, thereby “keeping the funds in the procurement stream” in the words of the Government.
On September 30, 1953, Rockwell[4] advised plaintiff that, in anticipation of formal price redetermination pursuant to its Contract 11448 with defendant, it was going to voluntarily make a refund of $1,845,338.09 applicable to Contracts 8292, 2¡97 and 983. Rockwell explained that it had been directed by defendant to make such refunds to its prime contractors because Ordnance’s receipt of the refund through the prime contractors would “keep the funds in the procurement stream” for further Ordnance procurement. Rockwell also advised plaintiff that this practice would be followed in all future refunds stemming from its Contract 11448 with defendant. This arrangement of passing refunds from Rockwell under its Contract 11448 through plaintiff to defendant was also insisted upon in a communication between the Detroit Ordnance District and plaintiff’s counsel. It was further insisted by defendant that in all instances it would be the prime contractor’s obligation to give the Government the benefit of the refund. Thereafter, plaintiff deposited Rockwell’s check and issued a check to defendant for the same amount, $1,845,338.09.
On November 6,1953, Rockwell in anticipation of formal redetermination by Detroit Ordnance under Contract 11448, made a refund of $371,207.09 to plaintiff applicable to Con *827 tracts 297, 983, 8292 and also to 8841, a fixed price spare parts contract which had no price redetermination or repricing of subcontracts provision. The amount of the Rockwell refund on this last contract was $35.09. Plaintiff paid $371,172.00 of the refund to defendant, and retained $35.09. This is the $35.09 item in defendant’s second counterclaim.[5]
On February 17, 1954, Rockwell sent a refund of $217,--676.69 to plaintiff in anticipation of formal price redetermi-nation under its Contract 11448 with the Detroit Ordnance District. Of the total amount, $167,870.48 was applicable to Contracts 297 and 983, and plaintiff thereafter paid this amount to defendant. The remaining amount of $49,806.21 could be broken down as follows: $31,587.40 applicable to Contract 1216, and $18,218.81 applicable to eleven fixed price spare parts contracts (inclusive of Contract 8841). Plaintiff retained this amount of $49,806.21. Thereafter, upon demand for payment by defendant, plaintiff paid $25,000 to the Chicago Ordnance District. (In its third counterclaim, defendant claims the difference between the $49,806.21 and $25,000, i.e., $24,806.21).
Prior to February 15, 1955 Rockwell advised plaintiff of an intended refund of $1,529,737.90 applicable to Contract 1216 for the fiscal year 1954. Plaintiff advised Rockwell that it intended to retain this refund and not pass it on to defendant, as previously done under the prior contracts. At plaintiff’s insistence, the credit memorandum accompanying the payment of $1,529,737.90 was revised to describe the refund as a revision of Rockwell’s price to plaintiff instead of a “voluntary price adjustment,” and to list all the axle sets with original and lower revised prices, with the difference totaling the amount of the refund. The original notation “voluntary price adjustment for the fiscal year ended December 31, 1954 * * on the credit memorandum was revised to state, “To revise set price on Contract Number DA-11-22-ORD-1216. Shipped during the year ended *828 December 31, 1954.” Plaintiff retained the full amount of the Rockwell refund of $1,529,737.90.
On March 9, 1955, as a result of prior repricing negotiations under Contract 11448, Rockwell and the Detroit Ordnance District entered into Supplemental Agreement No. 2. Listed upon a schedule attached thereto entitled “Refunds Made to Customers,” was the refund made to plaintiff in the amount of $1,845,338.09 as allocated and applicable to purchases by plaintiff under prime Contracts 8292, 297 and 983.
By letter dated March 25, 1955, to the Detroit Ordnance District, Rockwell submitted a statement of sales, costs of sales and profits for the year ended December 31, 1954, covering axle sets and spare parts subject to price redetermi-nation imder Contract 11448. The letter in part read as follows:
Price adjustments were made with the International Harvester Company for the fiscal year ended December 31,1954, totaling $1,529,737.90, which price adjustments have been given effect in the statements enclosed. These were the only price adjustments during the year.
As a result of prior negotiations, on October 21,1955, Rockwell and Detroit Ordnance District entered into Supplemental Agreement No. 3 to Contract 11448. Listed upon a schedule thereto entitled “Refunds to Customers” was the refund made to plaintiff in the amount of $371,207.09 as allocated and applicable to purchases by plaintiff under prime Contracts 8292, 297, 983 and 8841. The agreement further stated that this amount of $371,207.09 was part of the total amount which represented the result of the agreed revision of prices pursuant to Contract 11448.
As a result of prior negotiations, on December 13, 1955, Rockwell and the Detroit Ordnance District entered into Supplemental Agreement No. 4 to Contract 11448. Listed upon schedules similar to those in previous supplements was the refund made to plaintiff in the amount of $217,676.69 as allocated and applicable to purchases by plaintiff under prime Contracts 297, 983, 1216 and the eleven additional spare parts contracts. The agreement further stated that this amount of $217,676.69 was part of the total amount *829 which represented the results of the agreed revision of prices pursuant to Contract 11448.
Having been furnished by Detroit Ordnance District with copies of the aforementioned Supplemental Agreements Nos. 2, 3 and 4, Chicago Ordnance District could not reconcile the amounts listed therein as having been refunded to plaintiff with the amounts that had been refunded by plaintiff to it. Upon request, Detroit Ordnance forwarded a tabulation to the Chicago District showing the refunds made by Rockwell to its prime contractors through December 31,1953, and also notified the Chicago District that Rockwell “has advised this office that it has made a refund direct to International Harvester Company of $1,529,137.90 ‘on Contract 1216’ for the calendar year * * Thereupon, in a letter dated April 12, 1956, the Chicago Ordnance District requested plaintiff to “pass this refund” of $1,529,737.90 “on to this District, as you have in the past.” By letter of April 20,1956, plaintiff refused to pass on said refund to defendant because “* * * the subcontract price revision affects deliveries and costs during periods as to which the prime contract is firm and not subject to price revision.”
As a result of prior negotiations, on June 1,1956, Rockwell and the Detroit Ordnance District entered into Supplemental Agreement No. 5 to Contract 11448. The agreement recited, among other things, that for the fiscal year ended December 31, 1954, Rockwell had “refunded to one of the Government prime contractors, namely, International Harvester Company, under Contract DA-11-022-ORD-1216, the sum of $1,529,737.90 * * Listed upon attached schedules captioned “Refunds to Customers” was tire refund made to plaintiff on Contract 1216 in the sum of $1,529,737.90. The agreement further stated that this amount of $1,529,737.90 was part of the total amount which represented the results of the agreed revision of prices pursuant to Contract 11448 between Rockwell and defendant.
Further requests for payment were made upon plaintiff. Finally, by letter dated January 23, 1957, plaintiff was notified it was indebted to defendant for the sum of $1,529,-737.90 under Contract 1216', “representing the amount paid over to you by Rockwell Spring & Axle Company for and *830 inuring to tlie benefit of the Government, relating to axles supplied by it for performance of the contract, in accordance with repricing agreement existing between the Government and ‘Eockwell’.” Upon plaintiff’s refusal to pay, said amount ,of $1,529,737.90 was deducted from amounts otherwise due to plaintiff on Contract 2200 entered into with defendant.
Upon analysis of the foregoing facts we have decided that all cash refunds made to plaintiff by Eockwell were made for the benefit of defendant pursuant to Eockwell’s obligations under its price redetermination contract with defendant. The funds were expressly delivered in trust to plaintiff for the use of defendant. When the funds were wrongfully diverted and retained by plaintiff, defendant was entitled to a setoff ,of $1,529,737.90 which we now affirm, and is presently entitled to judgment on its two counterclaims in the amounts of $35.09 and $24,806.21.
The express practice of operating the price adjustments and voluntary refunds in the aforementioned maimer was begun on September 30, 1953, when plaintiff was informed by Eockwell that in anticipation of formal price redeter-mination pursuant to Eockwell’s Contract 11448 with defendant, Eockwell was going to refund $1,845,338.09 applicable to Contracts 8292, 297 and 983 to plaintiff. Plaintiff was thereafter advised that such refunds were being made directly to prime contractors (rather than defendant) in order to keep the funds in the procurement stream, and thereby available to Army Ordnance for further procurement purposes. Plaintiff was also advised that Eockwell intended to make all refunds stemming from its Contract 11448 with Detroit Ordnance District in the same manner. Thereafter, plaintiff was informed by Detroit Ordnance District that said District insisted that the refund would have to be made through the prime contractor to the Government, and that in all instances, it would be the prime contractor’s obligation to give the Government the benefit of the refund. Plaintiff, therefore, fully cognizant of the conditions, circumstances and terms of the refund, accepted this initial refund of $1,845,338.09 and passed said sum on to defendant.
Under these factual circumstances, it is clear that Eockwell *831 had created an express trust pursuant to which plaintiff was obligated to pass through intact all Rockwell refunds stemming from Rockwell’s obligations under Contract 11448 to ' defendant in order to keep these monies in the procurement stream. An express trust is created where the settlor properly manifests an intention to create a trust. Scott, Trusts, § 23 (1939 ed.) However, neither a particular or technical form of words, written or oral, nor a particular form of conduct is necessary in order to manifest the intention to create the trust. There is sufficient manifestation if there is reasonable certainty as to the property, the objects and the beneficiaries. Colton v. Colton, 127 U.S. 300, 310 (1888) ; Chicago, Milwaukee & St. Paul Railway Co. et al. v. Des Moines Union Railway Co. et al., 254 U.S. 196, 208 (1920); Mahafey v. Helvering, 140 F. 2d 879, 882 ( 8th Cir. 1944); Edgerton v. Johnson, 178 F. 2d 106, 110-111 (7th Cir. 1949) ; Scott, Trusts, §24 (1939 ed.) Accordingly, when plaintiff agreed to the above-mentioned terms of the refund, and then accepted the payment, and turned the payment over to defendant, a trust had been established. Rockwell was the settlor who had created a trust vesting title in plaintiff, as trustee. The equitable title to all such refunds belonged to defendant as cestui que trust.
Having accepted the trust, plaintiff was required to effectuate its objectives, and, because of the fiduciary relationship, was bound to abstain from doing anything inconsistent with the duty or trust imposed upon it by such relationship. As was stated by Chief Judge Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 464 (1928):
* * * Many forms of conduct permissible in a workday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held' to something stricter than the morals of the market • • place. Not honesty alone, but the punctilio of an honor ■. the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending ' ahd inveterate * * *. Only thus has the level of conduct for fiduciaries been kept á level higher than that .■ : trodden by the crowd.' It'will not consciously be lowered .-:by any judgment of this court. ■-
*832 Plaintiff alleges that it is entitled to the Rockwell refunds in issue because the contracts to which they were applicable either had no repricing of subcontracts article (i.e., Supplement 3 to Contract 1216), or had no price re-determination provisions and no repricing of subcontracts article (i.e., the eleven fixed price spare parts contracts).
These arguments are untenable. As reported in Finding 34, a repricing of subcontracts or purchase orders article was not included in Supplement 3 to Contract 1216 between plaintiff and defendant because, for one reason, Rockwell had in the past objected to, the inclusion of such a clause in plaintiff’s purchase orders. Plaintiff knew the objection was made because Rockwell was subject to price redetermination pursuant to Contract 11448 with Detroit Ordnance. When the refunds on Contract 1216 were turned over to plaintiff, plaintiff was well aware that they were made because of the price redetermination clause of Rockwell’s Contract 11448, and that Rockwell expected plaintiff to turn them over to the Government. Plaintiff wras aware of the same factual situation with regard to the refund applicable to the fixed price spare parts contracts. For plaintiff to divert this money, knowing full well why it was being paid to it (as trustee) and for what purpose (for the benefit of defendant), was a clear violation of the terms of the trust. Plaintiff violated the terms of the trust by diverting and retaining the sums of $35.09, $24,806.21 and $1,529,737.90.
Plaintiff’s further contention that Rockwell did not intend the refund of $1,529,737.90 under Contract 1216 to be turned over to the Government as part of Rockwell’s contractual obligations with the Government, but instead, intended it to constitute a routine axle price adjustment under plaintiff’s and Rockwell’s own subcontract arrangements, is also without foundation. The proof shows without doubt that Rockwell considered this payment to be exactly like the others, and to be made for the same purpose. It is true that after Rockwell made this particular payment in the same manner it had adopted in making the other similar payments to plaintiff, Rockwell and plaintiff (at plaintiff’s urging) held a special meeting and revised the papers to make it appear as if the payment represented a routine axle price *833 adjustment on tbe subcontract, instead of a payment pursuant to Rockwell’s contractual arrangements with defendant. Rockwell knew full well why plaintiff wanted the usual procedure to be changed and the papers revised and, despite its clear obligation of trust with defendant, chose to cooperate with plaintiff. Its explanation at the trial was that it knew plaintiff was planning to retain the funds, but it nevertheless felt what happened to the money was essentially a matter between plaintiff and defendant, and not its concern. This form of connivance and violation of trust by the prime contractor and the subcontractor cannot be allowed to becloud the true nature of the payment or to deprive the Government of funds rightfully belonging to it. That Rockwell itself never had any real doubt as to such true nature is evidenced by the fact that in its direct dealings with the Government, it subsequently reported the payment to the Government as having been made to plaintiff pursuant to its own contractual obligations to the Government, and in accordance with the Government’s previous directions under the agreed arrangements, and in the same way as its previous payments. Thus, despite the different forms it ultimately employed at plaintiff’s request, it clearly regarded this payment to plaintiff the same as the others it had made to plaintiff, i.e., for turning over to the Government.
Defendant, as equitable owner of all the aforementioned payments made to plaintiff by Rockwell for defendant’s benefit was justified in offsetting the amount wrongfully retained by plaintiff in the sum of $1,529,731.90. Further, defendant is entitled to prevail in its two counterclaims for further sums wrongfully retained by plaintiff in the respective sums of $35.09 and $24,806.21.
THE FEDERAL EXCISE TAX ISSUE
Pursuant to the excise tax provisions of the Internal Revenue Code then in effect, plaintiff, in submitting bid proposals on military vehicles, computed an excise tax on the body and chassis of 8 percent of the bid price on each model exclusive of the cost of tires and minor accessory items. The body and chassis excise tax was included in the bid proposals and the resulting contract prices. The net result of operating in *834 this manner meant that plaintiff would initially pay the excise tax and then be reimbursed the amount of the tax by defendant through the contract price.
When plaintiff submitted its bid proposal to defendant on July 24, 1953, for the aforementioned 3,750 vehicles to be included in Contract 1216 it included in its cost breakdown an amount representing 8 percent Federal excise tax on the body and chassis of each model. Three days later on July 27, plaintiff advised defendant by letter that, based upon a ruling by the Bureau of Internal Revenue that the body and chassis of 2y2 ton M-108 military vehicles were not subject to Federal excise taxes, the proposal of July 24 should be amended by deleting the chassis and body excise tax on the 475 M-62 vehicles included in that proposal. Plaintiff thereafter requested a specific ruling from the Bureau of Internal Revenue on the M-62 vehicles. The Bureau’s reply to plaintiff by telegram of August 17 stated that the M-62’s were ruled to be “off-the-highway” vehicles and not subject to excise tax under section 3403(a), as amended, of the Internal Revenue Code of 1939, 26 TJ.S.C. § 3403(a) (1952 ed.)
Plaintiff submitted a revised proposal on the 3,750 vehicles on August 26, 1953. Attached to the proposal were cost breakdowns for each, model of vehicle, which breakdowns included an 8 percent excise tax on all vehicles including the M-62. This tax was included by plaintiff despite the July 27th letter to defendant, and despite the ruling of the Bureau of Internal Revenue by telegram of August 17. On September 11, 1953, Supplement No. 3 to Contract 1216, covering the production of the 3,750 vehicles, was executed at the prices bid by plaintiff, including the Federal excise taxes.
On December 22, 1953, plaintiff wrote to the Bureau of Internal Revenue, and requested an “off-the-highway” classification (body and chassis excise tax exemption rating) on various model numbers, including all those in Contract 1216. PÍaintiff received a reply on January 29, .1954. In that reply,. plaintiff was informed that the various vehicles were not subject to the body and chassis tax. As a result of .the ruling, by the Bureau of Internal Revenue, no excise tax was paid by plaintiff on the chassis or body. of any vehicle *835 under Contract 1216. At no time after receipt of either of the rulings did plaintiff inform defendant that the vehicles -being manufactured under Contract 1216 were not subject to the body and chassis excise tax.[6]
• The dispute between the parties concerns the body and chassis excise taxes in the sum of $249,919.47. Defendant contends that since plaintiff was relieved from paying the excise taxes by virtue of the aforementioned rulings of the Bureau, and since the sum ,of the taxes was included in the contract price, plaintiff was, by the terms of the contract, obliged to refund said sum to defendant.[7] Plaintiff does not dispute the fact that any amount of tax included in the contract price must be refunded to defendant. In fact, plaintiff has refunded over $2% million to defendant for taxes plaintiff was relieved -from paying under Contract *836 1216, said taxes being included in the contract price. However, plaintiff contends that the sum of money in issue here ($249,919.47) was not in fact included in the contract price as excise taxes, but was part of the cost of the materials.
Plaintiff uses the changes article[8] of the contract as a basis for its contention. By letter of March 25, 1954, the Chicago Ordnance District requested plaintiff to furnish cost estimates involving proposed contract changes. One of the changes consisted of deleting 323 Model M-51 trucks from the contract, and replacing them with 323 additional Model M-54 trucks. As was previously stated, plaintiff’s basic contract unit price included the 8 percent excise tax. The new unit price that plaintiff submitted to defendant for the additional M-54’s consisted of the old M-54 contract price, plus additions for winches and other items not called for in the original M-54 specifications.
Plaintiff had in effect merely added to the old price the price for additional components. However, in submitting a cost breakdown to defendant, plaintiff reallocated the 8 percent excise tax to the materials component. Plaintiff had determined to retain the amount of the former 8 percent *837 body and chassis excise tax in the price by shifting it into the materials component in an attempt to mitigate the effect of the very close prices it had contracted for on the vehicles covered by Contract 1216.
On April 15, 1954, plaintiff was requested to make cost estimates for other proposed changes. One of these changes consisted of adding 6 Model XM-246 tractor-wrecker trucks, but without fire extinguishers, to the contract. Plaintiff took the old price and made changes for the fire extinguishers in figuring the new price. Plaintiff also, as before, in submitting a cost breakdown, reallocated the amount of the 8 percent excise tax to the materials component.
On January 5, 1955, defendant requested another cost breakdown for further proposed changes. This change consisted of substituting fifteen M-55 vehicles for fifteen M-54’s. Plaintiff again reallocated the amount of the excise tax included in the old price into the materials component of the new price.
All of the above changes were incorporated into the contract at the revised prices quoted by plaintiff.[9] By letter of January 23, 1957, the contracting officer on Contract 1216 demanded payment of the amount of the body and chassis tax which defendant claimed plaintiff owed. The letter stated that plaintiff was indebted to defendant on this matter since the tax was “included in the contract price, paid to you for Federal excise tax, which you were relieved from paying and did not pay to the Director of Internal Revenue.” Plaintiff made payment on all items except the aforementioned changes. Defendant thereafter withheld the amount of $250,637.30 from payments due under another contract. Defendant has conceded that the withholding was excessive to the extent of $717.83, so that the amount presently in issue between the parties on account of the three above-mentioned excise tax items is $249,919.47.
Plaintiff states that when it made the cost breakdown of the trucks involved here the chassis and body excise tax was *838 deleted from the bid price and reallocated to the cost of direct material. Plaintiff believes that in light of this, it is immaterial that defendant can trace the original tax amounts into the new contract prices; that the key issue is how the total price was finally allocated under the change orders. Plaintiff further contends that the Change Form Questionnaire in which the cost breakdown was made, was obviously intended to be used as a request for equitable adjustment under the changes article. Therefore, the contracting officer, when he accepted the bid as shown on this form, accepted its terms with any resulting changes in price, and may not thereafter repudiate the acceptance.
Defendant, on the other hand, insists that the reallocation of the body and chassis excise tax to the materials component on the Change Form Questionnaire did not remove the tax from the prices. Defendant admits that the Change Form Questionnaire was used to make a claim for an equitable adjustment. However, defendant contends that a contractor has no right to adjust the price for an increase in costs not directly attributable to the structural changes ordered.
After close consideration of these questions, we have decided that defendant’s contentions are the more realistic ones, and are in accord with existing law. Plaintiff readily admits a reallocation of the tax amount to the materials component. Such a reallocation was made because plaintiff was losing money on the contract due to its extremely low contract bid. As will be explained in examination of the Price Nedetermination Issue, plaintiff had deliberately bid on the contract at a price on which it was almost certain to incur a loss. When the aforementioned changes were made, plaintiff attempted to minimize this loss by the reallocation of the tax funds to the materials component. While we can understand plaintiff’s predicament, we cannot condone its consequent actions. The very purpose of the inclusion of the changes clause in the contract was to reimburse a party for an increase or decrease in costs or to adjust the delivery schedule as a direct result of such change. The changes clause itself states this fact:
*839 If such changes cause an increase or decrease in the amount of work under this contract or in the time required for its performance an equitable adjustment shall be made * * *. [Emphasis supplied.]
The changes involved here consisted of substitutions of certain models of vehicles for others, with perhaps minor variances. All plaintiff needed to do in filling in the Change Form Questionnaire was to substitute the previous costs for the added models in place of the deleted models and then make adjustments for the minor variances. In breaking down the total cost there was no basis, as a result of the change, for increasing the materials component cost, except to minimize a prior planned loss. Since this increase in the materials component cost was not caused by the changes ordered, but was merely a funneling of the tax funds in order to avoid repayment of these funds to defendant, we hold that the changed contract price included the excise chassis and body taxes, and that defendant was entitled to withhold these sums from amounts due on other contracts with plaintiff.
Plaintiff has raised the point that defendant, by its action in accepting the changes as plaintiff set them out, was estopped from offsetting the sum in controversy at a later date. It is well established law, however, that when payments like these are erroneously made, it is not only lawful but the duty of the Government to recover the payments. Cf. Fansteel Metallurgical Corporation v. United States, 145 Ct. Cl. 496, 172 F. Supp. 268 (1959) and cases cited therein. As we previously mentioned, defendant has conceded that the offset involved here was excessive to the extent of $717.83. Plaintiff is therefore entitled to judgment on this amount..
THE PRICE REDETERMINATION ISSUE
As we mentioned in discussing the Rockwell Issue, defendant sent plaintiff an invitation to bid on 3,750 more trucks on July 3,1953. Defendant informed plaintiff that only one producer of these trucks would remain in production after December 31, 1953, and that in determining which producer *840 would be retained, “price would be the most important consideration.”
Plaintiff was exceedingly anxious to become defendant’s sole supplier of the trucks. To this end, it determined to make every effort to obtain the proposed new contract, even to the extent of sustaining a loss on this particular procurement. To enable it to submit as low a bid as possible, plaintiff determined to make every effort to obtain from its suppliers their lowest prices. Shortly thereafter, and after assembling the necessary data, including its subcontractor’s quotations, plaintiff commenced the preparation of its bid.
In preparing its cost statement for bid purposes on these military vehicles, plaintiff customarily calculated the cost of each truck model on a basis of its carrying its full share of plaintiff’s indirect and overhead costs in addition to the estimated materials costs, upon which it had received quotations, and the direct labor costs, the rates of which were known. These indirect and overhead costs had, through experience over the years, been calculated ,on various percentage bases. Such costs of a vehicle, so calculated, would be considered as bearing the vehicle’s full share of plaintiff’s total costs of manufacturing it, and would be termed as the “fully adjusted costs.” Such fully adjusted costs, plus plaintiff’s customary profit markup of, eight percent, was the normal basis on which plaintiff calculated its prices for these military vehicles.
The usual procedure as described above was followed in initially preparing the cost data for plaintiff’s bid on the proposed 8,750 vehicle contract. The proposed prices were calculated on a fully adjusted cost basis, and were composed of direct materials and labor plus a proportionate share of all overhead and indirect costs, such as direct overhead, material adjustments, the general and administrative expenses, plus eight percent profit.
Upon review of this cost data, plaintiff concluded that a bid based upon its fully adjusted costs plus eight percent profit would, in all probability, not be successful. Thereupon, plaintiff’s officials made a second calculation pf the proposed prices per vehicle on a so-called “specific cost” or “out-of-pocket” basis, a basis plaintiff sometimes used in *841 developing bids in special competitive situations. On this basis certain ,of the indirect and overhead costs which plaintiff customarily included in developing its fully adjusted costs were either eliminated or reduced. By this method, the proposed unit bid price of an M-51 vehicle, for example, was reduced from a fully adjusted cost of $12,552.82 to $11,349.67 on a specific or out-of-pocket cost basis.
On July 24, 1953, plaintiff submitted its bid proposal on the 3,750 vehicles. Accompanying the proposal was a schedule showing the unit price of each type of vehicle, and an estimated unit cost breakdown as to each type. This schedule which showed the bid price ,of each type of vehicle sets forth prices which were exactly equal to the prices developed on the above described specific cost or out-of-pocket cost basis. However, in breaking down the components of such price ,on a material, labor, overhead and profit basis, plaintiff showed amounts for such components in the data submitted with its bid which differed substantially from those previously and privately computed theretofor on the specific or out-of-pocket basis. Instead of building up t,o a price by the normal method of first calculating materials and labor costs, and then adding thereto overhead and profit rates on certain percentage bases (in this case, on less than the usual bases), plaintiff started with the price so previously built upon the specific cost basis, and then first carved out of this price the higher profit and overhead rates it normally used on a fully adjusted cost basis. This left a smaller and inaccurate balance for labor and materials. Then, by retaining the accurate amount for the labor component, the materials component was made to bear the brunt of the overstatements on the profit and overhead items, resulting in an amount for the materials component which was far less than the total quotations for materials from its suppliers as shown on its worksheets. For example, on one of the seven vehicle models, the M-52, the total unit price privately calculated by plaintiff on the specific cost basis was $10,147.60. Of this amount, $8,427.55 had been first privately computed as the estimated cost of “direct material,” on the basis of the total amount actually quoted by plaintiff’s materials suppliers. In the bid data submitted to defendant, however, this[1] *842 “material” item was set forth at $8,082.72, a fictitious amount not supported by any normal accounting methods.
The conclusion is reasonable that in submitting its bid on an expected loss basis in order to become defendant’s sole supplier of' these vehicles on future procurement, plaintiff thus reconstructed the prices in its bid data because it felt that setting the components forth in the above described manner would be favorable to it in the event of further price redetermination proceedings. For example, the failure to make its purported eight percent profit would necessarily be given serious consideration.
Shortly after the submission of its proposal on the 8,750 vehicles, plaintiff was advised that it was the low bidder. The parties then agreed that instead of entering into an entirely new contract, as originally contemplated, the 3,750 vehicles would be covered by a supplemental agreement to the already outstanding Contract 1216. On September 11, 1953, plaintiff and Army Ordnance, acting by the Chicago Ordnance District, provided for the production of the 3,750 vehicles by an agreement which was designated as Supplemental Agreement No. 3 to Contract 1216.
In early September 1954 the Chicago Ordnance District, prior to making a decision whether to demand formal price redetermination under Contract 1216, decided to review plaintiff’s costs on the contract in order to determine whether cost trends were upward or downward.[10]
The price analyst assigned by defendant to review the contract costs preliminary to a decision on price redetermination requested plaintiff to furnish the quotations which it had received from its suppliers for the major components of the vehicles, and upon which the bid and contract price of Contract 1216 were based, as well as plaintiff’s actual current costs for such components. He also requested plaintiff’s current overhead rates for comparison with the rates plaintiff utilized in its bid proposal. In addition, he asked for such *843 figures as plaintiff could furnish which would indicate the total current cost of the individual vehicles.
Plaintiff informed the price analyst that the materials costs shown in the bid proposal were not based on quotations from suppliers, but instead, were based on a competitive bid basis, and no breakdown of that system was available. Plaintiff further informed the analyst that its cost system did not reflect individual vehicle costs and therefore that the total current cost of any of the models could not be determined. Plaintiff did submit to the price analyst, however, its burden rates and suppliers’ invoices.
The analyst was not informed that plaintiff had in actuality obtained the actual materials quotations from suppliers as above mentioned. Nor was the analyst aware of the fact that plaintiff had computed its bid on a specific cost basis which included the full amount of such quotations but which eliminated or reduced overhead rates, adjustments and the profit percentage of eight percent. The price analyst was also not informed, and thus was unaware, that plaintiff had actually compiled figures showing the correct current total costs as of August 18, 1954, of the various models covered by Contract 1216. These figures showed plaintiff’s current costs of producing each such model under Contract 1216, both on a fully adjusted and specific cost or out-of-pocket basis.
The price analyst, having no knowledge that the bid or contract prices of Contract 1216 were calculated by plaintiff on the specific or out-of-pocket cost basis, observed that the current costs of Contract 1216 were higher than the contract or bid prices, and that plaintiff was therefore incurring a loss. The analyst reached this- conclusion in the following manner:
1) Examining the suppliers’ invoices in order to extract the major component costs;
2) Applying the burden or overhead rates given him by plaintiff to the component costs in order to determine the individual vehicle costs;
3) Comparing the individual vehicle costs arrived at in this manner with the individual vehicle costs on the contract or bid prices.
*844 The analyst noted that although the trend of materials costs in performing Contract 1216, as compared to the materials costs of other contracts plaintiff was performing, was downward, the over-all current costs, considering the overhead plaintiff was experiencing, were higher than such costs as set forth in plaintiff’s bid (which presumably reflected accurately plaintiff’s overhead costs at the time of the submission thereof and the execution of Supplement 3). The analyst concluded that the trend of plaintiff’s total cost was up, and that a price redetermination proceeding would not result in the establishment of lower contract prices. He therefore recommended that price redetermination proceedings not be instituted at that time.
Defendant contends in its first counterclaim[11] that had plaintiff accurately set forth the components making up the unit prices in its bid proposals on Contract 1216 so as to accurately reflect the amounts calculated on the specific cost basis (i.e., with reduced overhead and profit figures, and with accurate materials figures, instead of setting them forth as it did with the larger overhead and profit and understated materials costs), or had plaintiff made such specific cost bid data available to defendant’s price analyst, there would have been a forward and downward price redetermination, resulting in a contract price reduction in the amount of $490,533.08, the amount now claimed by defendant in the first counterclaim.
Defendant, in effect, is contending that plaintiff by its above actions has breached the contract, and that the measure of damages should be the amount of the price reduction ($490,533.08) which would have resulted from a price rede-termination. The question of breach and measure of damages, therefore, is contingent upon acceptance of the fact that had defendant been aware of all of the aspects of plaintiff’s cost system, defendant would have demanded price rede-termination negotiations which, in turn, would have resulted in a price reduction of $490,533.08.
*845 This is a difficult question because here we have the unusual situation of being asked to reprice a contractor, who has already suffered a slight loss on a normal fully adjusted cost basis into a much greater loss. Normally, prices are redetermined so as to remove excess profits and to leave contractors with their normal profits, plus any additional profits they may prove they are entitled to as a result of special efforts or contributions, or unusual manufacturing economies, or the assumption of extraordinary risks, etc. The general theory is that a manufacturer should not make abnormal profits from the nation’s war or defense effort. However, there are no abnormal or excessive profits involved in this case.
Under plaintiff’s fully adjusted cost system, the system which accurately reflected the normal projection of costs and profits of Contract 1216, plaintiff would have suffered a loss as a result of its low bid. We have already determined that defendant is entitled to retain the sum of $1,529,737.90 on the 1955 Eockwell refund issue, and the sum of $249,919.47 on the excise tax issue. If defendant were also to prevail on its first counterclaim for $490,533.08 on the price re-determination issue, plaintiff’s loss (on a fully adjusted cost basis) on Contract 1216 as supplemented would be $589,-406.47. If plaintiff prevails, and defendant’s first counterclaim is dismissed, plaintiff will still sustain a loss (on a fully adjusted cost basis) of $98,873.39 on this contract, after deducting the Eockwell refund and excise tax issues. Eegardless of the fact that under a price redetermination on the specific or out-of-pocket cost basis which plaintiff used for its own purpose in actually computing the bid, plaintiff would show a profit, and regardless of the misrepresentations in the bid data as submitted, the out-of-pocket cost basis could not be used as an accurate or realistic method of price redetermination. For example, defendant accepted a profit component of eight percent in awarding the bid to plaintiff.
The price redetermination issue poses a further problem for the court. Under paragraph (b) of paragraph 7 of Supplement 3 to Contract 1216, prices were to be redetermined or' revised by way of a negotiation between the parties. If *846 we determine that there has been a breach of contract and that the measure of damages is the resulting price revision saving, it might be said that the court itself has conducted a redetermination proceeding. However, the record provides a solution for this difficulty.
Although defendant’s price analyst testified that had he known of the true basis upon which plaintiff bid, he would have recommended price redetermination proceedings, we agree with the findings of the Trial Commissioner that it is not now possible to determine whether, had plaintiff set forth the bid showing the bid data in the form defendant considers proper, or had the analyst been given the data he asked for, or should have been furnished, a formal demand for price redetermination would have been made. Similarly, the Trial Commissioner has found, and we agree, that had such price redetermination proceedings been initiated, it is not now possible to determine what would have been the future events (such as the 1955 Rockwell refund herein involved) the parties would have anticipated and considered in formulating prospective or “forward” cost estimates, whether the price redetermination supplement to the contract would have reserved any matters for future consideration, and what, if any, specific amount would have, been determined as an appropriate price adjustment.
The Commissioner likewise found, and we concur, that in addition to considering prospective costs, arriving at predetermined prices including an appropriate profit amount involved a consideration of certain intangible factors, such as the risks assumed by the contractor, its efficiency, and its technical contribution to the defense effort.
Furthermore, the Commissioner has found, and we agree, that regardless of technical legality or power to so redetermine prices under the facts herein involved, and considering only the question of defendant’s practice or policy, the record shows no instance in which prices were reduced in situations where profits on a fully adjusted basis were very low or non-existent, or where, to reduce them, would throw the contractor into a loss position on such cost basis.
The issue as to whether defendant would have requested a price redetermination under these circumstances arises *847 from defendant’s first counterclaim in the amount of $490,-533.08, and the burden of proof on this issue is upon defendant. The crus of the matter is that defendant is required to prove that it would have requested or required negotiations for price redetermination had the actual basis upon which the bid was first computed been known. This requirement is not met by the testimony of defendant’s price analyst that had he known the actual facts, he would have recommended price redetermination proceedings. Defendant’s failure to meet this burden of proof leaves us to mere speculation as to whether or how much defendant was damaged by plaintiff’s withholding information from defendant, and by its misrepresentations in the cost data submitted with its bid. Both at the time of the execution of Contract 1216 and of Supplement 3, defendant’s procurement officers were well aware ,of plaintiff’s current materials costs and all other costs; on examining plaintiff’s bid data, they must have been also aware that the unit materials cost breakdowns were clearly underestimated. Plaintiff’s actions in this regard were clearly not above board, but this unsatisfactory conduct does not provide sufficient evidentiary basis to find for defendant on its counterclaim. Defendant’s first counterclaim is accordingly dismissed due to defendant’s failure to prove that it would have requested price redetermination proceedings, even if the bid and contract cost data, and other information had been submitted in the form that defendant contends was correct and proper, and that such proceedings would have led to the end result sought by the counterclaim.
Judgment should be entered as follows:
1. On the Bockwell payment claim of $1,529,737.90, the petition is dismissed.
2. On the excise tax claim, plaintiff is entitled to judgment in the amount of $717.83. The petition as to the balance of the claim in the amount of $249,919.47 is dismissed.
3. The first counterclaim of $490,533.08 is dismissed.
4. On the second counterclaim, defendant is entitled to judgment in the amount of $35.09.
5. On the third counterclaim, defendant is entitled to judgment in the amount of $24,806.21.
*848 6. The fourth counterclaim is dismissed.
Accordingly, judgment is entered for defendant in the total amount of $24,123.47.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of New Jersey, with its principal office and place of business in Chicago, Illinois. Plaintiff has been for many years a manufacturer on a large scale of various types of farm machinery, tractors, motor trucks and other equipment, including vehicles for commercial and military use.
2. For many years plaintiff has manufactured, assembled and produced many thousands of motorized heavy duty vehicles and parts therefor pursuant to contracts between it as prime contractor and defendant, acting through the Ordnance Corps of the Department of the Army (“Army Ordnance”). Among said vehicles were various models of a 5-ton, 6x6 (meaning six wheels, all power driven) heavy duty motor powered military vehicles.
THE ROCKWELL ISSUE
3. Under date of June 19, 1950, plaintiff and defendant, acting through Army Ordnance (negotiated by the Detroit Ordnance District), entered into a negotiated fixed price contract, designated as Contract No. DA-20-018-OBD-9197 (“Contract 9197”) for the production by plaintiff of 932 5-ton 6x6 trucks of various models, plus miscellaneous parts, materials and documents, for the total amount of $11,-131,222.20. The contract contained (Article 27) a “Price Adjustment” article which provided that, “because of the nature of the work called for by this contract and the great uncertainty as to the cost of performance hereunder,” the contract price could, after the completion or termination of the contract, be increased or decreased in accordance with the provisions set forth in the article. One of the provisions was that “In no event shall the revised price exceed the sum of *849 $12,021,719.98.” There was, however, no limitation on a price decrease.[1]
4. Contract 9197, the first of a series of contracts entered into by plaintiff for the manufacture of such trucks (and sometimes referred to as the “pilot” contract), was part of a large scale procurement program by Army Ordnance of 5-ton 6x6 military vehicles (as well as 214-ton vehicles) which began in 1950 as a result of the Korean war which broke out in June 1950. Contracts for the production of such vehicles were also let by defendant to other manufacturers. An important component of these vehicles was “axle sets,” which included front and rear axles, brakes, a transfer case from which the power to the gears in the front axle was transmitted, and hook-up parts, consisting of shafts running from the transfer case to the front axles and the two rear axles. As part of this huge military vehicle program, the Timken-Detroit Axle Company, a corporation organized under the laws of Ohio, with its principal place of business in Detroit, Michigan (hereinafter referred to as “Timken”), an experienced axle producer, in 1950 first undertook, as a subcontractor to the various Government prime contractors, the production of the specialized axle sets required for the vehicles. It early established itself as the sole producer of these parts and soon became flooded with orders therefor which were far beyond its capacity to fulfill. Included in such orders were the axle sets required for Contract 9197, upon which Timken, on July 26, 1950, quoted a price of $2,850.42 for each standard axle set, i.e., the type of axle set supplied by Timken for use in the majority of the 5-ton 6x6 military vehicles. This price remained for the duration of production under this contract.
5. (a) Under date of December 4, 1950, plaintiff entered into a “letter contract,” designated as Contract No. DA-089-OBD-8292FS (“Contract 8292”), with defendant, acting through Army Ordnance (negotiated by the Ordnance Tank Automotive Center, Detroit, Michigan), for the pro *850 duction by plaintiff of a large number of 5-ton 6x6 vehicles, spare parts and related supplies (designated as Items 1-19), Under this letter contract, the parties agreed to negotiate looking to the execution of a definitive contract, pending the execution of which plaintiff was authorized to spend not in excess of $47,000,000. It was also provided that the definitive contract “will include the Price Revisión Article set forth in Joint Procurement Regulations 4-805.5 (Form II B) (with a maximum upward price limitation of 15% of the basic contract amount).” By Supplement No. 1 thereto, dated December 21, 1950, the expenditure authorization was increased to $55,000,000.
(b) Plaintiff again placed with Timken the orders for the axle sets required under this contract. Prior to the execution of the contract plaintiff, on October 12, 1950, had received a quotation from Timken of $3,975 per standard axle set. On October 27,1950, in reference to this price quotation, plaintiff sent a letter to Timken stating as follows:
This will confirm our telephone conversation today * * * in which you indicated a set price of $3,975.00 * * *.
You advised that the $3,975.00 per set could be considered as the guaranteed maximum price for these units and that the price might be lower if costs for tooling, material and labor so warranted.
6. (a) Its facilities being insufficient to satisfy the demands placed upon it by the 2%- and 5-ton 6x6 military vehicle program undertaken by Army Ordnance, Timken turned to defendant for assistance. It sought to have defendant finance the building of a new Timken plant where the required increased production of the axles could take place, but this proposal did not materialize. It was finally agreed that if Timken itself financed the acquisition of the land and the buildings for a new plant at Newark, Ohio, defendant would furnish it, by a “facilities contract,” with the great bulk of the required machinery. However, since Timken had no prime contracts with defendant, the problem was to find a basis for entering into such a facilities contract. Consequently, it was ultimately agreed that Timken would, in addition to the facilities contract, also enter into another *851 contract with defendant under which Timken would agree to maintain a certain capacity of production to fulfill the axle needs of the military vehicle program.
(b) Under date of May 18, 1951, Timken entered into a Facilities Contract, bearing Contract No. DA-20-018-OKD-11447 (“Contract 11447”) with defendant, acting by the Army Ordnance Corps (and negotiated by the Detroit Ordnance District). The contract provided that, since “there is in existence or in negotiation at this time certain supply contracts between certain Prime Contractors with the Government and the Contractor [Timken],” Timken would acquire for the Government, at an estimated cost of approximately $12,600,000, certain machinery or facilities to be installed in its plant at Newark, Ohio, the title to such facilities to be in defendant, and that defendant would also deliver certain facilities to Timken. The contract further provided that defendant granted Timken the right to use the facilities, “without the payment of rental therefor” (Art. III-A), for the production of “axles and related parts for military vehicles being furnished” under 10 listed prime contracts between defendant and Neo Motors, Studebaker Corporation, plaintiff, Diamond T Motor Car Company, and Fruehauf Trailer, “and such other contracts as the Contracting Officer may from time to time hereafter approve in writing.” Plaintiff’s listed contracts were 9197 and 8292, hereinabove referred to. Timken also agreed that no part of the cost of the facilities covered by the contract would be included, in the form of depreciation or amortization, in the price of any items produced on the facilities. It was further provided that “whenever it is determined that all or any part of” the facilities “are no longer required in the performance of the Contractor’s prime or subcontracts for which the facilities have been authorized for use,” Timken would keep the facilities in a standby condition and subject to defendant’s removal orders.
(c) On the same day, and executed contemporaneously with the Facilities Contract, Timken and defendant, acting through Army Ordnance (and also negotiated by the Detroit Ordnance District), entered into a “Negotiated Service Contract,” bearing Contract No. DA-20-018-OBD-11448 (“Contract 11448”). Under this contract, it was agreed that, since *852 defendant desired Timken to “establish- and maintain a productive capacity for the production of Axle Sets for military use capable of producing such sets at” a certain rate, and defendant desired to assist Timken in maintaining such capacity, defendant and Timken contemporaneously entered into the Facilities Contract, Timken agreed to establish a productive capacity “at the rate of (i) not less than 4,500 such Sets for 2%-ton 6 x 6 M 84 Trucks, and (ii) not less than 1,200 such Sets for 5-ton 6 x 6 M 41 Trucks, per month, on an around-the-clock basis for a 6-day week,” and to maintain such capacity during the term of the Facilities Contract.
The contract further contained, in Article IY, provisions whereby Timken’s subcontract prices could be increased or decreased. The article provided in pertinent part as follows:
ARTICLE IV
Contractor and the Government agree as follows:
(a) The prices in effect as of any given time pursuant to the provisions of any subcontract between Contractor and any Prime Contractor which is a party to any Prime Contract mentioned or described in * * * the Facilities Contract (each such subcontract under any such Prime Contract being herein called a “Eelated Subcontract”) may, subject to the provisions of Paragraphs (i) and (j) of this Article IY, be increased or decreased in accordance with the provisions of this Article IY in the same manner and to the same extent as if each such Eelated Subcontract were between the Government and Contractor.
(b) Times for Negotiation — (1) Upon the completion of 40 percent of the Axle Sets to be furnished under any Eelated Subcontract, the parties to this Contract shall negotiate to revise the prices of all items theretofore and thereafter to be delivered under such Eelated Subcontract. Within 5 days after the completion of delivery of said 40 percent under such Eelated Subcontract, Contractor shall furnish the Contracting Officer the statements and data referred to in Paragraph (c) of this Article. At any time and from time to time after the completion of delivery of said 40 percent under any Eelated Subcontract subject to the limitations specified in this Article, either the Government or the Contractor may deliver to the other, a written demand that the parties to this Contract negotiate to adjust the prices *853 under such Related Subcontract. No demand shall be made prior to 90 days after the completion of delivery of said 40 percent and thereafter neither party to this Contract shall make such a demand having an effective date within 90 days of the effective date of any prior demand. Each demand shall specify a date (identical with or subsequent to the date of the delivery of the demand) as of which the revised prices shall be effective as to deliveries made thereon and thereafter pursuant to such Related Subcontract. This date is hereinafter referred to as “the effective date of the price revision.” For purposes of the first negotiation contemplated by this Article, the date of execution of this Contract shall be deemed to be the effective date of the price revision. Any demand under this Article, if made by Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in Paragraph (c) of this Article. If such demand is made by the Government, such statements and data will be furnished by the Contractor within 30 days of the delivery of the demand.
«!***:[:
(c) Submission of Data — At the time or each of the-times specified or provided for in Paragraph (b) of' this Article, Contractor shall submit (i) a new estimate and breakdown of the unit cost of the Axle Sets which are the subject matter of any Related Subcontract in respect of which a demand is made pursuant to Paragraph (b) of this Article and the proposed prices of items remaining under such Related Subcontract after the effective date of the price revision, itemized so far as practicable, in the manner prescribed by War Department Standard Form No. 105; (ii) an explanation of the difference between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production under such Related Subcontract to the extent that they are available at the time or times of the negotiation of the revision of prices thereunder ; and (v) any other relevant data usually furnished in the case of negotiation of prices under a new Contract. The Government may make such examination of the Contractor’s accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.
*854 .(d) Negotiation — (1) Upon the filing of tbe statements and data required by paragraph (c) of this Article, the Contractor and the Contracting Officer will negotiate promptly in good faith to agree upon prices for .items to be delivered pursuant to the Related Subcontract in respect of which negotiations are being conducted, on and after the effective date of the price revision. Negotiations for price revisions under this Article shall be conducted on the same basis, employing the same types of data (including, without limitations, comparative prices, comparative costs, and trends thereof) as in the negotiation of prices under a new Department of the Army contract.
(2) After each negotiation the agreement reached will be evidenced by an agreement between Contractor and the Government stating the revised prices to be effective with respect to deliveries on and after the effective date of the price revision (or such other later date as the parties may fix in such agreement) pursuant to any Related Subcontract covered by such Agreement and Contractor will adjust the prices under any such Related Subcontract in accordance with such Agreement.
‡ ‡ ‡ $ *
(i) Notwithstanding any of the provisions of this Article IV to the contrary, Contractor shall not demand pursuant to the provisions of this Article IV a revision of the price then in effect under any Related Subcontract (1) which would result in a revised price which is more than 10% in excess of the price initially fixed in such Related Subcontract, or (2) where such related subcontract specifically forbids any upward adjustment in the prices specified in such Related Subcontract.
(j) Nothing in this Article IV contained is intended to be construed or shall be construed to prevent Contractor from adjusting or revising upward the prices specified in any Related Subcontract at the time, or times, in the manner and to the extent provided in such Related Subcontract and without resort to, or compliance with, the provisions of this Article and notwithstanding anything in this Article IV to the contrary, Contractor shall have and retain the unrestricted right to adjust and revise upward the prices specified in any Related Subcontract at the time, or times, in the maimer and to the extent provided in such Related Subcontract, provided, however, that such revision or adjustment so made by Contractor shall be subject to the rights of the Government under this Article IV to demand a downward re *855 vision of sncb revised or adjusted price, provided always that the Government’s right to demand a downward revision of such revised and adjusted price may be made without regard to the 90 day limitations set forth in paragraph (b) (1) above.
‡ ‡ $
(d) Due to the multitude of orders received by Timken involving varying quantities and delivery schedules, it proved impracticable for Timken and the Detroit Ordnance District to comply with the requirements of subparagraph (b) of Article IY of Contract 11448 by repricing individual subcontracts at 40 percent of completion. Accordingly, some time after entering into Contract 11448, Timken and the District informally agreed that prices would instead be redetermined by repricing retroactively all sales made by Timken to Government prime contractors on the basis of Timken’s gross receipts from its subcontracts during Timken’s fiscal year. As will hereinafter appear, this modification in the contract terms to reprice on an overall fiscal year rather than an individual subcontract basis received formal recognition in supplements to Contract 11448 subsequently executed.
7. By a Supplemental Agreement No. 3, dated June 1, 1951 (negotiated by the Chicago Ordnance District), to Contract 8292 (finding 5), plaintiff and defendant entered into the definitive contract contemplated by the letter contract. Said supplemental agreement increased the number of the 5-ton 6x6 trucks of various models to be produced and delivered by plaintiff to 7,687 for a total contract price (including miscellaneous parts, materials, and documents) of $153,008,965.68, subject however to adjustment upward or downward in accordance with the Price Bedetermination Article (Article 6), such revised price not to exceed $191,261,207.10 (said increase being equal to 25 percent of the contract price) .[2]
*856 The Price Redetermination Article 6 (being the aforementioned Form II B) provided in part as follows:
(b) Times for negotiation.
(1) At the end of the Contractor’s interim accounting period in which delivery of 80% of the vehicles to be delivered under Item 1 to 11 inclusive of paragraph (a) of Article 1 “Scope of the Contract,” is completed, the parties shall negotiate to revise the prices of all items to be furnished under paragraph (a) of Article 1, “Scope of the Contract”, theretofore and thereafter to be delivered. . Within thirty (30) days after the end of such, interim accounting period, the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this Article. At any time and from time to time after the end of such interim accounting period, subject to the limitations specified in this Article, either the Government or the Contractor may deliver to the other written demand that the parties negotiate to adjust the prices under this contract. No demand shall have an effective date prior to 90 days after the end of such interim accounting period and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand. Each demand shall specify a date (identical with or subsequent to the date of delivery of the demand) as of which the revised prices shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as “the effective date of the price redetermination”. For the purposes of the first negotiation contemplated by this paragraph, the date of execution of this contract shall be deemed to be the effective date of the price redetermination. Any demand under this Article, if made by the Contractor, shall state briefly the ground or grounds therefor and within thirty (30). days after the delivery of the demand the Contractor will furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this Article. If the demand is made by the Government, such statements and data will be furnished by the Contractor within thirty (30) days of the delivery of the demand.
(c) Submission of data. — At the time or each of the times specified or provided for in paragraph (5) of this clause the Contractor shall submit (i) a new estimate and breakdown of the unit cost and the proposed prices of the items remaining under this contract after the effective date of the price redetermination, itemized so *857 far as is practicable in the manner prescribed by WD Form 105; (ii) an explanation of the differences between the original (or last preceding) estimate and the new estimate; (Hi) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (w) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices under a new contract. The Government may make such examination of the Contractor’s accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.
(d) Negotiations
(l) Upon the filing of the statements and data required by paragraph (c) of this clause, the Contractor and the Contracting Officer will negotiate promptly in good faith to agree upon prices for items to be delivered on and after the effective date of the price redetermination. Negotiations for price redetennination under this clause shall be conducted on the same basis, employing the same types of data (including, toithout limitations, comparative prices, comparative costs, and trends thereof) as in the negotiation of prices under a new contract.
(B) After each negotiation the agreement reached will be evidenced by. a supplemental agreement stating the redetermined prices to be effective with respect to deliveries on and after the effective date of the price redeter-mination (or such other later date as the parties may fix in such supplemental agreement).
* * * * *
8. (a) On June 30, 1951, plaintiff and defendant, acting through Army Ordnance (negotiated by the Chicago Ordnance District), entered into a contract, designated as Contract No. DA-11-022-OBD-297 (“Contract 297”) for the production by plaintiff of 6,260 5-ton 6x6 trucks of various models, plus spare parts, for the total amount of $113,868,-707.50, subject, however, to adjustment upward or downward in accordance with the “Price Kedetermination” Article (Article 6), the redetermined price not to exceed 25 percent *858 of the contract price.[3] The Price Eedetermination Article 6 contained provisions similar to those contained in Supplemental Agreement No. 3 to Contract 8292 dated June 1,1951 (finding 7). The contract also contained an Article 10, headed “Kepricing of Subcontracts or Purchase Orders” which provided as follows:
article 10. Eepricing of Subcontracts or Purchase Orders.
Except as hereinafter provided, subcontracts or purchase orders covering the following components or services:

Item,

No. Description

1. Frames
2. Spare Parts Packing
3. Universal joints & propeller shafts
4. Bodies
5. Cabs

Item

No. Description

6. Engines
7. Hoists and Winches
8. Transmissions
9. Axles
10. Wrecker Cranes
will contain price revision provisions substantially the same as those set forth in Article 6 hereof pursuant to which the subcontract or purchase order prices may be increased or decreased from time to time, prospectively or retroactively. The upward limitation to be provided in the price revision article to be included in a subcontract or purchase order shall be subject to the approval of the Contracting Officer. It is understood that the price revision of subcontracts or purchase orders for items 1. to 10. above will be performed directly by the Government. Subcontracts and purchase orders for the above items will specifically state that the Government will perform the price revision. The Contractor shall forward two copies of each such subcontract or purchase order, or amendment thereof, to the Contracting Officer after execution.
In the event an intended subcontractor for any such components or services refuses, after negotiation in good faith by the Contractor, to accept a subcontract or purchase order containing such provisions, the Contractor shall promptly report such fact to the Contracting Officer for instructions. If the Contracting Officer does not notify the Contractor within 30 days (or such longer *859 or shorter time mutually agreed upon) of the acceptance of such price revision provisions by the intended subcontractor, or suggest a mutually satisfactory alternate solution, the requirements of this article shall be deemed to be waived with respect to that particular subcontract or purchase order.
It is recognized that price revision of the prime contract may occur prior to the price revision of a subcontract or purchase order and it is also recognized that price revision of subcontracts and purchase orders will take place during periods when the unit prices in the prime contract are fixed. Should the price of any subcontract or purchase order be redetermined during any period when the prime contract price is fixed, the prime contract price will be correspondingly increased or decreased notwithstanding the provisions of Article 6 of the contract.
Either the Government or the Contractor may demand an accounting with respect to such increases and decreases at any time provided that such accountings shall not occur of tener than once each ninety (90) days. Within ten (10) days after demand has been made either by the Contractor or the Government for an accounting with respect to such price increases or decreases, the Contractor will furnish to the Government a list ox such increases or decreases which have occurred between the effective date of the last accounting and the date of the demand. The Government may make such examination of the Contractor’s accounts, records and books as the Contracting Officer may require, and may make such audit thereof as the Contracting Officer may deem necessary for the purpose of any such accounting. The Contractor will make a similar provision for the right of audit by the Contractor and/or the Government in the subcontracts covering the components listed above.
(b) Timken’s previously quoted price of $3,975 per standard axle set applied to the initial production under this contract.
9. (a) By letter dated August 24, 1951, Timken advised plaintiff that Timken had “entered into an agreement with the Detroit Ordnance District regarding the axle sets” being furnished on plaintiff’s purchase order applicable to Contract 8292, “subject to price redetermination by negotiation between the Detroit Ordnance District and the Timken-Detroit Axle Company”; that it would “probably be some *860 time before such negotiation” would be completed “but in the meantime we have reviewed our costs and are revising the prices” on Contract 8292 “for the period May 18, 1951 through August 18, 195.1, from $8,975.00 to $3,570.00 per set”; that a credit memorandum adjusting the previous billings covering shipments on the contracts for such period would issue; and that billings for the 90-day period commencing August 19, 1951, would be made at the price of $3,570 per set, “subject to adjustment, retroactively dependent on our cost experience for that period but not to exceed the price originally quoted of $3,975.00 plus 15% escalator upward.” On August 31,1951, Timken forwarded to plaintiff 13 credit memoranda totaling $317,391.97 representing retroactive price adjustments on plaintiff’s purchase orders under Contract 8292 for the period May 18 through August 18, 1951. Each of these credit memoranda set forth plaintiff’s purchase order number, Timken’s part number, Tim-ken’s invoice number, the amount for which Timken originally billed plaintiff for each specified part, the amount of the retroactive price adjustment allocable to each specified part, and the new adjusted price of each specified part.
(b) Plaintiff’s books and records were adjusted to reflect lower costs by the amount of the credit memoranda.[4] No cash refund was made to plaintiff in connection with these price adjustments and credit memoranda.
(c) In a letter dated September 17, 1951, plaintiff acknowledged that billings for shipments for the 90-day period commencing August 19, 1951, would be subject to adjustment retroactively, dependent on Timken’s cost experience for that period and upon any price redetermination between Timken and the Detroit Ordnance District.
10. On November 30,1951, plaintiff and defendant, acting through the Chicago Ordnance District, by Supplemental Agreement No. 6, amended Contract 8292 so as, among other things, to incorporate into the contract (as Article 13), the “Repricing of Subcontracts or Purchase Orders” article. Since only one of plaintiff’s subcontractors, the McCarthy Root Company of Detroit, Michigan, which was plaintiff’s *861 subcontractor for preparing, packaging and packing the spare parts to be delivered under Contract 8292, agreed that subcontracts or purchase orders should contain repricing provisions, the new article was made applicable only to such named subcontractor. In all other pertinent respects, the article was similar to Article 10 of Contract 297 (finding 8(a)).
11. (a) By letter dated December 7, 1951, Timken, referring to its letter of August 24,1951 (finding 9 (a)), “relative to our entering into an agreement with the Detroit Ordnance District regarding the axle sets which we are furnishing on your purchase order applicable to” Contract 8292 “being subject to price redetermination by negotiation between the Detroit Ordnance District and” Timken, advised “that for the period from August 19,1951 through November 18,1951, no retroactive adjustment to the billing at the price of $3,570.00 net per set will be made.” The letter further stated that the price for the period from November 19,1951 through February 18, 1952, would remain at $3,570 per set, but that such price “will be subject to adjustment retroactively dependent on our cost experience for that period but not to exceed the price originally quoted of $3975 net per set plus 10% escalation upward.”
(b) By letter of January 9,1952, Timken advised plaintiff that, despite its letter of December 7,1951, on Contract 8292, “it is now apparent that we will, as a result of increases in our costs, have to make a substantial retroactive billing adjustment for the period from November 19, 1951 thru February 18,1952” and that it would handle the matter by billing “all 5 Ton 6x6 material shipped on and after January 1, 1952 at a price of $3975. net per set * * *.” Timken stated' that on such basis “it is our belief that there will be little, if any, retroactive billing necessary for the period from November 19, 1951 thru February 18, 1952; however, we must still reserve the right to adjust the billing for this period retroactively dependent upon our cost experience for that period, but not to exceed the price originally quoted of $3975.00 net. per set plus 10% escalation upward.”
However, on February 12, 1952, Timken advised there would be no retroactive price adjustment for the Novem *862 ber 19,1951-February 18,1952 period and that for the period February 19-May 18,1952, the price would remain at $8,975, but again subject to retroactive adjustment depending on cost experience and not to exceed $3,975 plus 10 percent.
12. On or about March. 14, 1952, plaintiff submitted purchase orders to Timken for axle sets to be used in performing Contract No. 297. Attached to these orders, all of which were dated March 14,1952, was a price redetermination provision applicable to Timken’s price to plaintiff in compliance with Article 10 of Contract 297 (finding 8(a)). However, by letter to plaintiff dated March 25,1952, Timken took exception to the price redetermination provision in the purchase orders since “we operate under Facilities Contract No. DA-20-018-OKD-11447 and a Companion Contract, DA-20-018ORD-11448, which contain price redetermination clauses covering axles run over the facilities. We, therefore, are governed by agreement with the Detroit Ordnance District.”
■ 13. By letter of April 2, 1952, Timken advised plaintiff that effective April 1, 1952, the standard axle set price (applicable to Contracts 8292 and 297) would be reduced to $3,675 and that it was Timken’s “hope” that such price would apply through June 30, 1952. The letter stated, however, that such current quotation “does not in any way affect the maximum price chargeable of $3975.00 net per set plus 10% escalation as previously quoted.”
14. By letter of June 9, 1952, to the Chicago Ordnance District, plaintiff forwarded a copy of Timken’s letter of March 25, 1952 (finding 12), and requested “that price re-determination for this vendor” on Contract 297 “be waived.”
15. Under date of June 26, 1952, plaintiff and defendant, acting through Army Ordnance (negotiated by the Chicago Ordnance District), entered into a negotiated contract designated as Contract No. DA-11-022-ORD-983 (“Contract 983”), for the production by plaintiff of 1,087 5-ton 6x6 trucks of various models, plus spare parts, for the total amount of $20,576,712.55. The contract contained a Price .Redetermination Article (Article 6) which was similar to the provisions contained in Contracts 8292 and 297 although *863 here subject to a 20 percent upward limitation.[5] The contract also contained a “Repricing of Subcontracts or Purchase Orders” Article (Article 9) which was identical to the provisions of Article 10 of Contract 297 (finding 8(a)). Two days later, by Supplemental Agreement No. 1, dated June 28,1952, which took the form of a Letter Contract, the contract was increased by $22,150,122.10 to cover the cost of 800 additional vehicles, thus making the total number of vehicles 1,887, and the total consideration $42,726,834.65.[6]
16. By letter of July 3,1952, to plaintiff, the Chicago Ordnance District advised that, with respect to plaintiff’s notifications “that various subcontractors have taken exception to price redetermination” (including plaintiff’s letter of June 6, 1952, concerning Timken’s exceptions to plaintiff’s purchase orders on Contract 297), the District was negotiating “to secure acceptance of a repricing article” by the objecting subcontractors. On July 22,1952, the District advised plaintiff that it was still negotiating with a number of subcontractor “who have declined to accept the Repricing Article” in an effort to have them accept repricing under plaintiff’s Contracts 8292, 983 and 297. However, by letter of July 24, 1952, plaintiff advised the District that it would be impossible for plaintiff to meet its production schedule on Contract 297 unless plaintiff received immediate acceptance by the objecting subcontractors of plaintiff’s purchase orders with a price redetermination provision, or a waiver of the provision as provided 'by Article 10 of the contract. Finally, by letter of July 30,1952 concerning Contract 297, the District advised plaintiff that five named subcontractors had accepted price revision; that with respect to seven objecting subcontractors, including Timken, plaintiff was, “because of the urgency of the program and to enable you to maintain pro- *864 duc'tion and deliveries of the supplies as required * * * authorized to release your purchase orders unconditionally”; and that purchase orders issued to Timken “will be subject to redetermination by Detroit Ordnance District under the facilities Contract, No. * * * 11447, and Companion Contract, No. * * * 11448 which contain price determination clauses covering axles run over the facilities.” Plaintiff thereupon, on August 1, 1952, notified Timken to disregard the price redetermination provisions in the purchase orders it had originally issued under Contract 297.
17. (a) By letter of July 24,1952, Timken advised plaintiff that the then current $3,675 price per axle set would continue for the period commencing July 1, 1952, and that again it was Timken’s “hope” that this price would apply through September 30, 1952. The “maximum price chargeable” ($3,975 plus 10%) was, however, still reserved.
(b) By letter of October '6, 1952, Timken advised plaintiff that, with respect to their “agreement on the price of $3975.00 net per set plus 10% escalation upward being a maximum price for a standard set of units for the 5-ton 6 x 6,” the reduced $3,675 price would apply through September 30, 1952, and that it was “hopeful” it would be able to continue such lower price through December 31,1952.
18. (a) By letter dated December 19, 1952, plaintiff advised the Chicago Ordnance District that in its attempts to place purchase orders for material for Contract 983, it was “experiencing difficulty in securing acceptances from those suppliers who had previously refused to accept Price Bede-termination under” Contract 297. Plaintiff requested that, with respect to seven named subcontractors, including Tim-ken, the contracting officer waive the price redetermination requirements of Contract 983 in order “to enable our Purchasing Department to secure acceptances and establish production schedules.” The same reasons that had resulted in the District’s granting the similar waiver on Contract 297, i.e., the urgency of the program and, as to Timken, the existence of Timken’s Contracts 11447 and 11448 with defendant (finding 16) led the District to grant plaintiff’s request on Contract 983, and by letter dated December 23, 1952, the con- *865 traeting officer authorized plaintiff to release its purchase orders under Contract 983 to Timken and the other six subcontractors “without price redetermination.”
(b) Plaintiff commenced its purchases from Timken on this contract at a standard axle set price of $3,675 per set. On December 23,1952, Timken advised plaintiff that it was not “at this writing in a position to make any long term commitments as to prices”, but that it would maintain the current $3,675 price through January 30,1953. By letter of January 26, 1953 to plaintiff, Timken stated its intention to continue billing at this price through February 28, 1953. This price was subsequently adjusted to $3,677.34, and applied through March 31,1953.
19. (a) On December 29,1952, the Chicago Ordnance District requested plaintiff to submit a proposal for the supply of 854 5-ton 6x6 military vehicles and spare parts. By letter of January 12, 1953, plaintiff submitted such a proposal in the amount of $22,152,273.78, and also stated:
This proposal is submitted as a firm price without request for upward price revision. In view of the experience which both the Government and our Company have had in the production of these vehicles, we do not feel that the inclusion of Price Bedetermination Article will be of any benefit either to the Government or ourselves, especially in view of the expense and delay that we have experienced in the past. However, if it is deemed necessary by Ordnance to include Price Be-determination Article in the definitive contract, including sub-contractors, we assume that this requirement will be waived on those suppliers who have refused to accept Price Bedetermination on previous contracts.
Submitted also were Estimated Unit Cost Breakdown sheets, showing the various components (i.e., labor, materials, overhead, etc.) of the quoted prices of the models involved in the proposed contract, and the amount plaintiff assigned to each component making up the quoted price. Plaintiff also stated in the letter:
Production and deliveries will be in accordance with schedules to be established by Ordnance in conjmiction with the Heavy Duty Tactical Truck Integration Committee. At the present time, it is estimated these deliveries will be made in the first quarter of 1954.
*866 The Committee referred to was one composed of representatives of the Government, the various prime contractors producing military vehicles for Army Ordnance, and the major suppliers. Such huge demands were being made on subcontractors and suppliers by the prime contractors in connection with the program that it was found necessary to allocate the supplies on various percentage bases as between the prime contractors in order to maintain orderly production schedules. The Committee met periodically to arrange for such allocations.
(b) Following the submission of plaintiff’s proposal, plaintiff’s and defendant’s representatives conferred about a proposed contract to cover this procurement, during which conferences the question of price redetermination provisions to be included in the contract was discussed. As a result, plaintiff agreed to accept a so-called “Modified Type II-B Repricing Article” which would provide for downward revision only but resisted a similar provision that would be applicable to its subcontractors. Finally, in a letter dated February 17, 1953, to the District, plaintiff stated:
In accepting such a proposal, we cannot agree to extend price redetermination to our suppliers or sub-contractors, many of whom have already notified us they will not accept price revision downward only. The inclusion of price redeterminatioii article in our purchase orders handicaps our purchasing department in negotiating any reductions with suppliers. Of the 10 principal suppliers under Contract No. DA-11-022-ORD-297, 7 have refused to accept price redetermination, and we have been notified by our parts packaging supplier and Austin-Western Company, supplier of the Wrecker Crane, that they will not accept price redetermination downward only. Our previous supplier of Cargo Bodies, Gar Wood Industries, have also refused to accept price redetermination. The inclusion of price redetermination of suppliers in the definitive contract would only create confusion and delay in securing material, without any benefit to the Government.
Consequently, and for the same reasons that led it to waive the subcontractors’ repricing provisions under the previous contracts, the District concluded that a “Repricing of Sub *867 contracts or Purchase Orders” article would not be included in the contract covering this procurement.
20. Prior to January 29, 1953, plaintiff had, pursuant to the Price Redetermination Article of Contract 8292 (finding 7), submitted a statement of the costs incurred in the performance of the contract to the production point specified in the Article (30%) and also prior to said date, defendant conducted an audit of said costs. Thereafter, plaintiff and defendant negotiated a settlement which resulted in a net increase in the total contract price then in effect. By Supplemental Agreement No. 13 dated January 29,1953, to said Contract 8292, the parties consummated said settlement by increasing the then total contract price of $168,235,218.69 by $3,169,760.01, making the new contract price $171,404,978.70.
21. Under date of March 31,1953, plaintiff and defendant, acting through Army Ordnance (negotiated, as stated, by the Chicago Ordnance District), entered into a negotiated contract designated as Contract No. DA-11-022-ORD-1216 (“Contract 1216”) for the production by plaintiff of 854 5-ton 6x6 trucks of various models, plus certain services (the spare parts previously included in plaintiff’s proposal being eliminated), for the total amount of $19,909,823.69. The contract contained the usual Form II-B Price Redetermination Article (Article 6), but contained the following further provision:
(b) Price Redetermination.
(1) The prices for vehicles stated above may be decreased in accordance with Article 6 entitled “Price Redetermination”. Anything to the contrary contained in said Article 6 as modified by this paragraph (b) notwithstanding, the prices stated above shall not be increased as a result of such price redetermination negotiations.
(2) Subparagraph (1) of paragraph (b) of said Article 6 shall be deleted in its entirety and the following-substituted therefor:
(1) The Government and the Contractor agree to negotiate to revise the contract prices of all vehicles to be furnished under this contract in accordance with the Contractor’s most recent experience under Contracts numbered DA-11-022-ORD-297 and DA-11-022-ORD-983 which also call for the manufacture and delivery to *868 the Government of the same and similar models of Truck, 5 Ton, 6x6. Thirty (30) days prior to the commencement of delivery of vehicles hereunder or at such prior time as the Contracting Officer may fix, the Contractor will furnish the statements and data referred to in paragraph (c) of this Article. All cost data submitted under the provisions of this Article shall fairly reflect the normal operations of the Contractor’s cost system.
In accordance with the arrangements previously made, and for the reasons indicated, a Repricing of Subcontracts or Purchase Orders article was not included in the contract.
22. On April 3, 1953, Timken advised plaintiff that the current price of $3,677.34 per standard axle set would be held firm through June 30, 1953.
23. (a) Sometime after the execution of Contract 1216, defendant arrived at a policy determination to have only one producer of the 5-ton 6x6 truck. At that time, there were three such producers, being plaintiff, the Diamond T Company, and the Mack Truck Company. It was determined that the unfilled portions of defendant’s outstanding contracts with these three suppliers, including Contract 1216 with plaintiff, would be terminated and that all such trucks remaining to be produced would then be consolidated in a new contract with the successful sole supplier. It was further decided that a meeting would be held which would be attended by representatives of the three contractors at which this important new policy would be explained and discussed.
As a result, representatives of the three companies were invited by Brigadier General Carroll H. Deitrick, Commander of the Ordnance Tank-Automotive Center (OTAC) at Detroit, Michigan, to attend a meeting with him in Detroit on July 3,1953.
(b) On July 3, 1953, representatives of the three companies met separately with General Deitrick in Detroit. At this time, defendant’s new policy was explained to plaintiff’s representatives. At the same time, they were handed a letter dated July 3, 1953, addressed to plaintiff and inviting its proposal for producing 3,750 vehicles. The contents of the letter were also discussed and explained. The letter read in pertinent part as follows:
*869 In keeping with expenditure objectives for fiscal year 1954, set by the Secretary of Defense, the Army is rescheduling certain of its production programs. The purpose of this re-scheduling is to hold down expenditures of the coming year and assist in the future balancing of the budget. This policy dictates that only one 5 Ton, 6x6 Tactical Truck producer remain in production after 31 December 1953. In keeping with this reduction of expenditures, it is necessary that the required end products be procured at a minimum cost.
In order to comply with the above objectives it is necessary that the Ordnance Corps remove from production by 31 December 1953 two of the three producers of the 5 Ton, 6x6 Tactical Truck. In making this determination all important factors will be considered. However, as you must realize price will be the most important consideration. In order that this determination be made on a fair competitive basis all three concerns will be requested to submit a price proposal for the delivery of 3150 — 5 Ton, 6x6 Tactical Trucks of various body types as outlined on attached listings. These vehicles are to be produced during the period 31 December 1953 through 31 March 1955 at a rate of 750 per quarter or approximately 250 per month.
í]í ifc % H*
After a thorough analysis of proposals submitted and due consideration of all other factors involved an award of 3750 vehicles will be made to the concern selected. Simultaneously a complete cancellation will be effected against the unsuccessful bidders for that quantity of vehicles now scheduled for delivery after 31 December 1953. All producers will be given the option of a free selection of subcontractors without regard to previous allocations of subcontracting capacity.
5¡» V
It is requested that you submit a proposal to the Chief, Chicago Ordnance District, by not later than 25 July 1953, for:
a. A quantity of 3750 — 5 Ton, 6x6 Trucks to be delivered at a rate of approximately 250 per month or 750 per quarter from 1 January 1954 through 31 March 1955, produced on a one-shift, forty-hour-week basis. Equipment which is now government furnished will continue to be so supplied.
b. With a view toward retaining the largest active base possible, consistent with economy considerations, a major and costly rearrangement of your facility is not *870 considered desirable. In the event your proposal envisions a plant rearrangement involving additional, facilities or tooling costs, it is requested that this be priced separately and submitted as a separate part of your proposal.
Except as to additional facilities, the above proposals will be submitted on a fixed-price basis with price re-determination. Upward redetermination will be considered ; however, the percentage of upward limitation requested will be added to the base price for the purpose of evaluation.
m * * * ❖
The attached form is for your guidance in submitting price information. Deviations from the form of this breakdown, to conform with your normal accounting procedures, will be acceptable. * * *
Attached to the letter was a “Request for Proposal” form listing the vehicles on which quotations were sought, and two price columns, one headed “Vehicle Unit Price Without Upward Price Revision” and the other “% Upward Price Revision (If Any).”
24. Plaintiff was exceedingly anxious to become defendant’s sole supplier of the 5-ton 6x6 military trucks. To this end it determined to make every effort to obtain the proposed new contract, even to the extent of sustaining a loss on this particular procurement.
25. (a) To enable it to submit as low a bid as possible, plaintiff determined to make every effort to obtain from its suppliers their lowest prices. With respect to Timken, on July 7,1953 a representative of plaintiff telephoned a representative of Timken and advised of defendant’s request for bids on the 3,750 vehicles as well as of the substance of General Deitrick’s letter of July 3, 1953, and requested that Timken submit to plaintiff as soon as possible its lowest prices on axle sets. On the same day, plaintiff wrote to Timken confirming the telephone conversation and its request for Timken’s “best price” on 3,750 axle sets for the 5-ton 6x6 military vehicles. With the letter there was transmitted a schedule showing the breakdown of the 3,750 vehicles by models.
(b) By letter of July 16,1953, Timken responded by quot *871 ing a price of $8,501 per set. It stated, however, that if it received concurrent production orders from other prime contractors on the 2%-ton axle at the rate of 666 per month, its price to plaintiff on the 5-ton axle would be lowered to $3,240 (since it could produce both simultaneously with much of the same equipment and tooling) and, if the concurrent orders were as high as 1,666 per month, the price would be further reduced to $2,975. To these prices, Timken reserved the right to add 5 percent to cover any material or labor increases which might occur. On these bases Timken agreed to maintain these prices through the first quarter of 1954.
26. (a) Shortly thereafter, and after assembling the necessary data, including its subcontractors’ quotations, plaintiff commenced the preparation of its bid.
(b) The 5-ton 6x6 military trucks were produced at plaintiff’s plant at Fort Wayne, Indiana, which is sometimes referred to as plaintiff’s Fort Wayne Works. In the preparation of its bids for these trucks, both purchasing departments in its general offices in Chicago and its Fort Wayne Works obtained quotations from suppliers and subcontractors, the Chicago office obtaining quotations on the major components, such as the axle sets, while the Fort Wayne Works secured quotations for the minor parts, such as batteries. All the quotations were then centered in the Fort Wayne Works which proceeded to assemble all the cost data and to prepare a statement of the proposed cost of the vehicle, the total cost being broken down into the component material, labor and overhead items.
In preparing its cost statement for bid purposes on these military vehicles, the Fort Wayne Works customarily calculated the cost of each truck model on a basis of its carrying its full share of plaintiff’s indirect and overhead costs in addition to the estimated materials costs, upon which it had received quotations, and the direct labor costs, the rates of which were known. These indirect and overhead costs had, through experience over the years, been calculated on various percentage bases. Such costs of a vehicle, so calculated, would be considered as bearing the vehicle’s full share of plaintiff’s total costs of manufacturing it, and would be termed as the “fully adjusted costs.” Such fully adjusted *872 costs, plus plaintiff’s customary profit markup of 8 percent, was the normal 'basis on which plaintiff calculated its prices for these military vehicles. Customarily, the cost data, on a fully adjusted cost basis, were prepared for each model by the Fort Wayne Works on so-called worksheets and transmitted to the home office in Chicago which would actually prepare and submit the bid.
(c) The usual procedure as described above was followed by the Fort Wayne Works in preparing the cost data for plaintiff’s bid on the proposed 3,750 vehicle contract. The proposed prices calculated were on a fully adjusted cost basis and were composed of direct materials and labor plus a proportionate share of all overhead and indirect costs, such as direct overhead, material adjustments, the general and administrative expense of the Fort Wayne Works (referred to as “Works general and administrative expense”), and general corporate administrative expense, plus 8 percent profit. (Except for the pilot Contract 9197, this was the basis upon which plaintiff’s prior contracts had been bid.) As so prepared, the worksheets were submitted to plaintiff’s executive offices in Chicago, with a copy of the worksheets (one for each model) retained at the Fort Wayne Works.
27. (a) Upon reviewing the worksheets and prices developed by the Fort Wayne Works, plaintiff concluded that a bid based upon its fully adjusted costs plus 8 percent profit would in all probability not be successful. On prior contracts, negotiated without competitive bidding under circumstances wherein approximately 45 percent of the nation’s total production of these vehicles was allocated to plaintiff, and under contract clauses wherein the prices bid could be adjusted either upward or downward, the development of a close or truly competitive price for bidding purposes was not considered a matter of great importance. In this case, however, where obtaining the contract depended on a price submitted in competition with its two competitors, plaintiff felt that an extremely low or close price would be essential if it was to achieve its purpose of becoming defendant’s sole supplier. As stated, to obtain this contract and so achieve this purpose, plaintiff was even prepared, if its costs were calculated in accordance with the usually applied overhead *873 and other indirect cost percentage rates, to sustain a loss. Consequently plaintiff’s officials in its Chicago administrative offices carefully reviewed the prices based upon the fully adjusted costs prepared by the Fort Wayne Works with the purpose of making such adjustments therein as would serve to lower the prices to a level which they felt would insure plaintiff’s obtaining the contract, even if a loss was incurred. Plaintiff’s officials hoped that they would be able to effect such manufacturing economies and reductions in suppliers’ prices as would enable it to keep the loss at a minimum or even to come out with a slight profit.
(b) Thereupon, plaintiff’s officials made a second calculation of the proposed prices per vehicle on a so-called “specific cost” or “out-of-pocket cost” basis, a basis plaintiff sometimes used in developing bids in special competitive situations. On this basis certain of the indirect and overhead costs which plaintiff customarily included in developing its fully adjusted costs were either eliminated or reduced. As an example, the following adjustments were made in the costs and resulting price quoted on one of the models, i.e., the Model M-51, without winch:
(1) An item of expense termed “material adjustment”,which was equal to 1 percent of the total material costs, was eliminated. On this model, this came to $94.63.
(2) The component cost item labeled “Works general and' administrative [G & A] expenses” which was normally calculated on a basis of 4.342 percent of materials and labor costs and charges, and came to $432.90 on this model (and an average of over $400 per vehicle on all models), was reduced to $28.65.
(3) The component cost item labeled “General Office General and Administrative [G & A] Expenses” was reduced from 3 percent of the total labor, materials, and “Works G & A” charges, to 2.6 percent thereof, plus an additional fiat deduction of $90 (said additional deduction being made by plaintiff’s president personally upon final review before submission).
(4) The profit item was reduced from 8 percent of the materials, labor and G & A items calculated on the “fully ad *874 justed” basis to 4 percent of said items calculated as above described on the “out-of-pocket” basis.
(5) Two items of expense, labeled “Special Tooling” and “Engineering,” both of which totaled $91.09, were reduced to $82 per vehicle.
The same adjustments were made on the other models bid upon, with further adjustments being made on the more expensive so-called- “wrecker” trucks. On such wrecker (Model M-62) no G & A expenses or profit in any amount were applied to the cost of the wrecker body to arrive at the final G & A and profit figures which were included in the unit price. Thus the cost figures against which the 2.6 percent — $90 G & A, and the 4 percent profit, computations were made did not include the cost of said bodies.
On the above-mentioned M-51, the adjustments described resulted in reducing the proposed bid price from $12,552.82 per vehicle on the fully adjusted cost basis, to $11,349,67 on the specific or out-of-pocket cost basis, a reduction of $1,203.15. Generally comparable reductions occurred on the other models.
28. (a) On July 24, 1953, plaintiff submitted its bid proposal on the 3,750 vehicles. The proposal was in the form of a letter of that date, accompanied by a schedule showing the price of each type of vehicle, and an estimated unit cost breakdown as to each type. In the letter, plaintiff stated that “This proposal is submitted as a fixed-price subject to price redetermination downward only” and that it was not requesting upward price redetermination because it understood “that any upward redetermination requested by any bidder would be added to the bid price of that bidder for purpose of evaluation * * *.” The letter further stated:
Because of the possible effect of the proposed rescheduling on both the 2y2 Ton 6x6 and 5 Ton 6x6 Tactical Truck programs, our axle supplier has submitted alternate quotations based on the alternate production schedules.
The accompanying “Request for Proposal” and unit cost breakdown are predicated on the award of 1666 2% Ton units per month, or a total of 25,000 to Reo Motors, Inc., Lansing, Michigan.
In the event that Reo Motors are awarded a production of only 666 vehicles per month, or a total quantity *875 of 10,000, the unit prices quoted on the attached proposals should be increased by $265.00, plus $21.20 excise tax. In the event that Keo Motors are awarded “NO” vehicles, unit prices on the attached proposals should be increased $526.00, plus $42.08 Federal Excise Tax.
This proposal has been prepared in keeping with the expenditure objectives outlined in the first paragraph of your letter of July 8. The policies of dictating a single manufacturer for the production of all vehicles in the 5 Ton classification, utilizing the option of a free selection of subcontractors without regard to previous allocations, and effecting economies accruing from 2 years of quantity production of this vehicle are incorporated in this proposal and are reflected in these low bid prices.
(b) The attached schedule showing the bid price of each type of vehicle set forth prices which were exactly equal to the prices developed on the above-described specific cost or out-of-pocket cost basis, as shown on plaintiff’s worksheets. These prices were as follows:

Proposal Item No. Vehicle Model Price Bid

1- M-40 (Truck, Chassis)_ $9, 773. 54
2- M-41 (Truck, Cargo)_ 10,701.60
3- M-51 (Truck, Dump)_ 11,349.67
4- M-52 (Truck, Tractor)_ 10,147. 60
5- M-54 (Truck, Cargo)_!_ 10,463. 30
6_ M-61 (Chassis, Truck)_ 9, 825. 89
7- M-62 (Truck, Wrecker)_ 19, 873.09
8_ M-139 (Truck, Chassis)_ 11,244. 88
All prices were quoted for the vehicles without winches (except the M-62) and with soft top cabs. Additional amounts ($516.66 for Model M-51 and $571.50 for the others, except the M-62) were included for winches, and for hard top cabs ($95.35).
(c) Also attached, in accordance with the requirement that a price breakdown be submitted with the bid, were eight “Estimated Unit Cost Break-Down” sheets, one for each of the models. These sheets repeated, as the “Proposed Contract Price” for each model, the identical amount bid as shown above. However, in breaking down the components of such price on a material, labor, overhead and profit basis, plaintiff showed different amounts for such components than had been computed theretof or on the specific or out-of-pocket basis. In effect, instead of building up to a price by the *876 normal method of first calculating materials and labor costs, and then adding thereto overhead and profit rates on certain percentage bases (in this case, on less than the usual bases), plaintiff started with the price so previously built up on the specific cost basis, and then carved out of it the higher profit and overhead rates it normally used, leaving a smaller and inaccurate balance for labor and materials. Then, by retaining the accurate amount for the labor component, the materials component was made to bear the brunt of the overstatements on the profit and overhead items, resulting in an amount for the materials component which was far less than the total quotations from its suppliers as shown on its worksheets.
The differences between the components as shown on plaintiff’s cost breakdown sheets submitted to defendant with its bid and as it actually arrived at its prices, as shown on its worksheets containing the components computed on a specific cost basis, were as follows:
(1) Based upon the ultimate price already computed on the specific cost basis, plaintiff arrived (after deducting the Federal excise taxes on the chassis and tires) at an 8 percent profit figure (price divided by 108 percent). In this manner, it was made to appear that plaintiff was bidding on a basis of 8 percent profit on the material, labor, and overhead components, instead of, as was actually the situation, only 4 percent on the adjusted material, labor and overhead items, as hereinabove set forth. Taking the Model M-52 as an example, plaintiff showed on its bid, in terms of dollars, an expected profit of $694.90 on such 8 percent basis, whereas, as shown on its worksheets, it actually estimated, on the 4 percent specific cost basis, a profit of only $360.82.
(2) The remaining total cost figure (i.e., after deducting excise taxes and 8 percent profit) was then divided by 102.6 percent to establish a 2.6 percent “Gr and A Expense” item (general office, or indirect, overhead) on the remaining items, consisting of material (and material handling and shipping) and labor (including “direct overhead”). Thus, on this component plaintiff did use the same 2.6 percent rate that it had used in developing its price on the specific cost basis. However, the $90 deduction (finding 27(b) (3)) was *877 not reflected (although, the dollar amount produced was lowered somewhat because it was applied to a lower remaining balance, the natural result of having removed 8 percent of the total price as “profit” rather than 4 percent, thus leaving a smaller balance against which the 2.6 percent could apply.) In terms of dollars, using the Model M-52 as an example, the amount shown for this overhead component on plaintiff’s bid was $220.12 whereas the actual amount plaintiff had allocated to the item on the specific cost basis was only $140.87.
(3) Having taken out of the ultimate price arrived at on the specific cost basis larger sums for profit and overhead than it had actually allocated thereto in the construction of the price, an unrealistically smaller amount remained for plaintiff to allocate to the remaining items, consisting principally of labor and materials. By far the largest component making up the total price of these trucks consisted of materials. For example, on the M-52, of the total price of $10,147.60 (calculated on the specific cost basis), $8,427.55 was computed as being the estimated cost of “direct material” (so calculated on both the fully adjusted and specific cost bases). Plaintiff therefore determined to show the remaining charges other than materials as it had computed them on the specific cost basis and then to show as “materials” whatever balance remained. Accordingly, the cost of $75.44 for the item “Material Handling and Shipping” (so calculated on both the fully adjusted and specific cost basis) was included in the proposal without adjustment, as were the costs for labor, “direct overhead,” and “Works G & A”, although these costs of $53.39 (so calculated on both the fully adjusted and specific cost bases), $275.98 (also so calculated on both bases) and $28.65 (drastically reduced on the specific cost basis, as shown in finding 27(b) (2)), respectively, totaling $358.02 were restated as $179.01 for “Productive Labor” and $179.01 for “Direct Overhead,” which was set forth as 100 percent of such Productive Labor figure.
(4) The balance resulting from these calculations was then set forth as the “Material” item. On the M-52, this resulting balance was $8,032.72. On the comparable “Direct Material” item which plaintiff had calculated on the specific cost *878 basis and which constituted the amount actually quoted to plaintiff by its suppliers, the figure was, as stated, $8,427.55.[7]
(d) Plaintiff contends it submitted the cost breakdown sheets as it did, with different profit and overhead figures (and with a resulting different materials figure), than those it used in actually constructing its price on the specific cost basis, because of the reference to “normal accounting procedures” in the last paragraph of General Deitrick’s letter of July 3,1953 (finding 23 (b)). Plaintiff does not keep its books on a specific cost basis and it maintains that it was therefore proper (and required) that it submit its bid on a fully adjusted cost basis, which was in accordance with the normal accounting method by which it keeps its books.
The record does not support this contention. Even assuming plaintiff’s interpretation of General Deitrick’s letter is correct, there is nothing in the evidence which indicates either that plaintiff’s normal accounting procedures or generally accepted accounting principles prevented it from presenting figures which accurately reflected how it constructed its price. Plaintiff’s normal accounting methods, even though cast in “fully adjusted” terms, did not require it to show that it was bidding on an 8 percent profit basis when in fact it was not. Further, on a so-called “fully adjusted” cost basis, plaintiff itself applied on the worksheets a 3 percent figure to calculate “General Office G & A”, which percentage it reduced to 2.6 in calculating its prices on a specific cost basis. Yet, there was nothing in its “normal accounting procedures” to compel the use of the 3 percent figure. Instead, in this instance, it accurately reflected the 2.6 percent reduced figure in its bid. Nor did plaintiff’s normal accounting procedures or generally accepted accounting principles require it to show fictitious amounts allocated to the important “Material” item.
Plaintiff also contends that it actually hoped to obtain substantial price reductions from its suppliers and that if these *879 hopes materialized, the “Material” figure submitted with its bid would not only become a realistic one, but that plaintiff would further be able to realize the 8-percent profit figure submitted with its bid. The record also fails to support this contention. The record does not indicate specifically wherein plaintiff justifiably and reasonably expected to make such substantial savings in the amounts already quoted to it by its suppliers pursuant to plaintiff’s urgings that they quote their “best prices” (finding 25(a)). Plaintiff’s principal supplier, Timken, had already quoted to it a substantially lower price on this procurement. At that time, it was supplying axle sets to plaintiff on plaintiff’s other contracts at $3,675 per unit. On this proposed procurement, however, it had already quoted to plaintiff the lower price (based on certain concurrent production) of $3,240 per unit, a decrease of $435 per unit on this one component. The quotations obtained for the 3,750 vehicles covered by the proposed contract involved production during a future 15-month period commencing January 1, 1954 and running on into 1955. The record fails to support any reasonable basis for alleged optimism on plaintiff’s part that during this future period it would be able to make such substantial savings on materials over and above the prices quoted to it by its suppliers as to make the low quoted “Material” figure a realistic one and as to further enable it to make a substantial profit on this proposed contract. As shown (finding 27(a)), plaintiff felt that such reduction in suppliers’ prices and such manufacturing economies as it might be able to effect would serve only to reduce its loss or, at best, to produce (on a fully adjusted cost basis) a small profit.
The conclusion is reasonable that plaintiff reconstructed the prices as it did because it felt that setting the components forth in the above-described manner would be favorable to it in the event of future price redetermination proceedings. Among other things, the failure to make its alleged expected 8-percent profit would necessarily be given serious consideration in such proceedings.
29. On July 27, 1953, plaintiff amended its proposal to lower its price on the M-62 5-ton wrecker. Plaintiff stated that, after submitting its proposal, it had learned that the *880 Bureau of Internal Revenue had, on July 23,1953, ruled that the crane, body and chassis of the 2%-ton wrecker, designated as the M-108, were not subject to Federal excise tax and accordingly that its bid on the similar M-62 5-ton wrecker was revised by the elimination of $586.27 Federal excise tax. Plaintiff further advised that “all other prices, terms, and conditions in our original bid remain firm thru 15 August 1953.” In this amended proposal, neither the base prices nor their breakdowns as originally submitted were changed.
30. Prior to August 12, 1953, plaintiff, pursuant to the Price Redetermination Article of Contract 297 (finding 8(a)), commenced preparation of its statement of the costs incurred in the performance of the contract as of the production point specified in the Article (30%). On said date, plaintiff submitted to the Chicago Ordnance District its statement of such costs, which, as supplemented on September 14, 1953, were audited by defendant shortly prior to September 28, 1953.
The material costs reflected in plaintiff’s cost statement were higher than the amounts allocated to such costs for the comparable vehicles in its bid proposal covering the 3,750 vehicles. For example, on the M-61 (without winch) the estimated materials cost shown by plaintiff in its bid proposals of July 24, 1953 and August 26, 1953, was $7,803.21. The material costs for the first 30 percent of production of said vehicles under Contract 297, as submitted by plaintiff in its cost statement of August 12, 1953, was $8,989.50. However, the periods involved during which these costs were applicable are not comparable. The Contract 297 material costs were as of May 1953 (the date of the 30 percent production point), whereas the bid covering the new procurement related to production commencing, according to the invitation to bid (finding 23(b)), December 31, 1953 through March 31, 1955. For example, Timken’s price for axle sets under Contract 297 was, as of May 1953, $3,675, whereas its quoted price to plaintiff under the proposed procurement was the substantially lower price of $3,240.
There is no showing that any comparison was made by defendant’s employees between plaintiff’s materials costs on *881 other contracts and the materials components of the various vehicles in plaintiff’s current bid. There is also no showing that the same employees were involved in the Contract 297 price redetermination proceedings as were involved in the proposed procurement of the 3,750 vehicles.
31. (a) Shortly after the submission of its proposal on the 3,750 vehicles, plaintiff was advised that it was the low bidder, and thereafter its representatives engaged in negotiations with the Chicago Ordnance District concerning the proposed new contract. Included in the subjects discussed was the matter of price redetermination as it related both to plaintiff and to its subcontractors, and the provisions with respect thereto that would be included in the proposed contract. Among other things, it was agreed that instead of entering into an entirely new contract, as originally contemplated, the 3,750 vehicles would be covered by a supplemental agreement to the already outstanding Contract 1216. It was also agreed that the “price redetermination downward only” provision referred to in General Deitrick’s letter of July 3, 1953, and plaintiff’s bid of July 24, 1953, would not be on both a retroactive and prospective basis, as was the situation on plaintiff’s previous contracts containing price redetermi-nation provisions, but would be on a prospective or “forward” basis only. It was further agreed that the “Repricing of Subcontracts or Purchase Orders” article would, for the same reasons that the article had been omitted in the outstanding Contract 1216 (finding 19(b)), also be omitted from the proposed supplement thereto. During the course of the discussions concerning the subcontractors, reference to Tim-ken was again made and it was again stated by defendant’s representatives, as plaintiff had previously been informed, that Timken was subject to price redetermination under its separate agreement with the Detroit Ordnance District, which District would continue to administer such- contract and any price redetermination proceedings thereunder.
(b) On August 26,1953, plaintiff submitted a revised proposal to cover certain adjusted quantities and additional vehicle equipment. In this proposal plaintiff stated that its proposal was submitted under the same terms and conditions as its original proposal of July 24,1953, and that its under *882 standing was that the additional quantity of 3,750 vehicles would be covered by a supplemental agreement to Contract 1216. In this revised proposal too, neither the base prices nor their breakdowns as originally submitted were changed.
32. (a) If plaintiff’s full costs of performing the proposed contract were calculated on the fully adjusted cost basis hereinabove described, which in fact was plaintiff’s normal method of calculating such costs, the above-mentioned prices which plaintiff bid on the specific or out-of-pocket cost basis, which included profit calculated as described, were insufficient to recover such fully adjusted costs alone without any profit on such costs. Thus, on that basis, plaintiff anticipated incurring a loss on the vehicles ultimately contracted for, as follows:

(b) As stated, plaintiff, faced with the possibility of a substantial loss on the proposed contract (if its costs were calculated on a fully adjusted cost basis), determined to make every effort to effect all possible manufacturing economies and to obtain the best possible prices from its suppliers in the hope of reducing its loss or even coming out with a slight profit. Plaintiff so acted on the premise that any such economies and price reductions would inure to its benefit rather than to the Government’s. For the purpose, among others, of dispelling a contrary belief by certain of its employees in its Fort Wayne Works concerning the benefits plaintiff would receive from cost reductions, plaintiff on August 31,1953, issued a memorandum to such Works which read in pertinent part as follows:
*883 As you no doubt know, when we bid on the latest 5-ton proposal, it was based on tbe lowest possible manufacturing cost. When this bid was submitted, it was thought that certain economies could be effected in not only the prices of the purchased parts, but in the manufacturing operations, and these economies, of course, would mean the difference between a slight profit or a loss.
We have just been informed that there is a certain feeling on the part of some of our people in the plants that we should not look too closely at the purchased prices of material or manufacturing operations, because any economies effected would merely pass on to the Government, and it was felt that the time could be better well spent on our own products.
We thoroughly discussed this in a meeting here this afternoon, and we were assured by Mr. Wade [plaintiff’s Comptroller of the Motor Truck Division] that in 99 out of 100 cases, the savings would be to our benefit rather than to the government.
Therefore, it behooves you to make sure that everyone in your organization connected with either the manufacturing end or the purchasing end scrutinizes every purchased part and every manufacturing operation to do whatever possible to lower our costs on the 5-ton truck. The Chicago. Purchasing Department is diligently pursuing this with the outside suppliers with whom they have contacts to determine whether or not our prices can be reduced.
By copy of this letter to Mr. Drum, we ask that he again send personnel to Fort Wayne to review the items that, perhaps, could be made at Springfield Works, because we feel that even though our fully adjusted cost would be equal to the purchase price, the absorption of overhead these parts may stand would mean a certain savings to the Division.
* * * * :fc
33. Prior to September 1, 1953, plaintiff and defendant negotiated with respect to a second price redetermination on Contract 8292 and on that date entered into Supplemental Agreement No. 18 consummating the agreement arrived at with respect thereto. By said supplemental agreement, the then total contract price of $171,748,292.85 was decreased by $2,330,265.34, making the new contract price $169,418,027.51,
34. On September 11, 1953, plaintiff and Army Ordnance, acting by the Chicago Ordnance District, covered the pro *884 duction of the 8,750 vehicles by an agreement which was designated as Supplemental Agreement No. 8 to Contract 1216. Said supplemental agreement recited that the vehicles to be produced after December 31,1953, under the previously executed Contracts 297 (2,511 vehicles), 983 (372 vehicles), and 1216 (746 vehicles), totaling 3,629, were to be deleted from said contracts and were to be consolidated into Supplemental Agreement No. 3 at the lower prices bid therefor by plaintiff; that an additional quantity of 121 vehicles was to be produced, making the aforesaid sum of 3,750 vehicles; and that an additional quantity of 108 vehicles, also still remaining to be produced under Contract 1216, was to be retained for production *by transferring them to Supplement No. 3, but at the existing contract prices, thus making a new contract total to be produced under Supplement No. 3 of 3,858 vehicles. As to the 3,750 vehicles, the prices set forth were those which plaintiff had previously bid upon the specific or out-of-pocket cost basis hereinabove described (as adjusted, as set forth in finding 31 (b)). The contract price for said 3,858 vehicles, plus certain spare parts, was $52,817,-640.95.[8] Paragraph 7 of Supplement No. 3 provided that the prices applicable to the 3,750 vehicles “may be decreased only, in accordance with” such paragraph. The paragraph then went on to incorporate the usual Article 6 Price Tie-determination provision, adding thereto, however, the following provision:
(b) Demand for negotiation. (1) At any time and from time to time, subject to the limitations specified in this Paragraph 7, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to revise .the prices under this contract. No such demand shall be made before 1 December 1953 and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand. Each demand shall specify a date (identical with or subsequent to the date of the delivery of the demand) as of which the revised prices shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as “the effective date of the price revision”. Any demand *885 under this paragraph, if made by the Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in paragraph (c) of this Paragraph 7. If the demand is made by the Government, such statements and data will be furnished by the Contractor within 80 days after the end of the Contractor’s monthly accounting period within which such demand is made. All cost data submitted under the provisions of this Article shall fairly reflect the normal operations of the Contractor’s cost system.[9] *****
For the reasons already set forth, Supplemental Agreement No. 8 did not contain a “Bepricing of Subcontracts or Purchase Orders” provision.
35. Between March 11 and September 11, 1953, plaintiff and defendant entered into a number of contracts providing for the furnishing of certain spare parts by plaintiff to defendant, as follows:

Date Contract Number Contract Price

Mar. 11, 1953 DA-11-022-ORD-1231_ $115, 137. 46
Mar. 12, 1953 DA-20-113-ORD-15556_ 14, 800. 00
Mar. 27, 1953 DA-11-022-ORD-1217_ 604, 775. 61
Mar. 27, 1953. DA-20-113-ORD-15582_ 5, 400. 00
Apr. 1, 1953-DA-11-022-ORD-1254_ 9, 096. 00
Apr. 14, 1953. DA-11-022-ORD-1280_ 205, 486. 13
Apr. 16, 1953-DA-20-113-ORD-15920. ■__ 4,120. 00
May 18, 1953. DA-20-113-ORD-16512_ 12, 800. 00
June 9, 1953— DA-11-022-ORD-1360_ 17, 737. 90
June 30, 1953. DA-11-022-ORD-1390_ 23, 559. 56
Sept. 11, 1953 DA-11-070-ORD-9335_ 16, 584. 90
All of these contracts were fixed price contracts without price redetermination provisions or a Bepricing of Subcontracts or Purchase Orders clause.
In meeting the requirements of the above listed contracts, it was necessary for plaintiff to purchase certain parts or components from suppliers, including Timken.
36. Prior to September 11,1953, plaintiff, by six purchase orders, ordered certain materials from Timken which plaintiff required to perform spare parts contracts 1231 and 1217. Thereafter, plaintiff was advised by Timken that the prices *886 of the parts involved had been reduced and consequently, plaintiff, also prior to September 11, 1958, issued new purchase orders which reflected the lower prices.
These particular reductions in Timken’s current prices were not made in anticipation of price redetermination under Timken’s Contract 11448 with the Detroit Ordnance District.
37. Prior to September 28,1953, plaintiff, pursuant to the Price Eedetermination Article of Contract 983 (finding 15) commenced preparation of its statement of the costs incurred in the performance of the contract as of the production point specified in the Article (30%), which was as of August 1953. On September 28,1953, plaintiff submitted to the Chicago Ordnance District its statement of such costs. The situation concerning its materials costs as reflected in this statement and as compared with its bid on the 3,750 Vehicles was substantially the same as hereinabove set forth on Contract 297 (finding 30).
38. (a) On October 1, 1953, Timken and the Standard Steel Spring Company, a Pennsylvania corporation (hereinafter called “Standard”), consolidated into a single new corporation named Eockwell Spring and Axle Company (hereinafter called “Eockwell”).[10] Thereafter, there was created in Eockwell a Timken-Detroit Axle Division. Said merger had been previously authorized by the adoption of appropriate resolutions by the shareholders of Timken and Standard on August 25 and 26, 1953, respectively.
(b) By a consolidated supplemental agreement between defendant and Eockwell, executed as of September 30, 1953, recognition was given to the above merger by.the Government. Under said supplemental agreement Eockwell, the new corporate entity, agreed to assume all duties, liabilities and obligations of Timken and Standard and to carry out and perform all contracts, including Contracts 11447 and 11448, in force and effect with defendant.
39. Prior to October 1, 1953, there had been no price re-determinations under Timken’s Contracts 11447 and 11448. However, Timken had realized very large profits. It knew it would be obliged to divest itself of excessive profits when *887 sucli price redetermination proceedings would be undertaken. For various reasons, including tax considerations, Timken wished to divest itself of a substantial part of these excess profits as soon as practicable and without waiting for the price redetermination proceedings which would follow extensive audits of its books and records by the Army Audit Agency. As shown, under Article IY (b) of Timken’s Contract 11448, price renegotiation proceedings between Timken and defendant were to commence upon the completion of 40 percent of the axle sets to be furnished under a particular subcontract. At the beginning, Timken divested itself of these excess profits prior to the commencement of formal price redetermination proceedings by issuing credit memo-randa to its prime contractors on particular purchase orders or subcontracts, such as was done by the credit memoranda it issued to plaintiff on August 31,1951, under Contract 8292 (finding 9(a)). However, also as previously set forth (finding 6(d)), repricing on Timken’s fiscal year basis was substituted for repricing on an individual subcontract basis. After this new arrangement was agreed upon between defendant and Timken, and up to October 1, 1953, Timken followed the simpler practice of divesting itself of these excess profits by making advance payments to the Renegotiation Board of amounts which Timken recognized exceeded the amount it would be allowed to retain under future price redetermination proceedings. These payments went into the general receipts of the United States Treasury and were not available to Army Ordnance for further procurement purposes.
40. Prior to the consolidation, Standard, as a subcontractor to prime contractors with defendant on military armor plate production contracts, had entered into contractual arrangements with defendant, acting through the Detroit Ordnance District, which were similar to Timken Contracts 11447 and 11448. However, Standard had followed a different practice with respect to divesting itself of excess profits in advance of price redetermination proceedings under its contracts with defendant. Under the instructions of the Detroit Ordnance District, Standard had made its voluntary excess profits payments to its prime contractors who *888 in turn remitted the funds to Army Ordnance, or credited the amount on their prime contracts by reducing the contract price by the amount of such payment. Thus, such excess profits payments by ‘Standard to its prime contractors became available, either in cash or by way of reduced prime contract obligations, to Army Ordnance for further procurement purposes. The handling of the subcontractors’ payments in this manner was referred to as keeping the funds in the “procurement stream” or the “procurement system.”
41. Shortly prior to the consolidation, the officers of the two companies considered what the policy of the new company should be concerning voluntary payments in excess of amounts which the new company reasonably could anticipate it might retain in future price redetermination proceedings, since each company had similar repricing agreements with the Detroit Ordnance District but, as stated, was following different policies. Upon conferring with the Detroit Ordnance District, the officials were advised to follow the practice that had been adopted by Standard, since the Detroit Ordnance District desired that the funds be kept in the procurement stream.
42. Timken, by letter to plaintiff dated September 30, 1953 (which date was after the August approvals of the consolidation but one day prior to the effective date thereof), forwarded an “Accounts Eeceivable — credit memorandum” (No. 9-17816) in the amount of $1,845,338.09. The letter was as follows:
As you have been previously informed, the prices on the 5-ton military axles we have been furnishing you are subject to price redetermination under our facilities contract with the Detroit Ordnance District, Contract No. DA-20-018-OBD-11448.
The following is a tabulation of our total billing to you for 5-ton military axles and transfer cases and spares subject to price redetermination for our fiscal year ended June 30, 1953, and amounts of voluntary credit adjustments we are making for each contract:

Contract Number Total Billing Amount of Credit

DA-20-089-ORD-8292FS_ $9, 365, 363.29 $817, 522.34
DA-11-022-ORD-297_ 11,422, 351.44 997, 081.17
DA-11-022-ORD-983 and Miscellaneous_— 352, 088. 88 30, 734.58
$21,139, 803.61 $1,845,338. 09
*889 We have not undergone a formal redetermination of prices for this period and have no indication from the Detroit Ordnance District when they will be ready for ■formal redetermination pursuant to our contract. However in order not to unduly delay your receiving this credit, we are voluntarily making the above adjustment and enclose Credit Memorandum No. 9-17816 in the amount of $1,845,338.09.
Due to uncertainties as to the arrangement we will be able to work out with the Government facilities provided under Contract No. DA-20-018-OED-11448, to minimize idle capacity created by reduced schedules., we are unable to adjust current billing prices at this time.
If you have any questions about the refund, we suggest that you or your contracting officer’s representative contact Mr. C. E. Tobey, Administrative Assistant of the Detroit Ordnance District.
The credit memorandum merely specified the contract numbers and the amount of credit refunded under each, as already set forth in the letter, and also contained the statement: “Voluntary price adjustment per our letter of September 80, 1953, attached.”
Thus, Timken followed the same credit memorandum practice it had previously followed in 1951 (finding 9(a)) but here worked out the memorandum on a fiscal year rather than an individual purchase order basis (finding 6(d)).
43. Upon receipt of the Timken letter of September 30, 1953, advising of the credit of $1,845,338.09, plaintiff concluded it would not be desirable to accept such a credit for various reasons. As to Contract 8292, two price redetermination proceedings had been consummated (findings 20, 33), and as to Contracts 297 and 983, price redetermination negotiations were in progress (findings 30, 37), and plaintiff had submitted cost figures to defendant as recently as August 12, 1953, on Contract 297, and September 28,1953, on Contract 983. Plaintiff considered that its profits on these contracts were satisfactory (assuming the acceptance by defendant of its costs on Contracts 297 and 983 as presented). Consequently, plaintiff requested an immediate meeting with Eockwell to discuss the matter.
44. On October 15, 1953, a meeting was held at plaintiff’s offices in Chicago between representatives of plaintiff and *890 Rockwell at which plaintiff stated its position, as described above, concerning their unwillingness to accept the credit. Plaintiff inquired whether Rockwell could not make an equivalent refund direct to the Government in the form of a preliminary refund payment to the Renegotiation Board. However, Rockwell’s representatives explained that the refund was being made pursuant to Rockwell’s obligations under the price revision provisions of its Contract 11448 with the Government and that although said contract contemplated the repricing refunds being made directly to the Government, Rockwell had recently been directed to make such refunds to the prime contractors, which would follow the practice maintained by Standard prior to the merger. The Rockwell representatives further stated that the Government wanted this practice to be followed because the Government’s obtaining the money through the prime contractors would serve to keep the funds in the procurement stream and therefore available to Army Ordnance for further procurement purposes, whereas a direct payment by Rockwell to the Renegotiation Board would be included in the miscellaneous receipts of the Treasury and thereby lost to Army Ordnance for procurement purposes. The Rockwell representatives further informed they intended to make all future refunds stemming from their Contract 11448 in the same manner. In further explanation, Rockwell’s representatives showed plaintiff’s representatives a copy of the repricing article of their Contract 11448.
' Plaintiff’s representatives stated that since it was the subcontractor’s price to the prime contractor that was being adjusted or revised, they could understand why the refund should be made to the prime contractor. They further stated, however, that in their opinion certain situations might arise under this procedure of making such refunds directly to prime contractors wherein the Government would not ultimately receive the refund or the benefit thereof and thus defendant’s purpose of keeping the money in the procurement stream would be frustrated. They stated that in their opinion one such situation would arise where there was no Repricing of Subcontracts or Purchase Orders Article in the prime contract which in plaintiff’s opinion obligated the prime con *891 tractor to pass on the refund to the defendant in certain circumstances.
After further discussion, plaintiff’s representatives requested the opportunity to confer with the Chicago Ordnance District concerning the matter before Eockwell would take any additional action with respect thereto. Eockwell agreed and, accordingly, the meeting terminated with the matter still left open.
45. Following the meeting, plaintiff’s attorney discussed the matter with a Chicago Ordnance District attorney who advised him that the situation came under the jurisdiction of the Detroit Ordnance District because a refund was involved under that District’s Facilities Contract with Timken, and referred plaintiff’s attorney to that office. Accordingly, plaintiff’s attorney conferred, by telephone, with an appropriate official of the Detroit Ordnance District concerning the problem. Plaintiff’s counsel inquired whether the Detroit District would consider having Eockwell make the refund either directly to the Detroit District or to the Eenegotiation Board, rather than to plaintiff. However, the Ordnance official stated defendant would not approve either procedure and that the refund would have to be made to the Government through plaintiff. He explained that this procedure was required so that the amount of the refund would be kept in the procurement stream and would be available to Army Ordnance for further procurement purposes without any additional authorization or appropriation by Congress, whereas a direct payment by Eockwell to the Detroit District or the Eenegotiation Board would result in the moneys being deposited into the miscellaneous receipts of the Treasury. Plaintiff’s attorney replied that under the procedure the Detroit Ordnance District was directing to be followed there might, in his opinion, be situations in which the Government would not receive the benefit of a price adjustment clause such as was contained in Bockwell’s Contract 11448, citing the situations he had previously mentioned in discussing the matter with the Eockwell representatives. However, the Ordnance official disagreed, contending that it would be the prime contractor’s obligation in all instances to give the Government the benefit of the refund, and reiterated that a direct *892 refund to the Government by Rockwell would not be acceptable to the Detroit District.
46. (a) Thereafter plaintiff’s officials decided to accept the refund and turn it over to the Government, and so advised Rockwell. With respect to that part of the refund applicable to Contract 8292, plaintiff felt such turning over of the funds would constitute a voluntary act on its part because the “liepricing of Subcontracts or Purchase Orders” article in that contract was not applicable to Timken (finding 10) ,[11] However, for the reasons previously indicated, plaintiff decided to pass on to defendant the entire refund including the part thereof allocable to Contract 8292.
As a matter of procedure, plaintiff requested Rockwell to forward to plaintiff a check in the amount of the credit memorandum.. Thereafter, in a letter dated October 19, 1953, Rockwell enclosed a check in the identical amount of $1,845,338.09 “which covers the voluntary price adjustments made on Government Contracts covered in our letter of September 30, 1953.” Attached to the check was a voucher reciting “Refund of Accounts Receivable-Credit Memorandum No. 9-17816.”
(b) Plaintiff deposited the above check and issued its own check for an identical amount in favor of defendant, which plaintiff transmitted in a letter dated October 22,1953, which read as follows:
Re: DA-20-089-ORD-8292-FS
DA-11-022-ORD-297
DA-11-022-ORD-983 and Miscellaneous
*893 The Timken-Detroit Axle Company of Detroit, Michigan, directed their letter of September 30, 1953, copy of which is attached, to us and enclosed their credit memorandum in the amount of $1,845,338.09. On October 20,1953 we received Timken-Detroit Axle Division’s check payable to International Harvester Company for $1,845,338.09 together with their letter of October 19, 1953. We attach copy of this transmittal letter.
We enclose our voucher check for $1,845,338.09 payable to the Treasurer of the United States transferring this amount. We trust this meets with your approval.
47. (a) By letter dated October 31, 1953, Rockwell advised plaintiff that it anticipated making in the future, pursuant to its Contract 11448, further adjustments of the same character as the previous $1,845,338.09 refund. The letter read as follows:
This is with reference to the conversations we had with your organization subsequent to our letter of September 30 with which we enclosed Credit Memorandum to provide for voluntary credit adjustments on military products we have been selling to you, which are subject to price adjustment under our Facilities Contract No. DA-20-018-ORD-11448, and on which we subsequently furnished you our check to cover.
We now wish to inform you that we anticipate further adjustments of this character on the products that we shipped during the third quarter of this year, namely, for the three months ended September 30,1953, and you may expect to hear from us as soon as our cost analysis is completed and reviewed with the Detroit Ordnance District.
(b) Thereafter, on November 6, 1953, Rockwell sent to plaintiff a letter and credit memorandum totaling $371,-207.09 covering axles shipped during Rockwell’s fiscal third quarter ending September 30, 1953. The letter read as follows:
In our letter of October 31 we advised you of the possibility of a further adjustment in our billing covering 5-ton military axles, which we furnished you in our third quarter ended September 30,1953, and which were subject to price redetermination under our Contract No. DA-20-018-ORD-11448 with the Detroit Ordnance District.
*894 Rather than delay issuing this credit until we have undergone a formal redetermination of prices for this period with the Detroit Ordnance District, we are voluntarily making the adjustments tabulated below and enclose our Credit Memorandum No. 9-24040 in the amount of $371,207.09. This credit memorandum is issued as of September 30,1953, under the name of The Timken-Detroit Axle Company.

Contract Number Total Billing Amount of Credit

DA-11-022-ORD-297_$2,228, 710.58 $200, 583. 96
DA-11-022-OR.D-983_ 1, 894, 670.71 170, 520.36
DA-11-07O-ORD-8841_ 389.90 35.09
DA-20-089-ORD-8292FS_ 752.00 67.68
$4,124, 523.19 $371,207.09
If you have proceeded to the point in your price re-determination with your contracting officer that it is preferable to you to have our check m payment of this credit memorandum rather than credit to your account, please let us know and we will be glad to send you our remittance.
If you have any questions about the refund we suggest that you or your contracting officer’s representative contact Mr. C. R. Tobey, Administrative Assistant of the Detroit Ordnance District.
The enclosed “Accounts Receivable — Credit Memorandum” contained a listing of the contract numbers and amount of credits applicable to each contract. Also appearing thereon was the notation “Voluntary price adjustment per our letter of November 6, 1953 attached.”
. (c) By letter of December 4, 1953, plaintiff requested Rockwell to forward a check in the amount of the credit memorandum and made inquiry about one contract listed thereon. The letter read as follows:
Attached to your letter of November 6, was Credit Memorandum No. 9-24040 in the amount of $371,207.09 as an adjustment in your billing covering 5-ton military axles.
For simplicity in handling we kindly request that you send us a check for this amount, the same as previously handled, and we are attaching- and returning the credit memorandum.
We have no information whatsoever of Contract DA-11-Ó70-ORD-8841 and wonder if this contract number shouldn’t belong to one of the other prime contractors.
*895 (d) By letter of December 10, 1953, Rockwell forwarded a check with voucher attached to plaintiff. The letter, also enclosing a credit memorandum, read as follows:
This is in reply to your letter of December 4 * * * with which you returned our Credit Memorandum No. 9-24040 in the amount of $371,207.09, which we issued to you as an adjustment in our billing covering 5-ton military axles for the three-months period ended September 30,1953.
Pursuant to your request we are enclosing our check in full payment of this Credit Memorandum in the amount of $371,207.09, and we are returning the credit memorandum to you against which this check applies.
In reference to Contract No. 11-07O-ORD-8841, this contract is covered by your Purchase Order No. 2-91494, and covers our Part No. P-138-B Power Takeoff.
The voucher attached to the check contained the following statement:
IN FULL SETTLEMENT OF OUR CREDIT 9-24040 DATED SEPT. 30, 195 3 WHICH COVERED VOLUNTARY PRICE ADJUSTMENT ON GOVERNMENT CONTRACTS AS LISTED THEREON.
48. (a) Upon receipt by plaintiff of Rockwell’s letter of December 10,1953, with the enclosed check and credit memorandum, plaintiff reviewed Contract 8841 and ascertained it was a fixed price spare parts contract it had entered into with defendant which, like the other spare parts contracts herein-above mentioned (finding 35), did not have a Price Rede-termination or a Repricing of Subcontracts or Purchase Orders provision.[12] The other three contracts to which the check and credit memorandum applied (Contracts 8292, 297 and 983) were the same contracts to which the previous $1,845,338.09 refund had applied. For the same reasons which led plaintiff previously to remit the entire $1,845,-338.09 refund to defendant, plaintiff again concluded to *896 remit to defendant that part of the present $371,207.09 refund which was applicable to said three contracts. However, although, as shown, plaintiff knew that the full amount of the refund had been paid to it for the purpose of its in turn paying over said amount to defendant, and that defendant expected the entire amount to be paid over to it, plaintiff determined to retain the balance of the refund in the amount of $35.09 which was applicable to Contract 8841. Because said contract had no Price Redetermination or lie-pricing of Subcontracts or Purchase Orders provisions, plaintiff did not feel that the same considerations applied as were applicable to the refunds pertaining to Contracts 8292, 297 and 983. Said $35.09 was therefore retained by plaintiff and applied as a reduction to its spare parts costs in its Motor Truck Division.
(b) Thereupon, plaintiff, by letter dated December 14, 1953 to the Chicago Ordnance District, which made no mention of said $35.09 or the contract to which it applied, sent to defendant a check in the amount of $371,172, which was equal to the amount Rockwell had sent to plaintiff, less said sum of $35.09. Said letter read as follows:
Re: DA-20-089-ORD-8292-FS
DA-11-022-ORD-297
DA-ll-022rORD-983 _
_ We are in receipt of a credit memorandum and a check from the Timken-Detroit Axle Division of the Rockwell Spring and Axle Company covering a voluntary price adjustment on subject contracts. The amount applicable to each contract and the total amount of credit is as follows:

Contract Humber Amount of Credit

DA-11-022-ORD-297_ $200, 583. 96
DA-11-022-ORD-983_ 170,520.36
DA-20-089-ORD-8292FS_ 67.68
$371,172.00
We enclose our voucher check for $371,172.00 payable to the Treasurer of the United States transferring this amount. We trust this meets with your approval.
Said difference of $35.09 is claimed by defendant in its Second Counterclaim filed herein. Defendant contends, among other things, that the entire amount paid by Rockwell *897 to plaintiff was so paid only pursuant to Rockwell’s obligations under its Contract 11448 with defendant and tbat plaintiff knew and understood, from discussions held both with Rockwell representatives and the Detroit Ordnance District (findings 44, 45), that said sums were being paid to it for the sole purpose of keeping the funds within the procurement stream, which necessarily contemplated plaintiff’s turning the funds over to the Government.
49. (a) Prior to December 3, 1953, plaintiff ordered the first axle sets from Rockwell for Contract 1216 at the then applicable price of $3,240 per set (finding 25 (b)) and on that date, Rockwell made its first shipment. However, on December 17, 1953, Rockwell informed plaintiff that, “having been successful in accomplishing certain economies, we are pleased to advise you that the price of the 5-ton axle sets * * * against the new contract for 3750 sets to be scheduled through the first quarter of 1954, will be reduced by $26.50 per set.” The reduction was made retroactive to December 3, 1953, and plaintiff was advised that Rockwell would issue credit memoranda covering the price differential. Such a credit memorandum was issued on January 22, 1954, in the amount of $1,431. The new price of $3,213.50 was thereafter applicable on this contract until April 29, 1954.
(b) During the course of performing Contract 1216, plaintiff also received some relatively small price reductions from other suppliers. For instance, the Delco Remy Company gave a $21 per vehicle reduction in price on electrical equipment and the Budd Wheel Company gave a $15 per vehicle reduction in the price on wheels.
(c) The savings in material costs that plaintiff was able to effect in performing Contract 1216, although substantial in terms of dollars when related to the number of vehicles being produced,[13] were actually insubstantial in- their contribution to the realization of a normal contract profit on a fully adjusted cost basis.[14] Similarly, there is no evidence of *898 any significant manufacturing economies achieved by plaintiff in performing the contract. As already shown, (findings 28(d), 32(b)), in estimating its prospective profit on this contract, plaintiff in fact had no reasonable basis for anticipating such substantial savings on materials over the prices its suppliers had quoted or such substantial manufacturing economies as would enable it to realize its customary 8 percent profit.
50. (a) By letter of December 18, 1953, Rockwell informed plaintiff of a possible adjustment, pursuant to Rockwell’s Contract 11448, of the price of axles shipped during the fiscal quarter ending December 31, 1953. The letter read as follows:
You may accept this as advance notification in reference to the possibility of further adjustment in billing covering 5-ton military axles we are furnishing you, which may be applicable to production in the fourth quarter that will end December 31,1953, and which axles are subject to price redetermination under our Contract No. DA-20-018-ORD-11448 with the Detroit Ordnance District.
As soon as the cost analysis is completed and reviewed, which will probably not be until some time in the early part of February, you may expect to hear from us. This advance information is given so that you may have knowledge that an adjustment is contemplated.
This adjustment will be applicable to axles furnished you under the old contracts and does not have reference to deliveries on the new contract just starting [Contract 1216].
(b) Thereafter, by letter dated February IT, 1954, Rockwell forwarded to plaintiff a check and credit memorandum in the amount of $217,676.69. The letter read as follows:
In our letter of December 18 we informed you of the possibility of a further adjustment in our billing covering 5-ton military axles and parts, which we furnished you in the fourth quarter ended December 31,1953, and which axles are subject to price redetermination under our Contract No. DA-20-018-ORD-11448 with the Detroit Ordnance District.
Rather than delay issuing this credit until we have undergone a formal redetermination of prices for this period with the Detroit Ordnance District, we are volun *899 tarily making tlie adjustments tabulated below and enclose our Credit Memorandum No. 12-20101 in tlie amomit of $217,676.69. This credit memorandum is issued as of December 31, 1953.

Contract Humber Total Billing Amount of Credit

DA-11-022-ORD-297_ $1, 535, 007.40 $138,150. 67
DA-11-022-ORD-983— 330,220.09 29, 719. 81
DA-11-022-ORD-1216 — . 350,971.08 31, 587.40
DA-11-070-ORD-S841__. 1,169.70 105. 27
DA-11-022-OB3>-1217__. 106,190. 50 9, 557.15
DA-11-022-ORD-1254__. 1,023. 65 92.13
DA-11-022-ORD-1280__. 54,176.26 4, 875.86
DA-11-022-ORD-1360— 6,900. 60 621. 05
DA-11-022-ORD-1390 — . 6,461. 85 581. 57
DA-20-113-ORD-15556-. 1, 013. 76 91.24
DA-2D-113-ORD-15582-. 1, 376. 55 123.89
DA-20-113-ORD-15920-. 244. 32 21. 99
DA-20-113-ORD-16512-. 8, 984. 88 808.63
DA-11-022-ORD-1231__. 14, 889.24 1,340. 03
$2,418,629.88 $217,676. 69
Inasmuch as you have indicated on previous refunds that you would prefer our remittance rather than apply the credit to your account with us, we are enclosing herewith our check in the amount of $217,676.69 in payment of the credit memorandum that has been issued.
A copy of this letter is being sent to Mr. C. E. Tobey, Administrative Assistant of the Detroit Ordnance District.
The enclosed “Accounts Eeceivable — Credit Memorandum” also contained a list of the contract numbers and the amount of credits applicable to each contract. Also appearing thereon was the notation “Voluntary price adjustment per our letter of February 17, 1954, attached.” The voucher attached to the check contained the following statement:
IN PULL SETTLEMENT OP OUR CREDIT MEMO #12-20101 DATED DEC 31, 1953 WHICH COVERED VOLUNTARY PRICE ADJUSTMENT ON GOVERNMENT CONTRACTS AS LISTED THEREON.
51. Upon receipt of Eockwell’s letter of February 17, 1954, with enclosed check and credit memorandum, plaintiff reviewed its contracts with defendant .on which the credits applied as shown in the letter. The first two contracts (297 and 983) were contracts which were included in the prior refunds from Eockwell in the total amounts of $1,845,338.09 and $371,207.09.
*900 For the same reasons which led plaintiff previously to remit that part of the prior refunds applicable to said two contracts to defendant, plaintiff again concluded to remit that part of the present $217,676.69 refund which was applicable to said two contracts. However, plaintiff determined to retain the balance of the refund applicable to the other contracts listed in the letter in the total amount of $49,806.21.
With regard to Contract 1216 (the third contract listed in the February 17 letter), plaintiff considered that, under the type of price redetermination article contained in this contract, wherein the redetermined prices applied only prospectively, the current prices to the Government were firm and would remain so until new prices would be set under future price redetermination proceedings, if any. In addition, plaintiff felt that the absence of a liepricing of Subcontracts or Purchase Orders provision in the contract relieved it of passing on to defendant such refunds from suppliers. Furthermore, as heretofore noted, plaintiff, in bidding low on Contract 1216 in an effort to become the sole supplier of the 5-ton military vehicles, expected to experience a possible loss or at best to make only a small profit. Therefore, plaintiff sought every means by which to minimize its losses on this contract. Consequently, plaintiff decided to retain any price refunds or reductions received from suppliers which related to this contract. Plaintiff was confident that no future price redetermination proceedings would result in its being deprived of the refund because of the improbability that, even with the retention of the refund, its percentage of profit would, after deducting its overhead costs calculated on a fully adjusted cost basis, equal or exceed the 8 percent which its bid breakdown indicated it expected to make on this contract.
With regard to the remaining 11 contracts listed in the February 17, 1954, letter from Rockwell (Contracts 8841 through 1231), plaintiff ascertained these were also fixed price spare parts contracts it had entered into with defendant which did not contain a Price Redetermination or a Repricing of Subcontracts or Purchase Orders provision. For the same reasons plaintiff retained the $35.09 applicable to Contract 8841 in the prior refund received from Rockwell *901 (finding 48(a)), plaintiff again decided to retain also that portion of the $217,676.69 refund applicable to these spare parts contracts.
Thus, plaintiff retained a total of $49,806.21 from the Rockwell refund of $217,676.69. Plaintiff applied $31,587.40 as a reduction of its cost of producing 5-ton military vehicles by its Motor Truck Division under Contract 1216 and applied $18,218.81 as a reduction of its spare parts costs in the same Division.
52. As shown (finding 30) plaintiff had, on August 12, 1953, pursuant to the Price Redetermination Article of Contract 297, submitted a statement of the costs incurred in the performance of the contract to the specified production point, and defendant subsequently conducted an audit of such costs. Thereafter, upon arriving at an agreement concerning redetermined prices, the parties, on February 18,1954, entered into Supplemental Agreement No. 13 which, among other things, consummated such agreement. Said supplement stated that “the parties have negotiated and agreed on redetermined prices on all of the supplies delivered and to be delivered under the Contract” and that, as a result of the supplement, the total contract price was reduced by the sum of $3,095,834.40. The supplement also provided:
5. The revised prices herein for vehicles and spare parts may be further adjusted by reason of any increase or decrease in the selling prices of any of the suppliers of the components or services, described in Article 10 of the Contract, purchased by the Contractor in and for the performance of this Contract, which results from the redetermination of such subcontract prices by the Government. Such increase or decrease of the redetermined prices herein shall be made upon the demand of either party following upon the change of the selling prices of any of the suppliers, to the Contractor, of the components and services described in Article 10 of the Contract, as aforesaid, without regard to the time limitations contained in Article 6 of the Contract with respect to the times when prices of supplies under the Contract may be increased or decreased.
53. By letter dated February 26,1954, to the Chicago Ordnance District, which letter made no mention of the credits totaling $49,806.21 or the contracts to which they applied *902 (finding 50(b)), plaintiff sent to defendant a cheek in the amount of $167,870.48, which was equal to the amount Rockwell had sent to plaintiff less said sum of $49,806.21. Said letter read as follows:
Re: DA-11-022-ORD-297
DA-11-022-ORD-983
We are in receipt of a credit memorandum and a check from the Timken-Detroit Axle Division of the Rockwell Spring and Axle Company covering a voluntary price adjustment on subject contracts. The amount applicable to each contract and the total amount of credit is as follows:

Contract Number Amount of Credit

DA-11-022-ORD-983_ $29, 719. 81
DA-11-022-0RD-297_ 138,150. 67
$167, 870.48
We enclose our voucher check for $167,870.48 payable to the Treasurer of the United States transferring this amount. We trust this meets with your approval.
54. As shown (finding 37) plaintiff had, on September 28, 1953, pursuant to the Price Redetermination Article of Corn-tract 983, submitted a statement of the costs incurred in the performance of the contract to the specified production point, and defendant subsequently conducted an audit of such costs. Thereafter, upon arriving at an agreement concerning redetermined prices, the parties, on February 25,1954, entered into Supplemental Agreement No. 8, which consummated such agreement. Said supplement stated, among other things, that “the parties have negotiated and agreed on redetermined prices for all of the supplies delivered and to be delivered under the Contract” and fixed a new total contract price by increasing such price by the amount of $181,215.09. The supplement also contained a paragraph concerning possible further adjustments in price as a result of the redeter-mination by defendant of subcontractors’ prices which was the same- as that contained in Supplemental Agreement No. 13 to Contract 297 (finding 52).
55. On April 29,1954, Rockwell increased the then current price of the standard axle set from $3,213.50 (finding 49(a)) to $3,290, the new price to be effective after delivery of 2,000 axle sets for use under Contract 1216.
*903 56. On May 26,1954, plaintiff and defendant entered into Supplemental Agreement No. 9 to Contract 983, which, stated in pertinent part:
Whereas, in Supplemental Agreement No. 8, the parties revised the prices of supplies delivered and to be delivered under the Contract, pursuant to the price re-determination provisions therein, and agreed that the said redetermined prices would be further adjusted by reason of any increase or decrease in the selling, prices of any of the suppliers of the components described in Article 9 entitled “Eepricing of Subcontracts or Purchase Orders” of the Contract, which resulted from the redetermination of such subcontract prices by the Government, pursuant to said Article .9; and
Whereas, the Government is in the course of redetermining the selling prices of Eockwell Spring and Axle Company (or Timken-Detroit Axle Company) for axles, one of the components listed in Article 9 of the Contract, purchased by the Contractor in and for the performance of the Contract, and the said subcontractor, in anticipation of said price revision, has refunded, to the Contractor, the amount of $230,974.15,[15] which amount the Contractor has paid over to the Government; and
Whereas, the parties have agreed that, pending consummation of said redetermination negotiations, a lump sum reduction in said amount from the Contract price should be reflected in the Contract * * *.
The supplement then fixed a new total contract price after making adjustments for certain changes and also after deducting said amount of $230,974.75. This deduction carried the descriptive statement:
Less: Eefund by Contractor in amount equal to refund made to it by its subcontractor Eockwell Spring & Axle Company (or Timken-Detroit Axle Company) in anticipation of redetermination by the Government of said subcontractor’s selling prices for axles supplied to the Contractor in and for the performance of the Contract * * *.
57. (a) On or about August 19, 1954, the Chicago Ordnance District requested plaintiff to furnish information *904 concerning tbe refunds received by plaintiff from Rockwell and Timken. Plaintiff gave the data with respect to the refunds received which were applicable to Contracts 8292, 297 and 983 and wliich.it had turned over to defendant, as well as the $49,806.21 received on the other contracts which plaintiff had not forwarded to defendant. Apparently due to an oversight, no mention was made of the $35.09 refund on Contract 8841 retained by plaintiff (finding 48 (a)).
Thereafter, the Chicago Ordnance District, contending that the funds in question belonged to defendant and that plaintiff was obliged to remit them to defendant, asked plaintiff to turn over to it the refund of $49,806.21. At first plaintiff refused, contending that said refund was composed of amounts applicable to fixed price contracts between plaintiff and defendant and that, considering such fixed price nature as well as the other terms of the contracts, including the absence of the “Repricing of Subcontracts or Purchase Orders” article therein, the funds belonged to plaintiff and that plaintiff was not therefore required to turn over such amounts to defendant. Nevertheless, after additional discussions between representatives of plaintiff and the District, and repeated oral demands by the District’s representatives, one of whom suggested that plaintiff make some kind of a payment with respect thereto, such as the amount of $25,000, plaintiff, on October 5, 1954, hoping to satisfy such demands, forwarded to the Chicago Ordnance District a check in the amount of $25,000. The letter of transmittal read in pertinent part as follows:
Attached is our check in the amount of $25,000.00 which constitutes a voluntary refund on a number of miscellaneous fixed price contracts and is applicable to amounts received or accrued by International Harvester Company in the current fiscal year. This check, added to previous voluntary refunds amounting to $817,-590.02[16] makes a grand total of $842,590.02 volmitarily *905 refunded by International Harvester Company on the 5-ton 6x6 program.
The Chicago Ordnance District acknowledged receipt of the check by its letter of October 8,1954.
(b) The difference between said sum of $49,806.21 and said payment of $25,000, i.e., $24,806.21, is claimed by defendant in its Third Counterclaim filed herein.
58. On October 4, 1954, plaintiff and defendant, acting through Army Ordnance (negotiated by the Chicago Ordnance District), entered into a contract designated as Contract No. DA-11-022-OED-1680 (“Contract 1680”) for the production by plaintiff of 3,000 5-ton 6x6 trucks for the total amount of $36,639,37l.88.[17] The Price Eedetermination provisions in this contract were similar to those incorporated in Supplement 3 to Contract 1216 (finding 34) insofar as they permitted only decreases in price and provided that any redetermined price would apply only to deliveries made thereafter. The Price Eedetermination Article (Article 6) did, however, contain the following additional provision:
(c) Submission of data. * * * The Contractor further agrees to include in each of his subcontracts which is on a cost or cost-plus-a-fixed-fee or a price revision basis a provision to the effect that the subcontractor agrees (vi) to submit to the Contracting Officer such cost data, accounts, records and books as the Contracting Officer may require, (vii) to permit the Contracting Officer to make or cause to be made such examination and audits of the books, records and accounts as the Contracting Officer may deem necessary, and (viii) .to include a like provision in each of his subcontracts which-is on a cost- or cost-plus-a-fixed-fee or a price revision basis.
This contract did not contain any. “Eepricing of Subcontracts or Purchase Orders” provision.
59. By Supplemental Agreement No. 19, dated as of October 6,1954, to Contract 8292, plaintiff and defendant stated that:
Whereas, the Contractor has received a refund of $817,590.02 from a sub-contractor and an amount equivalent to such refund and with respect thereto has been *906 voluntarily paid by the Contractor to the Government, such refund thus inuring to the benefit of the Government ; and the parties desire to reflect such amount as a lump sum reduction in the contract price; * * *
The supplement also made other changes in the contract and set forth a new total contract price. It did so, however, after deducting $817,590.02 with the descriptive statement for the item: “Minus: Adjustment for refund from subcontractor, Timken-Detroit Axle Company.”
SO. (a) In early September 1954 the Chicago Ordnance District, prior to making a decision whether to demand formal price redetermination under Article 7 of Supplement 3 of Contract 1216, decided to review plaintiffs costs on said contract to ascertain if the cost trends were upward or downward.
The price analyst assigned to make the analysis requested plaintiff to furnish the quotations which it had received from its suppliers for the major components of the vehicles and upon which the bid and contract price on Supplement 3 of Contract 1216 was based (such quotations being called a “bill of materials”), as well as plaintiff’s actual current costs for such components. He also requested plaintiff’s current overhead rates for comparison with the rates plaintiff utilized in its bid proposal. In addition he asked for such figures as plaintiff could furnish which would indicate the total current cost of the individual vehicles. The price analyst informed plaintiff the data was being requested for the purpose of making a decision whether price redetermination would be recommended on Contract 1216.
In response plaintiff informed the price analyst that the material costs shown in the bid proposal submitted by plaintiff, which resulted in Supplement 3, were not based on a “bill of materials” (or actual quotations from suppliers) but that instead the material costs figures were submitted on a competitive bid basis and therefore no breakdown of this amount was available. Also, plaintiff advised that its cost system did not reflect individual vehicle costs and that it therefore could not readily determine the total current cost of any of the models. It did state, however, that current burden rates were available, as shown by monthly operating *907 statements. Thereafter, plaintiff submitted to the price analyst a statement showing a comparison of the costs of the major components used in producing six vehicle models under Contract 1216 as against costs of the comparable major components for the same six models under Contract 297, along with overhead rates and adjustments applicable to both contracts.
The price analyst was not informed, and thus was unaware, that plaintiff had actually obtained material quotations from suppliers and then, as hereinabove explained, computed its bid on a specific cost basis which included the full amount of such quotations but which eliminated or reduced substantially various overhead rates, adjustments, and the profit percentage. However, also as shown, the bid prices as submitted to defendant by plaintiff had indicated that the bid was calculated on a fully adjusted cost basis, which included full overhead and profit rates. The price analyst was also not informed, and thus was unaware, that plaintiff had actually compiled figures showing the current total costs as of August 13, 1954, of various of the models covered by Contract 1216. Plaintiff had compiled these current costs in connection with a proposal it was submitting to defendant on a new contract (1680) covering these same models (finding 58). The figures showed plaintiff’s current costs of producing each such model under Contract 1216, both on a fully adjusted and an “out-of-pocket” cost basis, and compared them with plaintiff’s proposed costs and prices on the new contract, also calculated on a fully adjusted and an out-of-pocket cost basis.
Shortly thereafter, the price analyst informed plaintiff he desired to examine the suppliers’ invoices. Since these invoices were kept at plaintiff’s Fort Wayne Works, where the vehicles were being produced, a visit to such plant was arranged. The price analyst, accompanied by a Chicago home office representative of plaintiff, arrived at the Fort Wayne Works on September 20, 1954. The price analyst requested and was given invoices of suppliers of major components on Contracts 1216, 297 and 983 for comparison of their price trends. He also was furnished overhead and adjustment rates applicable to the contracts for comparison of these cost trends.
*908 The price analyst, having no knowledge that the bid or contract prices of Supplement 3 were calculated by plaintiff on the above-described specific cost basis, observed that the current costs on Contract 1216, calculated on plaintiff’s fully adjusted basis, were higher than the contract or bid prices, and that plaintiff was, therefore, incurring a loss. He noted that although the trend of material costs in performing Supplement 3 of Contract 1216, as compared to the other contracts, was downward, the overall current costs, considering the overhead plaintiff was experiencing, were higher than such costs as set forth in plaintiff’s bid (which presumably reflected accurately plaintiff’s overhead costs at the time of the submission thereof and the execution of Supplement 3). In view of this higher current overall cost, the analyst concluded that the trend of plaintiff’s total costs was up, and that a price redetermination proceeding would not, therefore, result in the establishment of lower contract prices. Accordingly, he recommended that price redetermination proceedings not be instituted at such time.
(b) The results of the price analyst’s studies and his recommendation were reflected in his report dated October 7, 1954, which read as follows:
International Harvester Co.
Contract No. DA-11-022-OKD-1216
1. Eeference is made to request for an informal review of contractor’s costs to determine whether the trend is downward or upward, prior to making a formal demand for price revision.
2. A plant visit was made by the Analyst on the 20th of September 1954. Invoices covering the major component parts were examined for current costs and costs prior to 1 January 1954. Schedule “A” attached hereto shows the cost values of these parts, extended by the number of trucks to be delivered after 25 August 1954, indicating a net decrease in costs of 3%.
3. As of 25 August 1954, there remained 1974 vehicles to be delivered. The present contract price of these trucks as compared to the redetermined prices on Contract 297 or 983 is shown on Schedule “B” and reflects a total reduction of 13.5% in subject contract.
4. The contractor informed the Analyst that the bid proposal for subject contract was not based upon a bill of materials but on a competitive bid basis. A cost *909 break-down of tlieir bid prices was therefore not available. In addition, the contractor’s cost system does not reflect individual vehicle costs, hence it was not possible for the contractor to determine the total present cost of any of the truck models without going through all the motions of price redetermination. Current burden rates (as of 29 August 1954) were available, however, from the monthly operating statements.
5. The Analyst has estimated the current cost of the M51, with winch, by applying current burden rates to the material costs of the major component parts (representing 761^% of the total material cost) as follows:
Direct La~or~
Major components (76%%)_ $7,815.29
Balance 231/2%_ 2,400. 78
- $10,216.07
Material 102.16
Overhead-554.35% - 310.49 Direct
56. 01 1\ffg. 1\ffg.
La~or~ 56. 01 Material handling & shipping-477~
cwt~ Gen. & Adm.-6.6O6q~,. •
104. 90 SUB-TOTAL_. Works $10, 789.
69 712. 77 MPG.
COST _ $11,502.46 General Office Gen & Adm 2.4% (1953 rate)
- 276. 06 rOTAL COST )3EFOI~E P~OF~T~
Profit- 8%---------942.28
Fedei~ai Excise Tax�8% 0" $[18] 947. 88
TOTAL cost_ $13,668. 68
Unit price-Contract 1216 (Item 7a) ~12, 559.30
*910 Tliis represents an increase of $1,109.38 (or 8.83%) higher than the current contract price. It is evident that the 3% decrease in material costs (Exhibit “A”) is more than offset by the increase in burden rates.
6. In view of the facts revealed above, it seems apparent that the unit prices contained in the current contract were lower than the contractor’s costs at the time the bids were submitted and are lower than their current costs. The conclusion at this time is that a price revision demand would not result in lower costs and the Government would not benefit therefrom.
7. The contractor’s fiscal year ends on 31 October and the year-end adjustments should be completed and available by 30 November. There would still be 1,000 vehicles left to be delivered at that time and it is suggested that a review of the burden rates be made in another 45 days.
Attached to the memorandum was a “Schedule A” which set forth, with respect to Contract 1216, the “Current Cost of Major Components As Compared to Costs Prior to January 1954.” The schedule showed that, on the 1,974 vehicles remaining to be delivered after August 25,1954, there would be a decrease in the cost of major components, as compared to such costs on previous contracts, of $537,363.14, which was equivalent to a net decrease of 3 percent of the total costs of such components.[19]
Also attached was a “Schedule B” which compared the unit prices under Contract 1216 with the prices, as redetermined, of similar vehicles under Contracts 297 or 983.. This schedule showed that, on said 1,974 vehicles, the Contract 1216 prices were lower by the total amount of $4,112,589.65.
(o) The price analyst’s recommendation was approved and no price redetermination proceedings were instituted at that time.[20]
61. (a) As shown in findings 47(b) and 50(b), the refunds from Bockwell to plaintiff in the amounts of *911 $371,207.09 and $217,676.69 were with, respect to the 3-month periods ending September 30, 1953 and December 31, 1953, respectively. As noted, said refunds were forwarded in letters of transmittal from Rockwell to plaintiff.
However, the next refund was applicable to the entire calendar fiscal year from January 1 through December 31, 1954, and involved the sum of $1,529,737.90. This was the first full year’s refund from Rockwell to plaintiff. Also, said amount related entirely to Contract 1216.
Sometime prior to February 15, 1955, as a result of a telephone conversation between an official of Rockwell and an official of plaintiff, plaintiff was advised of the proposed issuance of such refund. However, as shown, plaintiff had previously decided to retain all Rockwell refunds applicable to Contract 1216 and not pass them on to defendant (finding 51). Plaintiff’s official so apprised the Rockwell official, and said officials then agreed that, instead of Rockwell’s adhering to the usual procedure of mailing the check to plaintiff together with a transmittal letter and a credit memorandum in the form previously adopted, plaintiff would send representatives to Rockwell’s office in Detroit to personally receive said check and, so as to strengthen plaintiff’s position in retaining the check, to review the credit memorandum to make certain it was in the form plaintiff desired for its purposes.
(b) On February 15, 1955, such a meeting was held at Rockwell’s offices in Detroit between representatives of plaintiff and Rockwell. There had been prepared prior to the meeting a check and attached voucher in the amount of $1,529,737.90 covering a refund on the axles shipped by Rockwell to plaintiff for the year ended December 31, 1954, as well as a Rockwell “Accounts Receivable — Credit Memorandum” dated December 31, 1954, which showed that the entire credit of $1,529,737.90 was applicable to Contract 1216. Also appearing thereon, in the usual form, was the notation “Voluntary price adjustment for the fiscal year ended December 31, 1954 * * These were shown to plaintiff’s representatives to ascertain if they were satisfactory for plaintiff’s purposes.
*912 However, plaintiff’s representatives stated that they wanted this particular credit memorandum to show specifically the original and the revised prices of each of the axle sets purchased on Contract 1216 to which the refund applied, and to describe the refund as a revision of Rockwell’s price to plaintiff under the contract instead of as a “voluntary price adjustment.” Rockwell thereupon agreed to prepare and furnish plaintiff’s representatives a revised credit memorandum in the form requested by plaintiff’s representatives, and, after one of plaintiff’s representatives gave detailed instructions to Rockwell’s employees as to the data the credit memorandum should contain, the meeting adjourned for such period of time as was necessary for the preparation of the revised memorandum by Rockwell.
(c) Upon the completion of the revised credit memorandum, the meeting reconvened and the check, in the amount of $1,529,737.90, and the revised memorandum, were then handed to plaintiff’s representatives together with a letter dated February 15,1955, which read as follows :
We are attaching hereto our credit memorandum No. 12-18843 and a check; in the amount of $1,529,737.90 which are self-explanatory.
Attached to the check was a voucher which stated thereon: “To Refund Our Credit Memorandum #12-18343, dated December 31, 1954 per our letter February 15, 1955.” This credit memorandum, dated December 31,1954, revised as requested by plaintiff’s representatives, and consisting of eight pages, listed all the axle sets purchased by plaintiff during the period in question at the various original set prices, and the lower revised prices, with the differences totaling the amount of the refund.[21] The memorandum also contained the following notation, in lieu of the notation set forth above, which had been on the original memorandum:
To revise set price on Contract Number DA-11-22ORD-1216. Shipped during the year ended December 81,1954.
*913 Thereupon the meeting terminated and plaintiff’s representatives returned to Chicago with the revised credit memorandum, the. check, the voucher, and the letter of transmittal.
(d) Said amount of $1,529,737.90 was retained by plaintiff and credited to plaintiff’s costs of producing the vehicles ■under Contract 1216.
62. Prior to March 9, 1955, Eockwell and defendant, acting through the Detroit Ordnance District, entered into repricing negotiations under Contract 11448 with respect to Timken’s sales to its prime contractors for Timken’s fiscal years ending June 30, 1952 and 1953. The agreement reached as a result of such negotiations was reflected in Supplemental Agreement No. 2 to Contract 11448, dated March :9, 1955. Under this supplement the parties stated their previous agreement “to adjust the prices of the related subcontracts as defined in paragraph (a) of Article IV of this •Contract, on the basis of fiscal year receipt resulting from .gross billings under such related subcontracts” and agreed that “adjustment of prices on a fiscal year basis in lieu of the basis as heretofore set forth in Article IV of this Contract, is deemed now to be in the best interests of the Government.” The agreement further recited that Timken’s receipts from its gross billings to the Government’s prime contractors for the two fiscal years ended June 30,1952 and 1953 ■amounted to almost $230,000,000, and that it had “refunded to the aforesaid Government prime contractors the sum of $7,712,781.50.”
The agreement further provided that, “as a result of repricing negotiations”, Eockwell agreed “to refund to the •Government the sum of $3,029,021.92 with respect to its gross billings for fiscal year ended 30 June 1952, and the sum of ■$3,539,692.63 with respect to its gross billings for fiscal year •ended 30 June 1953, less the sum of $1,500,000.00 refunded to the Eenegotiation Board.” Eockwell agreed to deliver its check covering the refund (less tax credits and the amount already refunded to the Eenegotiation Board) made out “to the order of the Treasurer of the United States” and to deliver such check “to the Department of the Army, Detroit Ordnance District.”
*914 Schedules attached to the Supplemental Agreement listed all the “Refunds Made to Customers” during both fiscal years by individual prime contractors and contract numbers. No such refunds were stated as having been made applicable to the fiscal year ending June 30, 1952. However, listed among the refunds totaling $7,712,781.50 made to ten prime contractors applicable to the fiscal year ending June 30,1953, was the refund made to plaintiff in the amount of $1,845,-338.09 with respect to purchases by plaintiff under its prime contracts 8292, 297 and 983, with the amount allocable to each contract also set forth.
63. As shown, each time Rockwell made a refund to plaintiff under its Contract 11448, it so advised the Detroit Ordnance District. Although Rockwell knew that plaintiff intended to retain the $1,529,737.90 refund, and indeed was willing to cooperate with this important customer, who was now the Government’s sole supplier of the 5-ton 6x6 truck, to assist it in retaining the refund, it nevertheless felt it had no concern with the question of the ultimate disposition of the'refund. It felt that this was essentially a matter between plaintiff and the Government. However, despite its actions of February 15, 1955, it still regarded the refund as having been made, like the previous ones, pursuant to its obligations under Contract 11448 and the instructions it had received from defendant to pay such refunds to the prime contractors in order to keep the funds in the procurement stream, and accordingly, by letter dated March 25, 1955, advised the Detroit Ordnance District that it had made such refund to plaintiff under its Contract 11448 with the District. With said letter, it submitted a statement of sales, cost of sales, and profits, for the year ended December 31, 1954, covering axle sets and spare parts “subject to price redeter-mination” under Article IV of Contract 11448. With regard to the refund the letter stated:
It is our desire to finalize all price adjustments at the earliest possible date to be evidenced by supplemental agreement to the above captioned contract as provided in Paragraph (d) (2) of Article IV.
% % Hi # #
Price adjustments were made with the International Harvester Company for the fiscal year ended December *915 31,1954, totaling $1,529,737.90, which price adjustments have been given effect in the statements enclosed. These were the only price adjustments during the year.
64. Prior to October 21, 1955, Rockwell and defendant, acting through the Detroit Ordnance District, entered into repricing negotiations under Contract 11448 with respect to Timken’s sales to its prime contractors for the quarter July-September 1953 (Timken’s fiscal year having ended on June 30,1953). The agreement reached as a result of such negotiations was reflected in Supplemental Agreement No. 3 to Contract 11448 dated October 21,1955. Under this supplement, the parties set forth their agreement “to adjust the prices of the related subcontracts as defined in paragraph (a) of Article IY of this Contract on the basis of receipts during the quarter Jidy-September 1953 resulting from gross billings under such related subcontracts” and stated that “adjustment of prices on basis of such quarterly period in lieu of the basis as heretofore set forth in Article IV of the Contract, is deemed to be in the best interests of the Government.” ■ The agreement further recited that Timken’s receipts from its gross billings to the Government prime contractors for such quarterly period amounted to over $25,500,000, and that it had “refunded to the aforesaid Government prime contractors the sum of $1,599,872.94.”
The agreement further stated that, “as a result of repricing negotiations,” Rockwell agreed “to refund directly to the Government the additional sum of $1,167,364.93, * * * which amount together with the amount” of $1,599,872.94 refunded to the prime contractors “represents the results of the agreed upon revision of prices pursuant to paragraph (a) of Article IY of the Contract.” The payment provisions, were the same as set forth in the previous supplement (finding 62).
Schedules attached to the Supplemental Agreement listed all the “Refunds to Customers” during the quarter by individual prime contractors and contracts. Listed among the refunds totaling $1,599,872.04 made to seven prime contractors applicable to said quarterly period was the refund in the amount of $371,207.09 made to plaintiff with respect, to purchases by plaintiff under its prime contracts 8292, 297,. *916 983 and 8841, with, the amounts allocable to each contract also set forth.
65. Prior to December 8, 1955, the Detroit Ordnance District was advised by the Chicago Ordnance District of the problems involved in plaintiff’s refusing to turn over to defendant the full amounts of the refunds made by Timken or Rockwell to plaintiff under Contract 11448, including plaintiff’s contentions with respect thereto. Consequently, the Districts' agreed that Rockwell should be instructed to make all further voluntary refunds in anticipation of price redetermination under Contract 11448 directly to the Detroit Ordnance District rather than to the prime contractors. This direction was made by a letter dated December 8,1955, to Rockwell from the Detroit Ordnance District, which read as follows:
In the past, your company has made numerous voluntary refunds to your Government prime contractors in anticipation of the periodic price redeterminations under Contract No. DA-20-018-ORD-11448.
Although such refunds should rightfully inure to the benefit of the Government, the Government has been able to recapture only a portion of the refunds made, due in part to the absence of price redetermination provisions in the prime contracts involved and in part to the fact that the refunds have been made after the prime contracts have been closed or redetermination negotiations completed.
It is, therefore, requested that, if any voluntary refunds are to be made by you in the future, they be made directly to Detroit Ordnance District, rather than to the prime contractors.
66. Prior to December 13, 1955, Rockwell and defendant, acting through the Detroit Ordnance District, entered into repricing negotiations under Contract 11448 with respect to Rockwell’s sales to its prime contractors for the quarter ending December 31,1953. The agreement reached as a result of such negotiations was reflected in Supplemental Agreement No. 4 to Contract 11448 dated December 13, 1955, which supplement was in terms similar to the previous ones. For this quarter, the supplement set forth Rockwell’s gross billings to the prime contractors as almost $18,000,000, the ■refunds made to certain of such prime contractors as $1,044,- *917 867.95, and Rockwell’s agreement “to refund directly to the Government the additional sum of $1,015,064.46 * * * which amount, together with the amount” of $1,044,867.95 already refunded to the prime contractors “represents the results of the revision of prices agreed upon pursuant to paragraph (a) of Article IV of the Contract.”
Attached were schedules similar to those in the previous supplements. Listed among the refunds totaling $1,044,-867.95 made to seven prime contractors was the refund in the amount of $217,676.69 made to plaintiff with respect to purchases by plaintiff under its prime contracts 297, 983, 1216 and the 11 additional spare parts contracts, with the amounts allocated to each contract also set forth.
67. (a) Copies of Supplemental Agreements Nos. 2,3 and 4 to Rockwell’s Contract 11448 with the Detroit Ordnance District which covered the periods up to January 1, 1954, were forwarded by said District to the Chicago Ordnance District. Upon ultimately studying such supplements, the Chicago Ordnance District found it could not reconcile the amounts listed therein as having been refunded to plaintiff with the amounts that had been refunded by plaintiff to the Chicago Ordnance District. In February 1956, the Detroit Ordnance District advised the Chicago Ordnance District that Rockwell had been instructed to make all refunds under Contract 11448 for the fiscal years 1954 and 1955 directly to the Government and not to the prime contractors. Thereafter, by letter dated March 15,1956, the Chicago Ordnance District requested the Detroit Ordnance District to advise it of all the refunds that had been made to plaintiff by Rockwell pursuant to Contract 11448.
(b) By letter of March 26, 1956, the Detroit Ordnance District forwarded a tabulation showing the refunds made by Rockwell to its prime contractors applicable to Rockwell’s sales through December 31, 1953. It also informed that, with respect to Rockwell’s making all further refunds direct to defendant, Rockwell “has advised this office that it has made a refund direct to International Harvester Company of $1,529,737.90” on Contract 1216 “for the calendar year 1954. No other refunds have been made to referenced contractors by Timken for the calendar year 1954.”
*918 68. On March. 22, 1956, plaintiff and defendant entered into Supplemental Agreement No. 20 to Contract 8292, which recited in pertinent part:
Whereas, the contractor did voluntarily refund to the Government the sum of twenty-five thousand ($25,-000) and the parties have agreed for their administrative convenience to reflect such voluntary refund a,s a lump sum reduction in the price of this contract * * *.
The supplement also covered certain changes in the contract and set forth a new total contract price. It did so, however, after deducting $25,000, with the descriptive statement for such item: “Minus: Adjustment for voluntary refund received from the contractor.”
69. On March 23, 1956, plaintiff and defendant entered into Supplemental Agreement No. 17 to Contract 297, which recited in pertinent part:
Whereas, the Contractor has received a refund of $1,335,815.80 [22] from a subcontractor, and an amount equal to such refund and with respect thereto having been voluntarily paid by the Contractor to the Government, such refund thus inuring- to the benefit of the Government, and the parties desire to reflect such amount as a lump sum reduction in the contract price * * *.
The supplement also covered certain changes in the contract and set forth a new total contract price. It did so, however, after deducting $1,335,815.80, with the descriptive statement for such item: “Less: Kefund by Contractor in an amount equal to refund made to it by its subcontractor (Timken-Detroit Axle Company).”
70. (a) Upon receipt of the letter of March 26,1956, from the Detroit Ordnance District (finding 67(b)), the Chicago Ordnance District, finding no record of the receipt by it from plaintiff of the $1,529,737.90 refund on Contract 1218, sent the following letter dated April 12, 1956, to plaintiff:
subject : Refunds on Timken-Detroit Axle Div. Contract No. DA-11-022-ORD-1216
Gentlemen:
This office has just been advised by the Detroit Ordnance District that the Timken-Detroit Axle Division *919 of the Rockwell Spring & Axle Company lias made a refund direct to you of $1,529,731.90 on Contract No. DA-11-022-ORD-1216 for the Calendar Year 1954. It is assumed that you will pass this refund on to this District, as you have in the past.
As stated in our letter dated 17 February 1956, to Mr. J. L. MacCafferty [plaintiff’s president], concerning refunds to the Government, it was emphasized that retention of Ordnance Funds can only be accomplished with timely refunds.
Your cooperation is solicited, in forwarding this refund from the Timken-Detroit Axle Division, as soon as possible.
(b) By letter dated April 20, 1956, to the Chicago Ordnance District, plaintiff, by its vice-president, advised that it would not pass on said refund to defendant. The letter read as follows:
I have received your letter of April 12,1956, addressed to our Company, directed to my attention, and relating to price adjustment made by Rockwell Spring & Axle Company which affects subcontracts under Prime Contract No. DA-11-022-ORD-1216.
The amount you referred to in your letter, $1,529,-737.90, results from price adjustment made by Rockwell Spring & Axle Company upon our purchase orders placed with that company. The purchase orders were sub contracts under the above numbered prime contract, but the subcontract price revision affects deliveries and costs during periods as to which the prime contract is firm and not subject to price revision.
Under the circumstances, we do not plan to pass on to the Government the savings in cost resulting from this subcontract price revision, and we are confident that upon reviewing the situation the Government will agree that we have no obligation to do so.
71. Prior to June 1, 1956, Rockwell and defendant, acting through the Detroit Ordnance District, entered into repricing negotiations under Contract 11448 with respect to Rockwell’s sales to its prime contractors for the fiscal year ending December 31, 1954.[23] The agreement reached as a result of *920 sucb negotiations was reflected in Supplemental Agreement No. 5 to Contract 11448 dated June 1,1956. Under this supplement, the parties set forth their agreement to adjust and revise the prices of Bockwell’s subcontracts, pursuant to-Article IY of the Contract, for the fiscal year ended December 81, 1954.
By this supplement, the parties agreed upon the substitution of an entirely new and revised Article IV for the original article. Among other things, the revised article set forth the periods during which Eockwell’s prices would be reviewed (including the past periods already covered by the previous supplement) and provided that in the future the repricing would be done on a calendar year basis. As to the method1 by which the refunds were to be made, the revised article provided:
_ (f) Payments. (1) If the aggregate of the amounts billed during any review period with respect to the Belated Subcontracts exceeds the revised aggregate prices negotiated pursuant to paragraph (d) of this Article, the Contractor will pay to the Government, in a manner directed by the Contracting Officer, an amount equal to such difference * * *.
(2) In lieu of such payment of sums billed in excess of the revised aggregate of prices, the Contractor may account for all or any part of such excess by rebates, refunds, or credit memorandum under such Belated Subcontracts; provided, however, that the written approval of the Contracting Officer shall be required with respect to rebates, refunds or credit memorandum under Belated Subcontracts * * *. Nothing contained herein shall prevent the Contractor from reducing prices charged under Belated Subcontracts with respect to shipments made after the date of such price reduction»
The agreement further recited that Bockwell’s receipts from its gross billings to the Government prime contractors for such fiscal year amounted to over $24,000,000, and, in paragraph 3, that Bockwell had “refunded to one of the Government prime contractors, namely, International Harvester Company, under Contract DA-11-022-OBD-1216, the sum of $4,529,737.90,” and that Bockwell “further represents that it has made no refunds other than as stated in this paragraph 3 to any other Government prime contractor *921 under any Eelated Subcontract during the calendar year 1954.”
The agreement further stated that the parties thereto “have negotiated in good faith and agreed upon reasonable revised prices under the Eelated Subcontracts for the calendar year 1954” and that “As a result of these repricing negotiations,” Eockwell agreed “to refund to the Government the sum of $2,528,674.00 * * * which amount, together with the amount set forth in paragraph 8 hereof, represents the results of revision of prices agreed upon pursuant to” Article IV. The provisions as to making payment of the refund were the same as set forth in the previous supplements.
Schedules attached to the supplement listed Eockwell’s gross billings to all its prime contractors for the year, as well as its “Eefunds to Customers”, under which was listed only the refund to plaintiff on Contract 1216 in the sum of $1,529,737.90.
72. On June 28, 1956, plaintiff and defendant, acting through Army Ordnance (negotiated by the Chicago Ordnance District), entered into a contract designated as Contract No. DA-11-022-OED-2200 (“Contract 2200”) for the production by plaintiff of 1,644 5-ton 6x6 trucks, plus spare parts, for the total amount of $17,328,611.43.[24] This contract contained neither a Price Eedetermination article nor a Eepricing of Subcontracts or Purchase Orders provision. It did, however, contain the following provision with respect to suppliers:
Article I (b).
$ ^ ‡ ‡
(4) If, pursuant to a separate repricing agreement, existing as of this date between the Government and a supplier of the Contractor, the Contractor receives the benefit of a reduction in its purchase order price for supplies required for this Contract, or if the Contractor receives a voluntary refund or credit in connection with such supplies, such credit being capable of being realized in actual cash or in reduction of unpaid billings from a supplier subject to such a separate repricing agreement, *922 the Contractor agrees promptly to notify the Contracting Officer thereof ana the Contract Price shall be decreased by the amount of such benefit, refund or credit realized in actual cash or in reduction of any unpaid billings due such supplier, or the amount so received shall be paid over to the Government. Nothing herein shall be construed to authorize any such supplier to increase prices for supplies above the contract price agreed upon between the Contractor and said supplier.
73. Despite plaintiff’s refusal, in its letter of April 20, 1956 (finding 70(b)), to pay to defendant the $1,529,737.90 refund Rockwell made to plaintiff, the Chicago Ordnance District, in letters of May 24, 1956, and November 26, 1956, made further requests for payment. Finally, by letter of January 23, 1957, the contracting officer on Contract 1216 advised plaintiff that “upon a considered review” of the matter, “it is determined that you are indebted to the United States of America” under 'Contract 1216 in the amount of $1,529,737.90, “representing the amount paid over to you by Rockwell Spring & Axle Company for and inuring to the benefit of the Government, relating to axles supplied by it for performance of the contract, in accordance with repricing agreement existing between the Government and” Rockwell. The letter then went on to make demand for payment of said sum and to state that plaintiff’s failure to make such payment would be followed by setoff of amounts due to plaintiff under existing contracts.
74. On February 20,1957, plaintiff appealed the ruling of the contracting officer concerning the $1,529,737.90 dispute (and other matters) to the Secretary of the Army, which appeal was referred to the Armed Services Board of Contract Appeals. Subsequently, plaintiff and defendant joined in a motion to the Board to dismiss for want of jurisdiction that part of the appeal pertaining to this matter. On September 5, 1958, the Board dismissed the appeal “insofar as it pertains to the Government’s demand for payment by the appellant of the $1,529,737.90 received by it from Rockwell * * The Board stated in pertinent part:
As we view the case, the right which the Government is attempting to enforce is not one arising under the express terms of the written contract (No. 1216). The *923 Government’s position appears to be that it is entitled to the $1,529,137.90 in dispute — not by virtue of the written contract under which the appeal was taken — but by virtue of a contract between the Government and Rockwell plus certain facts and circumstances arising outside Contract No. 1216. To the extent that the Government’s claim for the $1,529,737.90 is based on Contract No. 1216 at all, it appears to be in the nature of a claim for reformation of the contract, which is beyond the jurisdiction of this Board.
75. Plaintiff’s refusal to pay said amount of $1,529,737.90 was followed by defendant’s deducting an equivalent amount (plus an additional amount for other claims, as hereinafter set forth) from amounts otherwise due to plaintiff on Contract 2200. Plaintiff, in its petition filed herein, sues to recover said $1,529,737.90 deduction.
THE FEDERAL EXCISE TAX ISSUE
76. Article 2, paragraph 10 of Contract 1216, provided in pertinent part:
10. FEDERAL, STATE, AND LOCAL TAXES
(b) Federal Taxes. — Except as may be otherwise provided in this contract, the contract price includes all applicable Federal taxes in effect on the contract date. $ ‡ ‡ ‡
(e) Price Adjustment. — If, after the contract date, the Federal Government or any State or local government either (i) imposes or increases (or removes an exemption with respect to) any direct tax, or any tax directly applicable to the materials or components used in the manufacture or furnishing of the completed supplies or services covered by this contract, or (ii) refuses to accept the evidence of exemption, furnished under paragraph {d) hereof, with respect to any direct tax excluded from the contract price, and if under either (i) or (ii) the Contractor is obliged to and does pay or bear the burden of any such tax (and does not secure a refund thereof), the contract price shall be correspondingly increased. If, after the contract date, the Contractor is relieved in whole or in part from the payment or the burden of any direct tax included in the contract price, or any tax directly applicable to the materials or components used in the manufacture or furnishing of the completed supplies or services covered by this con- *924 4ract, the Contractor agrees promptly to notify the Contracting Officer of such relief, and the contract price «hall be correspondingly decreased or the amount of such .relief paid over to the Government. Invoices or vouchers covering any increase or decrease in contract price pursuant to the provisions of this paragraph shall state the amount thereof, as a separate added or deducted item, and shall identify the particular tax imposed, increased, eliminated, or decreased.
77. Pursuant to the excise tax provisions of the Internal Revenue Code then in effect, plaintiff, in submitting bid proposals on military vehicles, computed an excise tax on the body and chassis of 8 percent of the bid price of each model, exclusive of the cost of tires.[25] In bid proposals and resulting contract prices, all of the excise taxes calculated •and to be paid by plaintiff, including the body and chassis ■excise tax, were included in the price breakdown on each truck model. Plaintiff made quarterly returns of the excise taxes due.
78. (a) As related in finding 28 (a), plaintiff, on July 24, 1953, submitted its bid proposal to defendant pertaining to the 3,750 military vehicles. As part of the bid proposal, plaintiff submitted a cost breakdown for each model. Said cost breakdowns included an amount representing 8 percent Federal excise tax on the body and chassis of each model.
(b) On July 27, 1953, plaintiff, prior to the execution of Supplement 3 to Contract 1216, in a letter to the Detroit Ordnance District, advised that the Bureau of Internal Revenue, in a telegram of July 23, 1953, had ruled that the body and chassis of 21/^-ton M-108 military vehicles were not subject to Federal excise taxes.[26] It further advised that, based on this ruling, its initial proposal of July 24, 1953, which included the furnishing of 475 M-62 vehicles, should be considered amended to delete $586.27 from the unit price thereof which it had included as Federal excise tax on that *925 particular model’s chassis (finding 29). The letter concluded, “We offer this amendment to our proposal to effect the lowest price possible in the evaluation of bids on the 5 Ton, 6x6, Tactical Vehicle.”
79. (a) By letter dated August 12,1953, plaintiff informed the Excise Tax Ruling Branch, Bureau of Internal Revenue, that it was contracting to supply 6x6 5-ton wreckers, Model M-62, to defendant, which plaintiff considered similar to the M-108 that the Bureau of Internal Revenue had recently ruled was an “off-the-highway” vehicle and not subject, therefore, to the Federal excise tax under Section 3403(a) of the Internal Revenue Code. Plaintiff asked for a ruling with regard to Model M-62.
(b) By a telegram dated August 17, 1953, received from the Excise Tax Ruling Branch, plaintiff was advised that the body and chassis of Model M-62 was not subject to excise tax under the above section of the code. This ruling was confirmed by letter to plaintiff under date of October 1, 1953, which stated in part, “* * * the M-62 crane body and chassis are not subject to the tax imposed under Section 3403(a) of the Code since the vehicle is neither designed nor adapted for transportation of property on the highways.”
80. (a) A revised proposal on the 3,750 vehicles was submitted by plaintiff under date of August 26, 1953 (finding 31 (b)). Again attached to the bid proposal were cost breakdowns applicable to each type or model of vehicle to be produced. Said cost breakdowns included as part of the cost for each type of vehicle, including the M-62, an amount for the 8 percent Federal excise tax on the body and chassis despite plaintiff’s previous letter of July 27,1953, to defendant which had deleted said tax from its proposal on that model and also despite the ruling plaintiff had received on August 17, 1953, that this model was not subject to the tax.
(b) Supplement No. 3 to Contract 1216 covering the production of the 3,750 vehicles was executed on September 11, 1953, at the prices bid by plaintiff with the Federal excise taxes included in the contract unit prices of each model of vehicle, including the M-62. Beneath the description of each model of the 3,750 vehicles to be produced under Supple *926 ment 3 and the contract unit price thereof was a parenthetical statement of the amount of Federal excise tax included in said unit price. For example, beneath the description and the amount of the unit price of the M-139 model vehicle was the statement, “ (Including $836.03 Excise Tax).”
81. By letter dated December 22, 1953, plaintiff informed the Excise Tax Billing Branch, Bureau of Internal Bevenue, that it had contracted to furnish to defendant various military vehicles. The letter listed various model numbers, including those being produced under Supplements 3 and 4 of Contract 1216 (with the exception of Model M-62 which had already been ruled as nontaxable) and requested confirmation that these vehicles were also “off-the-highway” vehicles and not subject to the body and chassis Federal excise tax.[27]
82. (a) In December 1953 or early January 1954, a Chicago Ordnance District attorney, in examining the Contract 1216 file, noted plaintiff’s letter of July 27, 1953, to the Detroit Ordnance District (finding 78 (b)). He observed that while the letter informed that the Federal excise tax was being eliminated on the body and chassis on Model M-62, plaintiff’s revised proposal and Supplement 3 to Contract 1216 nevertheless both incorporated the excise tax in the unit price for that model.
(b) At or about the same time there came to the attorney’s attention, in connection with his legal review thereof, proposed supplements to Contracts 297 and 983 concerning price redetermination.
(c) Shortly thereafter, in a meeting held in January 1954 with representatives of plaintiff, the Chicago Ordnance District attorney requested an explanation of the M-62 excise tax matter. He was informed that plaintiff had requested a ruling from the Bureau of Internal Bevenue as to whether the chassis and body of the various models of 5-ton trucks produced under the three contracts (297, 983 and 1216), in- *927 eluding the M-62, were subject to the Federal excise tax but that said ruling had not as yet been received.[28]
The parties agreed that Contracts 297 and 983 should include, in the supplements then being prepared reflecting redetermined prices, a provision recognizing that the prices of the various truck models included the Federal excise tax on the body and chassis, and providing that plaintiff would be required to file a refund claim should it be ruled that the vehicles covered by said contracts were not subject to such excise tax. It was further agreed that any such tax refund would be passed on to defendant.
The Chicago Ordnance District attorney also stated that some understanding would have to be reached on Contract 1216 since the prices therein included an amount for body and chassis Federal excise tax on each vehicle. Plaintiff’s representatives replied that the matter of eliminating such taxes from that contract would be considered after the requested ruling had been made by the Bureau.
83. By telegram to plaintiff dated January 29, 1954, the Excise Tax Puling Branch, Bureau of Internal Eevenue, in response to plaintiff’s letter of December 22,1953 (finding 81), informed that the models listed in the letter were “off-the-highway” vehicles and thus not subject to said 8 percent body and chassis excise tax under Section 3403(a).[29]
84. (a) Under date of February 18, 1954, plaintiff and defendant, in accordance with their previous understanding (finding 82(c)), entered into Supplemental Agreement No. 13 to Contract 297, which contained, among other things, the following:
*****
Whereas, the Contractor has paid Federal Excise Tax on all the vehicles hereunder and the revised prices of *928 vehicles' do include Federal Excise Tax at the rate of 8%; and
Whereas, the Contractor has agreed to apply for refund of said tax for such of the vehicles hereunder as are, under the Internal Revenue Code and existing applicable United States Treasury Regulations, “off-the-highway vehicles” and not subject to tax, and to pay to> the Government the amount of any such refunds;
$ ^ ‡ ‡ ‡
7. It is recognized that the Contractor has paid Federal Excise Tax on all the vehicles hereunder and that the revised prices herein for the vehicles include Federal Excise Tax at the rate of 8%. The Contractor shall' promptly apply for refund of said tax paid for such of the vehicles hereunder as are, under the Internal Revenue Code and existing United States Treasury Regulations, “off-the-highway vehicles” and not subject to such) tax, and shall promptly pay to the Government the amount of any such refunds obtained.
(b) Under date of February 25, 1954, plaintiff and defendant, also in accordance with said understanding, entered into Supplemental Agreement No. 8 to Contract 983, which contained, among other things, provisions identical to those hereinabove set forth in paragraph (a).
(c) Subsequently, plaintiff applied for and obtained refunds of the Federal excise taxes it had paid on the chassis; and bodies of the vehicles included in Contracts 297 and 983,. and ultimately paid to the defendant the amount of the refunds thus received.[30]
85. In a meeting between plaintiff’s representatives and* the Chicago Ordnance District attorney held in late March or early April 1954, plaintiff’s representatives advised that a* favorable ruling had been obtained on plaintiff’s request covering the vehicles being produced under Contracts 297, 983: and 1216, and that plaintiff was accordingly proceeding to; file claims for refund of the Federal excise tax paid to the-Bureau of Internal Revenue on the body and chassis of vehicles produced under Contracts 297 and 983, as was re *929 quired by the supplemental agreements recently executed on these contracts (finding 84(a) (b)).
There was no discussion at this meeting concerning any action to be taken with respect to the excise taxes included in the unit prices for the vehicles being produced under Supplements 3 and 4 of Contract 1216.
86. As a result of the rulings by the Excise Tax Ruling Branch, Bureau of Internal Revenue, that the vehicles being produced by plaintiff under Supplements 3 and 4 to Contract 1216 were not subject to the chassis and body excise tax, no such tax was paid by plaintiff on the chassis or body of any of such vehicles.[31]
87. As set forth in the pleadings filed herein, the dispute between the parties concerning the body and chassis Federal excise tax issue in the sum of $250,637.30 related to 345 vehicles. Among other things, defendant contended with respect thereto that the prices plaintiff quoted on such vehicles and the resulting prices incorporated in Contract 1216 included said tax, that plaintiff was relieved from paying it by the aforementioned rulings of the Bureau, and that, under the terms of Contract 1216, plaintiff was obligated to refund said sum to defendant. Plaintiff, however, denies that, as to these particular vehicles, such tax was included in the prices it ultimately contracted for. Instead, plaintiff contends the final unit prices of the 345 vehicles in dispute resulted from changes in models or quantities requested by defendant subsequent to the tax rulings. Plaintiff thus contends that the unit prices proposed by plaintiff and accepted by defendant in connection with these changes became new contract unit prices, and that in calculating such new unit prices on the 345 vehicles, the Federal excise taxes that had been applicable to the body and chassis were reallocated by plaintiff to the materials costs of the vehicles. According to plaintiff, this was done because, as hereinabove noted, the Supplement 3 contract prices were, at the time of the execu *930 tion thereof, substantially below the fully adjusted costs of producing the vehicles, and by the time it submitted its quotations on the proposed changes, it became clear that no such production cost reductions (finding 32(b)) as would substantially affect its profit position would materialize. Thus, in retaining the amount of such excise tax in the unit price by reallocating such amount to the materials costs, plaintiff would be enabled to bring the contract price on the 345 vehicles at least that much closer to such fully adjusted costs.
*929 789-382 — 65-60
*930 Plaintiff thus contends, with regard to the 345 vehicles, that in connection with the changes, it submitted new unit prices which reflected as Federal excise tax only that amount of said tax applicable to the tires and the six minor accessory items.
Defendant responded that the prices submitted by plaintiff pertaining to the 345 vehicles were, where merely a change in quantities was involved, actually the original contract unit prices for like vehicles and where only relatively minor changes in equipment to be furnished were involved, the original price, including the excise tax, persisted, with the only changes in price being those reflecting the equipment changes. Thus, defendant maintained that, as the original contract unit prices included an amount for Federal excise tax on the body and the chassis (which plaintiff concedes), said tax was also included in the adjusted contract unit prices for the 345 vehicles.
There is presently no dispute between the parties on this issue as to the balance of the vehicles produced by plaintiff under Contract 1216.[32]
During the trial of this case, defendant conceded it could not establish that the unit price of one of the 345 vehicles, being a vehicle incorporated in the contract by a change order and upon which vehicle plaintiff had not theretofore submitted any bid, included the disputed Federal body and chassis excise tax therein.. Defendant thus revised its con *931 tention so that it now pertains only to 344 vehicles, with the amount of the excise taxes applicable thereto being reduced to $249,919.47.
Of the 344 vehicles in dispute on this issue, 323 involve a model referred to as the M-54 and designated as Item 6 in Contract 1216; 15 involve a model referred to as the M-55, designated as Item 6a; and 6 involve a model referred to as the M-246, designated as Item 19(b). For clarity of presentation, the dispute as to each of these three items will be hereinafter separately set forth.

THE 823 ITEM 6 M-54 VESICLES

880 As related in finding 28, when plaintiff submitted its original bid on the 3,750 vehicles under date of July 24,1953, it noted that Timken had submitted alternate quotations dependent on its supplying concurrently axles under the 214-ton 6x6 truck program, which trucks were being produced by another prime contractor. The prices as submitted by plaintiff were based on the concurrent production by Tim-ken of 25,000 axle sets on the 214-ton program with prices to be increased by $286.20 (including $21.20 for the 8 percent body and chassis Federal excise tax) if only 10,000 such sets were concurrently produced; or further increased by $568.08 (which included 8 percent body and chassis Federal excise tax in the amount of $42.08) if no 214-ton axle sets were concurrently produced (said axles being an important part of the chassis of a vehicle).
Plaintiff’s revised proposal of August 26, 1953, contained the same provision.
Supplement 3 to Contract 1216, pertaining to the 3,750 vehicles, was at the various unit model prices as submitted by plaintiff in its revised proposal of August 26, 1953, plus the sum of $568.08 added on each unit price. Said supplement did, however, provide for price reductions in the event Timken concurrently produced axles under the 214-ton truck program. The applicable contract provision was as follows:
3. That, in the event Contractor’s supplier of axles, Timken-Detroit Axle Company (or Rockwell Spring & Axle Company), does concurrently with production of axles for the 3750 vehicles, Items 5 through 19, required to be supplied under this contract as amended, produce *932 axles for 2% ton trucks under purchase orders from Reo-Motors Inc., as a prime contractor under a military supply contract, then the stated unit prices for said 3750 vehicles will be reduced by $526.00 plus $42.08 Federal Excise Tax per unit vehicle if said purchase orders are for a quantity of 25,000 axle sets for 2y2 ton trucks,, and by $265.00 plus $21.20 Federal Excise Tax per unit vehicle, if said purchase orders are for a quantity of 10,000 axle sets for 2% ton trucks, said reductions in unit prices to be evidenced by appropriate supplementation of this contract as amended.
89. Under date of December 11, 1953, plaintiff and defendant entered into Supplemental Agreement No. 4 to Contract 1216 which provided, in part, that the contract unit prices of the 3,750 vehicles being produced under Supplement No. 3 (said vehicles being designated under contract Items 5 through 19) would be reduced $281.88 on each vehicle as a result of Rockwell’s having certain concurrent production of axles under other prime contracts for &/2-ton trucks.
The $281.88 amount consisted of a price reduction of $261,. plus 8 percent Federal excise tax thereon of $20.88, for a total unit price reduction of $281.88 on each vehicle being produced.'[33]
90. (a) Among the vehicles to be produced by plaintiff under Supplement 3 of Contract 1216 were 323 Model M-51 trucks and 294 Model M-54 trucks, designated as Item Nos. 6 and 11, respectively, in that and subsequent supplements. The unit prices of these vehicles as reflected in plaintiff’s revised bid proposal of August 26, 1953, and thereafter in Supplements 3 and 4 of Contract 1216, were as follows:

*933 As can be seen, there was added to the bid proposal prices as submitted by plaintiff (column 2) the sum of $568.08, so that the contract unit prices as incorporated in Supplement •3 (column 3) consisted of the revised bid proposal prices plus ■said sum of $568.08. From the Supplement 3 unit prices there was, as set forth in finding 89, deducted the sum of $281.88, resulting in the contract unit prices as incorporated in Supplement 4 (column 4).
(b) The revised bid proposal showed that the prices ■quoted on Item 6 and 11 included therein Federal excise taxes in the total amounts of $852.26 and $791.60, respectively.
As previously stated, the Timken concurrent production ■contingency of $568.08 which was added to the unit prices of the various models included $42.08 of body and chassis Federal excise tax (finding 88), and the unit price reduction of $281.88 also included such taxes of $20.88 therein (finding 89). Thus, the Supplement 4 prices listed above contained Federal excise taxes in the total amount of $873.46 ($852.26 +$42.08 — $20.88) on Item No. 6, and $812.80 ($791.60 +$42.08 — $20.88) on Item No. 11.
91. Paragraph 10 of Supplement 3 to Contract 1216 provided :
10. The provisions of this paragraph shall be applicable only to Items 5 through 19 of paragraph (a) of Article 1 of the Contract as amended.
Changes. The Contracting Officer may at any time, by a written order, and without notice to the sureties make changes of any one or more of the following types: (a) changes in the directions as to shipment and packing of any supplies; (b) increases in the quantity of supplies to be furnished hereunder, the total increase not, however, to exceed a quantity of 1000 vehicles; (c) changes in the drawings or specifications, where the supplies to be furnished are to be specially manufactured in accordance with drawings and specifications; (d) extensions of the delivery schedules hereunder reducing the rate of deliveries of the supplies called for by this contract; or (e) accelerations of the delivery schedules hereunder by an increase or increases in the rate of deliveries hereunder.
Unless consented to in writing by the Contractor, no Change Orders hereunder of the type mentioned in clause (d) of the preceding sentence shall cause de *934 creases in the deliveries hereunder, and no Change Orders of the type mentioned in clause (e) of such sentence shall cause increases in the deliveries called for hereunder, amounting respectively in the aggregate in any one month to more than 50 vehicles for decreases and 1190 vehicles for increases, of the quantity of supplies, the delivery of which is called for in such month by the delivery schedule originally contained in this Supplemental Agreement No. 3.
If such changes cause an increase or decrease in the amount of work under this contract or in the cost of performance of this contract or in the time required for its performance an equitable adjustment shall be made which adjustment may include in any instance an adjustment (i) in the purchase price, including (but not limited to) any adjustment in unit price fair in the light of any change in volume caused by such order, and (ii) in the delivery time or schedule, or (iii) in either the price or delivery schedule and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 30 days from the date the change is ordered, provided, however, that the Contracting Officer, if he determines that the facts justify such action, may receive, consider and adjust any such claims asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in paragraph 12 of General Provisions entitled “Disputes” hereof. But nothing provided in this paragraph shall excuse the Contractor from proceeding with the Contract as changed.
92. (a) By letter dated March 25,1954, the Chicago Ordnance District requested plaintiff to furnish cost estimates involving the following proposed changes to the aforementioned vehicles:
1. It was proposed to reduce the quantity of Item 11 (Model M-54 cargo truck without winch), by 101 vehicles to a new total of 193 vehicles. Of the 193 vehicles, 48 had already been delivered, leaving a balance of 145 to be furnished. The remaining 145 vehicles were to be furnished with dry-charge batteries. All the other specifications were to remain unchanged.
2. Item 6 called for the production of 323 Model M-51 dump trucks, without winch. It was proposed to change this *935 item to a Model M-54 cargo truck (similar to Item 11) equipped with a winch, soft top cab, semigloss marine paint, and deep water fording equipment but to be without batteries or hand air brake control valve. Further, the number of the vehicles under this item was to be increased by 101, being the number that was to be deleted from Item 11, making the new total under the proposed Item 6 equal to 424. Thus, the number of M-51’s to be produced under the contract was decreased and the number of M-54’s correspondingly increased.
(b) As shown, the M-51 was a dump truck and the M-54 a cargo truck. The M-54 has a longer wheel base and is a ■flat stake or cargo body vehicle with no hoist. The M-51 has a dump body operated by an underbody hoist.
93. In seeking contractors’ proposals in connection with proposed changes to a contract, the Chicago Ordnance District requested them to submit their proposals for the change on a form (Form 1025) entitled “Change Form Questionnaire.” This form required the contractor to set forth such data as the effect of the adoption of the proposed change on the present contract price, with an indication as to whether there would be no change, an increase, or a decrease with respect thereto. Where a change in price was indicated, it further required the contractor to set forth its estimate of the unit cost and price changes by showing a unit cost breakdown (14 cost components being indicated on the form for filling in where applicable), the profit, and the total price under the present specifications, the proposed revised specifications, and the resulting increases or decreases of the various individual components making up the price.
94. (a) Upon receiving the request' for the proposed changes, plaintiff calculated its new proposed unit prices of Items 11 and 6 as follows:
The unit price on the remaining 145 Item 11 vehicles to be equipped with dry-charge batteries was increased from $10,760.86 to $10,780.12. To arrive at its new proposed price, plaintiff added the amount of $19.26 for dry-charge batteries to the contract price of Item 11 for M-54’s of $10,760.86, making a new price of $10,780.12 for the remaining 145 Item 11 vehicles.
*936 The unit price on the 424 Item 6 vehicles (increased from 323 M-51 vehicles to 424 M-54 vehicles with certain specification changes) was increased from $10,760.86 to $11,438.01. To arrive at this new proposed price, plaintiff took the contract price of Item 11 for M-54’s of $10,760.86 and added the amounts of $638.16 for the winch, $8.18 for the marine paint, and $49.92 for the deep water fording equipment, but deducted $19.11 for the elimination of the battery, and thus arrived at the resulting unit price of $11,438.01.“[34] Thus the basic contract unit price of $10,760.86 for the M-54 remained unchanged except for the additions or deletions of equipment as requested by defendant. As related in finding 90(b), said basic contract unit price included Federal excise taxes in the total amount of $812.80, including the body and chassis tax.
(b) Plaintiff then undertook the preparation of the Change Form Questionnaire to be submitted to defendant, and prepared it in the following manner:
As to Item 11, it presented no new detailed unit cost or price breakdown. It simply showed the old and new unit prices, with the statement: “We also have arranged to supply 145 each truck, cargo, 5 ton, 6x6, M-54, wo/w [without winch] with dry charged batteries in lieu of wet batteries, as presently specified under Item 11, in the present contract.” It was thus obvious that the price differential as to these 145 trucks was attributable only to the batteries, and there is no excise tax dispute between the parties arising from this particular change.
As to Item 6 however, which involved substituting 323 M-54’s for an equivalent number of M-51’s which were deleted from the item (plus 101 M-54’s transferred from Item 11), plaintiff did present a new unit cost and price breakdown with the “present” and “revised” price and cost components calculated and shown as follows:
The present unit price was shown to be $11,635.87 which was the unit price of the M-51, Item 6, as reflected in plain *937 tiff’s revised proposal and as adjusted by Supplements 3 and 4. The revised unit price was shown to be the aforesaid figure of $11,438.01, or a decrease of $197.86 per unit.
Taking said $11,438.01 figure as the new price, plaintiff' then undertook to break down such figure into the amounts-of the various components thereof. It did so as follows:
(1) Based upon said ultimate $11,438.01 price already computed in the manner hereinabove explained, plaintiff' then deducted therefrom the amount of $102.91 which was the amount of Federal excise tax liability of plaintiff remaining on the tires and the other minor accessory items.[35]
(2) A profit of 8 percent was then calculated on the resulting figure (price divided by 108 percent), and such profit figure was separately shown.
(3) The remaining total cost figure was then divided by 102.6 percent to establish a 2.6 percent “General and Administrative Expense.”
(4) The other costs, exclusive of materials, were then calculated as shown in finding 28 (c), the item “Material Handling and Shipping” in plaintiff’s original bid breakdown on the M-54 (as slightly adjusted by the weight of the additional equipment) being set forth under the form classification “Miscellaneous Direct Factory Expenses,” and the costs-for labor and direct overhead being set forth under the form classifications of “Direct Productive Labor” and “Indirect-Factory Expenses,” respectively, in equal amounts.
(5) The balance resulting from these calculations was-then set forth as the “Direct Material” item.
In this fashion, the 8 percent body and chassis excise tax was reallocated to the “Material” component.
Plaintiff determined to retain the former 8 percent body and chassis excise tax in the price by shifting it into the materials component in an attempt to mitigate the effect of the very close prices it had contracted for on the vehicles-covered by Contract 1216.
(c) By letter dated April 2, 1954, plaintiff submitted to‘ defendant the Change Form Questionnaire reflecting its new *938 unit prices resulting from the changes requested by defendant, and filled out as above described.
(d) Plaintiff claims that as to the 323 vehicles eliminated from the original M-51 Item 6 category and the equivalent amount of M-54’s substituted therefor, it quoted a new unit price, the breakdown of which, as shown in the Change Form Questionnaire, contained no item for the 8 percent body and chassis excise tax, that such former item was reallocated to “Materials,” that it had a right to make such a new quotation with a new component breakdown, and that the new unit price so calculated in fact, therefore, contained no amount for such excise tax therein. Consequently, it contends that the Bureau’s rulings had no effect upon the 323 vehicles covered by this change since it had not designated any body and chassis excise tax item as such to any cost component of the changed unit price.
It makes no similar contention with respect to the 101 M-54’s under Item 11 which were transferred to Item 6, and there is no dispute between the parties as to these 101 vehicles.
Defendant claims that the new unit price of $11,438.01, being based on the already established unit price of Model M-54’s of $10,760.86, with clearly identifiable adjustments for equipment changes, contains therein Federal excise taxes in the amount of $812.80, which amount, except for the tax on tires and minor accessory items, plaintiff was in fact relieved from paying by the ruling of the Bureau of Internal ^Revenue.
95» (a) By letter dated June 9, 1954, the Chicago Ordnance District directed plaintiff, “pursuant to the Changes Article” of Contract 1216, to make the aforesaid changes as to the vehicles to be furnished under Items 6 and 11.
(b) By letter dated June 16, 1954, plaintiff acknowledged receipt of the above letter. It further noted that its new proposed prices did not include anything for obsolescence charges arising from the changes and reserved such question for future consideration. The letter read as follows:
We have notified our Works to make the necessary changes in specifications, which can be accomplished in *939 accordance with form 1025 submitted with our letter of April 2,1954.
However, we now find there will be some obsolescence charges which will occur due to parts peculiar to the truck, dump, five ton, 6x6, M-51, which are being changed to truck, cargo, five ton, 6x6, M-54, with winch. These are the peculiar parts which were purchased from Diamond T Motor Car Company to assist Ordnance in disposing of termination inventories at Diamond T.
As quickly as these excess parts have been determined, inventory schedules will be submitted for Ordnance disposal.
96. Under date of September 3,1954, the parties executed Supplemental Agreement No. 10 to Contract 1216, which, among other things, formally incorporated as part of the contract the changes as related hereinbefore with regard to the M-51 and M-54 vehicles. The preamble to Supplement 10 stated in part:
Whereas, pursuant to General Provision No. 2 entitled “Changes” the Government has required the Contractor to change the specifications and/or model of certain vehicles to be supplied under the contract as follows : (a) to furnish 323 M54 vehicles as well as a quantity of 101 M54 vehicles deleted from Item No. 11 of the Contract as hereinafter set forth under Item No. 6 of Paragraph (a) of Article 1 of the Contract in lieu of a quantity of 323 M51 vehicles and a quantity of 101 M54 vehicles previously appearing under Item No. 6 and 11 of the Contract respectively, * * *.
Supplemental Agreement No. 10 also provided for a unit price increase of $250 for all vehicles to be delivered by plaintiff after June 30, 1954. This price increase resulted from an increased price of axle sets to be supplied with respect to vehicles delivered after June 30, 1954. Vehicles to be delivered after said date totaled 2,310 in number and included the 424 M-54 vehicles to be furnished under Item 6. Thus, the unit contract price of the 424 M-54 Item 6 vehicles was increased $250 from $11,438.01 to $11,688.01.

*940
THE 6 M-UG VEHICLES

97. Among the vehicles to be furnished to defendant by plaintiff under the provisions of Supplement 3 of Contract 1216 were the following:

As related in finding 90 (a), the above contract unit prices were the revised bid proposal unit prices submitted by plaintiff plus the amount of $568.08 (the concurrent production axle contingency) added thereon. Said unit prices were reduced by $281.88 (also the concurrent production axle contingency) as reflected in Supplement 4 to Contract 1216.
In connection with the above listed models, Supplement 4 also provided for the following changes:
(a) The Item 10 97 Model M-54 vehicles were reduced by 48 and in lieu thereof there were to be furnished 48 Model M-55 vehicles. The Model M-55 was a new one and consequently a new contract item designation, Item 10(a), had to be made therefor.
(b) The Item 15 162 Model M-62 vehicles were reduced by 68 vehicles. Item 18, calling for 19 Model XM-246 vehicles, was reduced by 19, thus eliminating the item. The total reduction of these two items amounted to 87 vehicles. In lieu thereof the 48 Item 14 Model M-62 vehicles were to be increased by said amount of 87 to a total of 135 vehicles.
Said changes were made at no additional cost except as reflected in the unit prices applicable to the changed quantities to be supplied. The new quantities, according to the Supplement 4 requirements, were:

*941 The unit prices shown above were the same as those reflected in Supplement 3 after consideration of the $281.88 axle price reduction, except for Model M-55, which model was new. The 48 M-55 vehicles designated as Item 10(a) were to be delivered prior to June 30, 1954.
98. Sometime prior to April 15, 1954, the parties negotiated a change with regard to the Item 19 Model XM-246 vehicles. It was desired that in lieu of 36 of the Item 19 XM-246 vehicles, plaintiff should furnish 36 vehicles of the same model with, however, certain slight modifications. These modifications reduced the unit price on these 36 vehicles by $133.27 from $20,075.42 to $19,942.15. These 36 vehicles were designated as Item 19(a) and the quantity of vehicles to be supplied under Item 19 was correspondingly reduced by 36 from 299 to 263 vehicles.[36]
99. (a) On April 15,1954, the Chicago Ordnance District by letter to plaintiff requested cost estimates concerning the following proposed changes in Contract 1216:
(1) Item 15, which called for 94 Model M-62 medium wrecker trucks, with snatch block and tow chain (on front mounted winch only), soft top cab, olive drab color, dry-charged batteries and electrolyte, and hand-air control brake valve, was to be reduced to 88 vehicles.
(2) Item 19 (a) was to be increased from 36 to 42 Model XM-246 tractor-wrecker trucks with winch, soft top cab, dry-charged batteries and hand-air brake control valve, painted olive drab color.
(b) The Model M-62 medium wrecker had a wheel base of 197 inches with crane equipment mounted on it. A winch having a capacity of 45,000 pounds was mounted behind the crane. The Model XM-246 tractor-wrecker had a wheel base of 215 inches (“extra long”) with a crane similar to that on the Model M-62 vehicle, and with a shorter body. The Model XM-246 vehicle had a fifth wheel for hauling or transporting a semitrailer,; the Model M-62 did not have such a wheel. The fifth wheel was mounted below the crane be *942 tween the two rear wheels, and rested horizontally at the back of the vehicle.
(c) By letter of May 11,1954, plaintiff agreed to the above change at the unit prices then in effect on the two models. As to the M-62’s, plaintiff stated that there would be cancellation charges incurred resulting from the reduced quantity, and as to the XM-246’s plaintiff stated:
We will incur cost penalties on the components peculiar to the M-246, tractor wrecker, due to the small production increment; however, inasmuch as there is no change in the total quantity of common components, we are agreeable to accepting this change increasing the quantity of M-246’s under item 19A at no increased cost to the Government.
The letter closed by requesting immediate receipt of defendant’s authorization for the change “so that cancellation charges can be held to the minimum.”
(d) By letter dated May 24, 1954, defendant, “pursuant to the Changes Article” of Contract 1216, directed plaintiff to make the above changes in model quantities to be furnished under Items 15 and 19(a), the former item being reduced by sis and the latter increased by the same number. It further provided, however, that the fire extinguishers on the Item 19(a) XM-246 vehicles would be furnished by defendant.
100. (a) By letter dated July 15, 1954, to the Chicago Ordnance District plaintiff, to “support our letter of May 11, 1954,” forwarded a “form 1025” Change Form Questionnaire bearing the date of May 25,1954. The letter also stated:
As we have pointed out in our previous letters, there will be cancellation charges resulting from this change, which cannot be determined at this time.
As quickly as these charges can be determined, claim will be submitted for your approval.
(b) Said change form noted that 6 Model M-62 vehicles were being canceled and in lieu thereof plaintiff would furnish 6 Model XM-246 vehicles. The reference to cancellation charges was repeated.
The change form also contained unit price breakdowns for the six vehicles being changed. The present unit price for *943 the six vehicles being canceled was shown to be $20,124.88, whereas the revised unit price for the 6 XM-246 vehicles being added was shown to be $19,896.63. Said unit prices were the respective unit prices of Item 15 (M-62), as shown by Supplement 4, in the amount of $20,170.40 and the unit prices of Item 19 (a) (XM-246), as shown by Supplement 8, in the amount of $19,942.15 less, respectively, the amount of $45.52 for the fire extinguishers to be furnished by the Government.[37]
The new $19,896.63 price of the XM-246 set forth on the change form was developed as follows:
The original price for this vehicle proposed by plaintiff in its amended proposal of August 26, 1953, was $19,789.22. This price included $835.21 for the total Federal excise taxes, including the body and chassis tax. In Supplement 3, the price was set forth under the Item 19 designation, as $20,-357.30, which consisted of said bid price of $19,789.22 plus $568.08 (including $42.08 body and chassis excise tax thereon) for the Timken axle concurrent production contingency. In Supplement 4, the price was set forth, again as Item 19, as $20,075.42, which consisted of the former price less a Tim-ken axle concurrent production contingency of $281.88 (including $20.88 body and- chassis excise tax thereon). In Supplement 8, the price was, under the Item 19(a) designation hereinabove described, set forth as $19,942.15, which consisted of the $20,075.42 Item 19 price less $133.27 for the slight modifications applicable to the 36 former Item 19 vehicles now designated as Item 19(a). This $19,942.15 price thus still included the total Federal excise taxes which were now in the amount of $856.41 ($835.21+42.08 — 20.88), as did the new $19,896.63 price plaintiff set forth on the change form, which, as shown, consisted of said $19,942.15 price less $45.52 for the fire extinguisher.
(c) However, in setting forth the breakdown of the component items making up said $19,896.63 price, as called for on the Change Form Questionnaire, plaintiff eliminated the *944 body and chassis excise tax in the same manner as previously described in the Change Form Questionnaire concerning the increase in the quantities of the M-54’s (finding 94(b) ). It again commenced with the new total revised price and worked backward to the “Materials” item, segregating only the amount of the excise tax then applicable on the tires and accessories, and thus incorporating the body and chassis ■excise tax into the “Material” item.
101. As previously noted (finding 96), Eockwell increased the price of axles with respect to all vehicles to be delivered after June 30, 1954, by the sum of $250 and plaintiff’s unit price for all models under Contract 1216 to be delivered after that date was correspondingly increased.
Since this price change occurred subsequent to the execution on May 25, 1954, by plaintiff of the above mentioned Change Form Questionnaire, it was necessary to increase the $19,896.63 unit price quoted therein by said price increase, making the new price $20,146.63.
102. Under Supplemental Agreement No. 10 to Contract 1216 executed by the parties on September 3,1954, the aforesaid contract change involving the six vehicles was executed. However, instead of adding the 6 XM-246 vehicles to Item 19 (a), the new Item No. 19 (b) was established for these six vehicles, which were designated as M-246. The unit contract price for the 6 M-246 vehicles now designated as Item 19 (b) was, as explained, $20,146.63. The preamble to Supplement 10 stated in part:
Whereas, pursuant to General Provision No. 2 entitled “Changes” the Government has required the Contractor to change the specifications and/or model of certain vehicles to be supplied under the contract as follows: * * * (b) to furnish 6 M246 vehicles, as hereinafter set forth under Item No. 19 (b) of Paragraph (a) of Article 1 of the Contract in lieu of a like quantity of M62 vehicles previously appearing under Item No. 15 of the Contract.

TUB 15 M-55 VBBICLBS

103. (a) As related (finding 97) it was agreed by the parties in Supplement 4 of Contract 1216 that plaintiff would furnish 48 Model M-55 vehicles at a unit price of $13,689.30, *945 designated as Item 10 (a), in lien of 48 Model M-54 vehicles, designated as Item 10. The parties agree that there was included in the above M-55 unit price Federal excise tax on the body and chassis in the amount of $1,018.57.
(b) By letter dated January 5, 1955, defendant directed plaintiff, pursuant to the Changes Article of Contract 1216, to decrease by 15 the number of Item 6 Model M-54 vehicles to be supplied and to substitute therefor 15 Model M-55 vehicles equipped with winch, soft top cab, semigloss Marine Corps green paint, deep water fording equipment, tarpaulins and end curtains.
(c) The cargo body of the Model M-55 vehicle is approximately 20 feet in length, while the cargo body of the Model M-54 vehicle is approximately 14 feet in length. The basic chassis of the Model M-54 vehicle is a Model M-61 chassis and cab, while the basic chassis of the Model M-55 vehicle is a Model M-63 chassis and cab.
104. (a) Plaintiff, by letter dated January 7, 1955, acknowledged the requested change and attached thereto a Change Form Questionnaire reflecting the change in quantities. The Change Form contained unit price breakdowns for the 15 vehicles being changed. The present unit price for the 15 M-54 vehicles being canceled was shown to be $11,852.32, whereas the revised unit price for the 15 M-55 vehicles being added was shown to be $13,892.91.[38]
(b) Plaintiff, in setting forth the breakdown of the component items making up said $13,892.91 unit price as called for on the Change Form Questionnaire, eliminated the body and chassis excise tax in the amount of $1,018.57 in the same manner as previously described as to the Change Form Ques *946 tionnaires submitted concerning the hereinabove mentioned two other items involved in this excise tax issue. It again commenced with said $13,892.91 revised M-55 unit price and worked backward to the “Materials” item, segregating only the amount of the excise tax then applicable on the tires and accessories, and allocating the body and chassis excise tax to the “Material” item.
105. Under date of June 20, 1955, the parties executed Supplement 13 to Contract 1216 which incorporated the above change wherein the 15 M-55 vehicles were designated as Item 6(a) at the unit price of $13,892.91. The preamble to Supplement 13 stated in part:
Whereas, under the “Changes” provision of the Contract, the Government has directed the Contractor to change the specifications and model number of a quantity of 15 M54 Vehicles, Item 6, required to be furnished hereunder, so that the Contractor shall now deliver, in lieu thereof, a like quantity of M55 Vehicles, and the parties have negotiated an equitable adjustment in the Contract price to reflect such changes, resulting in a unit price increase of $2,204.90 and in an increase of $33,073.50 in the total Contract price; * * *.
106. By the aforementioned letter of January 23, 1957 (finding 73), the contracting officer on Contract 1216 demanded payment, among other things, of the amount of the body and chassis excise tax which defendant claimed was owed it by plaintiff (finding 87), including the three items of claim hereinabove set forth. If the total amount of the demand was not paid, defendant informed plaintiff it would offset said amount against amounts due on existing contracts. The letter stated that plaintiff was indebted to defendant on this matter since the tax was “included in the contract price, paid to you for Federal excise tax, which you were relieved from paying and did not pay to the Director of Internal Kevenue.”
107. Plaintiff, in its appeal of February 20,1957, from the ruling of the contracting officer (finding 74), also included this Federal excise tax issue. However, under date of September 4, 1958, the parties executed Supplemental Agreement No. 19 to Contract 1216 under which they settled certain excise tax disputes but reserved the excise tax issue involved *947 herein, upon which the sum of $250,637.30 had been withheld from payments currently due under Contract 2200. On September 28, 1858, the petition herein was filed to recover said withholding. On April 10,1959, plaintiff filed a motion with the Armed Services Board of Contract Appeals that the Board defer consideration of its appeal on this matter pending the outcome of plaintiff’s suit in this court. On May 7, 1959, defendant concurred in plaintiff’s request to the Board. On May 26, 1959, action on plaintiff’s appeal was suspended by the Board until such time as either party moved for consideration. On April 12, 1960, the Board on its own motion dismissed the appeal, “without prejudice to appellant’s right to move for reinstatement of so much of its appeal as the Court of Claims may decline to decide on the ground that appellant has failed to exhaust its administrative remedies * *
As noted, defendant now concedes that the withholding was excessive to the extent of $717.83, so that the amount presently in issue between the parties on account of the three above mentioned excise tax items of claim is $249,919.47.
THE PRICE REDETERMINATION ISSUE
108. Defendant contends in its first counterclaim that had plaintiff accurately set forth the components making up the unit prices in its bid proposals on Contract 1216 so as to reflect the amounts calculated on the specific cost basis (i.e. with reduced overhead and profit figures, and with accurate materials figures) instead of setting them forth as it did (i.e. with larger overhead plus 8 percent profit, resulting in understated material costs), or had plaintiff made such specific cost bid data available to defendant’s price analyst in September 1954 (finding 60(a)), defendant thereafter would have, in accordance with the contract provisions permitting downward and forward price redetermination, instituted such proceedings and recovered, through a contract price reduction, the amount of $490,533.08.
103. Had the price analyst been given the current or latest cost figures of the individual vehicles as of August 13,1954, referred to in finding 60(a), he would have noted that the body and chassis excise tax was no longer properly a price *948 component. For example, the cost of the M-51 with winch, as shown by such August 1954 figures, was, on a fully adjusted cost basis, $12,719.23, whereas the price analyst’s figure, based on the data supplied him, was $13,668.68, or $949.45 higher. However, $848.74 of such amount was attributable to the body and chassis tax.[39]
Further, had he been given such August 13 cost computations, he would have noted that plaintiff had based its bid on Contract 1216 on an out-of-pocket and not on a fully adjusted cost basis. If the price analyst had utilized the August or September 1954 vehicles costs on the out-of-pocket cost basis on which plaintiff had actually bid, he would have ascertained that the 3 percent overall decrease in the cost of the major materials components was not properly offset by any increases in other costs because these other costs (labor and overhead) were, on an out-of-pocket cost basis, held constant, being fixed by the nature of the bid. This would have left him with a downward trend in materials costs.
Plaintiff’s total out-of-pocket costs (including profit) for the M-51 with winch as of August 13, 1954, were shown on plaintiff’s above-mentioned cost computations as $11,768.64, exclusive of body and chassis excise tax. The contract unit price was, as shown by the analyst, $12,559.30, inclusive of such tax. Eliminating said tax in the amount of $848.74 from the contract unit price would have given the analyst the comparable figure of $11,710.56. On this out-of-pocket cost basis, the figures on this model would have shown plaintiff’s costs, including profit, as being substantially equal to the contract price, with plaintiff thus realizing a profit instead of losing over $1,000 as the analyst concluded.
110. Had the price analyst been given the data concerning the true nature of plaintiff’s bid and the then current cost data on an out-of-pocket cost basis, and had, based thereon, defendant concluded to conduct price redetermination proceedings effective September 20, 1954, defendant would have ascertained that:
1. There were 1,728 vehicles remaining to be produced after that date.
*949 2. The costs of producing contract 1216 vehicles as of September 20,1954, calculated on the same specific cost basis or formula upon which plaintiff had bid, had decreased due to reductions in various cost components.[40]
3. Such reductions applicable to the 1,728 vehicles, calculated on the basis of all costs experienced through the completion of the contract, totaled $2,718,964.57.[41] Defendant contends that had price redetermination proceedings so taken place and conducted on the same out-of-pocket cost basis as used by plaintiff in its initial pricing, it would have been entitled to recover, and would have recovered said amount of $2,718,964.57.
However, subsequent to September 20, 1954, defendant received certain excise tax payments made by plaintiff (finding 107), as well as a price adjustment on axle sets of which defendant received the benefit (both of which items were covered by Supplemental Agreement No. 19 to Contract 1216, dated September 4,1958). The amount of said payment and price adjustment applicable to the 1,728 vehicles totaled $1,319,789.32. Thus, on the aforesaid repricing basis, there would remain to be recovered $1,399,175.25.
However, said figure of $1,399,175.25 contains therein that portion of the $1,529,737.90 Rockwell refund which defendant has retained by setoff, as hereinbefore described, as well as that portion of the $249,919.47 excise tax amount also *950 claimed by defendant and also, as stated, withheld by setoff, which are applicable to the 1,728 vehicles. Said applicable amounts are $673,64:8.52 and $234,998.65, respectively, totaling $908,642.17.
If defendant is entitled to retain the refund and excise tax amounts of $1,529,737.90 and $249,919.47, respectively, plaintiff should be credited with the allocable portions thereof in said total amount of $908,642.17. Deducting said $908,642.17 from $1,399,175.25 (remaining to be recovered) would leave the net amount of $490,533.08 to be recovered on the price redetermination, which amount defendant claims in its First Counterclaim filed herein.[42]
111. (a) If, as an alternative, defendant is not entitled to said amounts of $1,529,737.90 and $249,919.47, then the aforesaid portions thereof allocable to the 1,728 vehicles, in the total amount of $908,642.17 (finding 110), should not be credited against the amount to be recovered on the price redetermination, which would then remain in the above-mentioned amount of $1,399,175.25 (finding 110) ,[43] Defendant claims this amount as an alternative in its Fourth Counterclaim (par. 1).
(b) If, as a further alternative, defendant is not entitled to said amount of $1,529,737.90 but is entitled to the excise tax amount of $249,919.47, then the aforesaid portion of the $1,529,737.90 allocable to the 1,728 vehicles in the amount of $673,643.52 (finding 110) should not be credited against the amount of $1,399,175.25 (being the amomit to be recovered from the price redetermination before adjustment). However, the amount of $234,998.65, being that portion of the excise tax issue applicable to the 1,728 vehicles, would still remain to be credited against the price redetermination *951 amount of $1,399,175.25. After applying this credit of $234,998.65, the net amount of $1,164,176.60 would remain to be recovered on the price redetermination. There would also remain the amount of $249,919.47 to be recovered on the excise tax issue. Said amounts total $1,414,096.07, which defendant claims as an alternative under its Fourth Counterclaim filed herein (par. 2) ,[44]
(c) If, as a further alternative, defendant is not entitled to said excise tax amount of $249,919.47 but is entitled to the Bockwell refund of $1,529,737.90, then the aforesaid portion of the $249,919.47 allocable to the 1,728 vehicles in the amount of $234,998.65 should not be credited against the amount of $1,399,175.25. However, the amount of $673,643.52, being that portion of the Bockwell refund allocable to the 1,728 vehicles, would still remain to be credited against the price redetermination amount of $1,399,175.25. After applying this credit of $673,643.52, the net amount of $725,531.73 would remain to be recovered on the price redetermination. There would also remain the aforesaid amount of $1,529,-737.90 to be recovered on the Bockwell refund issue. Said amounts total $2,255,269.63, which defendant claims as an alternative under its Fourth Counterclaim filed herein (par. 3)[45]
112. From time to time, Army Ordnance issued instructions, in the form of “Ordnance Procurement Instructions” (OPI), to its contracting officers concerning various procurement procedures and policies. The following are pertinent portions of certain instructions:[46]
*952 (a) Part 8 of Ordnance Procurement Instruction 24-800 (February 1,1951, revised June 5, 1953), provided in pertinent part as follows:
Part 3 — Profit
2A-300 Regulations.
# ;Ji # # #
24r-300.2 Fixed-price Contracts. OPI 24-200.2 indicates that it is the policy throughout the Department of Defense to provide for an adequate margin of profit in the negotiation of contract prices. In this connection, no fixed profit limitation on ordnance fixed-price contracts has been imposed by statute or regulation. The Assistant Chief of Staff, G-4, has not imposed any general profit limitations on fixed-price contracts, but does require justification with respect to profit rates recommended on individual contract awards, where the individual profit rate is high in relation to the nature of the procurement and the risks to be borne by the contractor. A justification should be recorded in the award documents as to the reasonableness of the profit rate which has been negotiated.
24-301 Evaluation of Profits omd Fees on Proposed Awards. Some of the factors which must be given consideration in the evaluation of the reasonableness of the profit rate or fee are as follows:
24-301.1 Risk. The extent to which the contractor has assumed risk, including the risk incident to reasonable pricing policies. In this connection, risk is reduced when an escalation or price redetermination article permitting upward price revision is included in the contract; accordingly, profit should be reduced to the extent that price protection is afforded by an escalation or price redetermination clause permitting upward price revision.
24-301.2 Efficiency. Efficiency of contractor with due regard to attainment of quantity and quality of production, reduction of costs, and economy in the use of materials, facilities, and manpower.
24-301.3 Reasonableness. Reasonableness of over-all price (costs and profits), with particular regard to volume of production, normal earnings, and comparison of military and peacetime products, volume, and earnings.
24-301.4 Capital Employed. Reasonableness of return on net worth with regard to the amount and source of public and private capital employed.
*953 24r-301.5 Technical Contribution. Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance.
24 — 301.6 Degree of Integration. Character of business, including type and source of materials, complexity of manufacturing technique, character and extent of sub-con tr acting, and rate of turnover.
24-301.7 Other Factors. Any other factors peculiar to the individual negotiation of prices which should be given consideration in the interest of fair and equitable dealing or which are in the public interest with respect to the efficient and economical use of public funds.
The above factors should be considered, to the extent practicable, at the time of the original negotiation of each fixed-price contract. It will be evident-, however, that certain of the above factors will not be subject to accurate evaluation until the time of price redetermination. Attention should therefore be given to such factors as efficiency of the contractor and contractor’s contribution to the defense effort at the time of price redetermination, in those cases where the contract contains a price re-determination clause.
Reference should also be made to OPI 24-709 which covers the treatment of profit in price redetermination under fixed-price contracts.
24-302 Profit and Fee Negotiations. It will be evident from the above that profit or fee allowances should generally be determined separately under each procurement, and “across the board” agreements with contractors as to rates of profit should not ordinarily be made except where similarity of procurements, forms of contracts, and other considerations warrant such action, or except where a company or over-all forward pricing arrangement has been authorized for use with the contractor. In the final analysis, the determination of a fair and reasonable rate of profit or fee is a matter of sound business judgment.
24-303 General. Among other things, the size of the procurement should be given careful consideration by the contracting officer and it should be ascertained that the profit or fee is reasonable in relation to the size of the procurement. Ordinarily, some profit or fee reduction should be accomplished on large procurements in view of the benefits which accrue to the contractor’s organization from such orders, such as continuity of employment and engineering and production efficiencies possible in *954 large production runs which, benefit both military and commercial business.
On April 19,1954, paragraph 24 — 300.2 was revised to read as follows:
24-300.2 Fixed-price Contracts. OPI 24r-200.2 indicates that it is the policy throughout the Department of Defense to provide for an adequate margin of profit in the negotiation of contract prices. In this connection, no fixed, profit limitation on ordnance fixed-price contracts has been imposed upon the Ordnance Corps. No general profit limitations on fixed-price contracts has been imposed but approval by higher authority with respect to profit rates on individual contract awards where the individual profit rate is in excess of 15 percent is required. A justification should be recorded in the award documents as to the reasonableness of the profit rate which has been negotiated. * * * In those cases where the contemplated profit rate is over 15 percent at time of contract negotiation or at time of price adjustment, requests should be forwarded to OCO (attention appropriate commodity branch) for presentation to higher authority. Such request should contain comparative prices, nature of incentive allowances included, or other justification for profit negotiated. Such requests may be in letter form and should be prepared and submitted after consummation of negotiations and board approval, but prior to execution of the related contract supplement.
(b) Ordnance Procurement Instruction, Part 7, entitled Price Redetermination, revised June 5, 1953, provided in pertinent part as follows:
‡ % % >fe #
24-701 Basic Policy.
As indicated in OPI 24-201, the basic policy throughout the Department of Defense is to use, whenever practicable, fixed-price contracts without provisions for price redetermination or escalation. However, fixed-price contracts with provision for price redetermination or escalation may be used whenever contingency charges otherwise would be included in a contract price due to such factors as prolonged delivery schedules, unstable market conditions for material or labor, or uncertainty as to cost of performance.
*955 24-703.1 Procedures.
(a) Objectives. The objectives of pricing Ordnance contracts containing price revision articles are:
(1) Only One Retroactive Repricing. Ordinarily, there should be only one retroactive repricing of a contractor during his continuous production of the same or a similar item. The retroactive repricing should be limited to his production during the initial phase of his entire production experience. Particular care should be exercised in the placing of continuation orders, and in the administration of price revision articles, to assure that only with respect to the initial phase of the contractor’s entire production experience is the repricing “after-the-fact.”
(2) Forward Pricing of all Production after Initial Production. As a corollary of OPI 24-703.1 (a) (1), deliveries subsequent to the initial period of production should be forward priced. The objective should be to complete the negotiation of revised forward prices for production beyond the initial period before the deliveries to which such forward prices apply have begun. The purpose of such forward pricing is to set “target” prices on forward production, the profit in which may be retained by the contractor as an incentive toward cost reduction. Thus the lower the costs are reduced in the forward period, the more the contractor’s profit is enhanced during that period. The Government receives the benefit of such cost reduction in future periods in the form of lower total prices. Full contractor incentive can only be obtained when forward prices are set prior to the production of the items covered by such prices. Once the “production run” stage has been reached, particular care must thereafter be taken that the contemplated profit portion of the forward price is negotiated on a basis which furnishes an incentive for cost reduction. Such incentive for cost reduction can be assured more by considerations of dollar profit per unit.
(3) Close Forward Pricing on Basis of Close Estimate of Future Costs. The firm forward price negotiated for a limited future period should be a “close” price. The price negotiated should be based, not upon an average of past costs, but upon a cost estimate which takes into account the minimum costs which1 the contractor may reasonably be expected to attain in the future period. This is particularly important when the item produced is a specialized military item, the production of which requires special tooling, the application of appropriate production engineering, and the *956 training of personnel. Under such, conditions the “cost curve” may be expected to be sharply downward as the initial phase is completed and “production run” conditions prevail. In other words, the contractor’s estimate of future costs should take into account the lowered costs to be anticipated as amortization of tooling and pre-production expense is completed, his personnel becomes trained, and his production techniques are perfected.
The following succeeding portion of this Instruction was revised as of July 7, 1954:
(c) Timely Negotiation of Forward Prices.
(1) It is emphasized that fixed price contract negotiations with respect to forward prices represent price negotiations with the contractor, as distinguished from cost determinations under cost-type contracts. It is necessary, therefore, to negotiate with the contractor upon the basis of forward estimates taking into full consideration past experience of the contractor and other producers, forward cost estimates or cost projections and any other information available at the time of negotiation.
(2) Timely Proposals for Repricing. If cost data are to be subjected to audit review and if the new price is to be negotiated before the new pricing period begins, repricing proposals must be obtained in time to allow audit before or shortly after the new pricing period begins. In the first repricing under a II-B contract, which repricing includes both the retroactive redetermined price for initial production and also the first forward pricing, experienced costs in the contractor’s proposals may be based on costs from inception of contract up to the “cut-off” point. The “cut-off” point should be established at the end of the contractor’s fiscal accounting period immediately preceding the month in which the redetermination point will be reached. The forecast or estimated costs to complete the contract may then cover the period from the contractor’s “cut-off-date” to the end of the pricing period contemplated in the contract. The “cut-off” date is thus established sufficiently prior to the redetermination date to allow the following steps to be taken:
(a) Contractor’s preparation and submission of experienced costs and proposal for forward price; completion of work by auditor before or during this period.
*957 (5) Completion of audit review, and submission of audit report by cognizant audit agency; discussion of various points with auditor, price analysis and preparation by negotiating team before or during this period.
( c) Negotiation with contractor, the contractor bringing to the negotiation table his latest reading on bus costs up to the redetermination point.
(d) It will be observed that the above steps require a carefully planned time schedule for the contractor to make his formal submission of his experienced costs and proposal for forward price; for the auditor to prepare and submit his report, and for the contracting officer to finalize the negotiation, it being emphasized that preliminary conferences may be held with the contractor even prior to receipt of contractor’s proposal for the purpose of reducing to a minimum the time necessary for negotiation. Careful planning is necessary if the negotiation is to be accomplished prior to or shortly after the redetermination point in the contract.
«§5
(d) Negotiation of Cost Estimate for Future Production.
(1) The negotiation of a close forward price based upon a reasonably close estimate of future costs which should be attained by the contractor is a difficult and challenging job for Ordnance negotiators. No formula or universal solution is available. Each negotiation is peculiar and individual. In order that forward prices may be established on a sound basis, emphasis should be placed upon obtaining complete proposals including both historical costs and detailed forecasts or projected cost estimates as a part of the contractor’s repricing proposal.
(2) Although audited historical costs are valuable, such cost data, even supplemented by the contractor’s latest reading on his costs up to the redetermination point, serve only as a guide in arriving at a reasonable estimate of future costs. In the negotiation of forward prices, care must be exercised that discussions relative to past costs do not divert attention from the more important consideration of putting pressure upon the contractor for cost reduction on the basis of what the costs within his control ought to be in the future. In order that proper consideration may be given, to the contractor’s “learning curve”, forward cost estimates and projections covering the run-out period of the contract beyond the redetermination point must be obtained.
*958 (8) The types of cost data which may be helpful in testing the contractor’s cost projections and estimates of future costs are:
(a) A statement of experienced unit costs — material, labor, and burden — on a month-by-month basis, particularly for the period immediately preceding the forward period for which a new price is to be negotiated.
(b) A statement of the most recent costs of major components, whether manufactured or subcontracted.
(c) A statement of assumptions upon which the contractor prepared his forward cost estimates and cost projections covering forward price. For example, projected level of operations and its effects upon overhead, trend of raw material prices, trend of labor rates, overtime contemplated, material variance trends, material shrinkage factors, design change contingency factor (if any), improvement in labor hours per unit, etc.
(4) The statement of chronological unit costs should facilitate the appraisal of the future course of the contractor’s cost trends, particularly when compared with the cost curves of other producers of the same or a similar item. The statement of maj or component costs should permit a more intelligent analysis of existing costs and appraisal of estimated future costs. When such costs are compared to component costs of other producers, out-of-line costs of both manufactured and subcontracted components should be highlighted. The comparison of subcontracted component prices should indicate also the care with which the contractor is administering his subcontracts.
(5) When the negotiation of a price is approached from the standpoint of ascertaining what a contractor’s costs ought to be, several highly desirable collateral results follow. The interest of the contractor is immediately enlisted. The negotiation is thereby converted, in part, from a controversy over cost accounting and the propriety of profit ratios and contingency provisions to the consideration of the contractor’s manufacturing efficiency and engineering methods. The engineering and production personnel of the Ordnance establishments can thus play an important part, as they should, in the purchase function.
(e) Negotiation, of Profit Portion of Forward, Price. The negotiation of the profit portion of forward price is, of course, closely tied in with the objective, as set forth in d above, of negotiating a “close” price based upon a reasonable estimate of what future costs should be. * * *
*959 24-703.2 Periodic Informal Review of Contractor Costs — Forms II-A and II-B. In the administration of II-A and II-B price revision articles, subsequent to the initial period, contracting officers should make an informal review, every 3 to 6 months, of knowledge or information relating to contractors’ costs. Contract file should be documented to reflect that such. periodic review has been made. Without such consideration there can be no valid basis for determining whether or not the Government should make a formal demand under its option for revision of the contract price, in order to protect its interests. Contractors whose accounting systems are sufficiently good to qualify for the initial inclusion of either article would ordinarily maintain running cost figures as production proceeds,_ and may be relied upon to serve a demand if cost experience indicates that a higher price appears to be warranted. The Government can rely on the same figures, which are already available, for its purposes. It capnot be assumed that the contractor will volunteer the information that major changes have occurred in costs and that the Government should serve a demand. Office review of information or knowledge of changes in the major cost factors should form the basis of the inquiry with the minimum additional burden imposed on the contractor in furnishing information for such informal review. In no event should the contractor be required to furnish data in form as full or complete as if the Government was making a formal demand in accordance with its option * * *.
(c) Ordnance Procurement Instruction 24 — 1108-9 dated June 28,1954, provided in part as follows:
24-1108.6 Negotiation. The approach of the procurement office in the price redetermination of the contract should be the same as in the original negotiation with the contractor. Negotiations should be based on a careful evaluation of the contractor’s proposal; the audit report, if any; technical reports on performance, if any; detailed discussions with the contractor during the negotiation proceedings; and any other factors which in the opinion of the negotiating team merit consideration in the redetermination of the contract prices.
24-1109 TREATMENT OF PROFIT IN PRICE REDBTERMINAtion. It is the policy of the Defense Department to pro *960 vide incentives for efficient performance and cost reduction in the various contracts covering production and supply of defense materials and end items. It is very important to recognize efficient performance and cost reduction at the time of price redetermination in order that such incentives will be encouraged and continued throughout the remaining pricing periods of the contract. Incentives for efficient performance and cost reduction are encouraged by close pricing and by negotiating a fair and reasonable rate of profit at the time of price redetermination. It may therefore be stated that the subject of profit should be approached on the same general basis as was agreed upon at the beginning of the contract and that, in addition, the contractor’s performance should be evaluated.
24 — 1109.1 Cost Reductions. Cost reductions should be carefully evaluated to ascertain whether such reductions resulted from efficient performance or because of inaccurate initial estimates. In those instances, where substantial cost reductions have been affected by the contractor based on efficient performance, the procurement office may negotiate a somewhat higher rate of profit in the price redetermination proceedings to reward such efficient performance. Such allowance should be made only after careful and detailed analysis of all related factors, and with the full understanding between the parties that a reduced profit rate will be negotiated in pricing periods where efficient performance and cost reductions, in the area within the contractor’s control, have not been accomplished. Ordinarily, in the Ordnance Corps, the total profit allowed in price redeter-minations including additional profit allowances in recognition of efficient performance and cost reduction have not exceeded the original dollar profit in the contract. Thus, a contractor through efficient performance may, in certain instances, be allowed to retain the original dollar profit in the contract where costs have been substantially reduced. For example, the contractor’s original profit rate might be increased from 9 percent of original estimated costs to perhaps 12 percent of costs at time of price redetermination as a reward for substantial cost reductions and efficient performance.
24r-1109.2 Cost Increases. In those instances where there have been cost increases and evidences of poor performance, consideration should be given to reducing the rate of profit on costs (within the contractor’s control) over and above the original target price or elimi *961 nating profit on costs over and above the original target price, if cost reductions might reasonably have been anticipated and other contractors producing the same or similar items have achieved substantial cost reductions. Care should be exercised in the above procedures and it should be ascertained whether cost increases were within the contractor’s control or whether the cost increases were due to rising prices of materials and labor or other factors not within the contractor’s control.
(d) Ordnance Procurement Instruction 30-204.7, dated October 1954, provided in pertinent part as follows:
30-204.7 Negotiated Oontraets in General
b. Conditions on Authority to Approve Awards. When one or more of the following conditions exist, requests for approval of awards will be submitted * * *.
(1) Pro-fit Factor.
(a) When the profit margin exceeds 15 percent of estimated cost, in those fixed-price contracts (including supplements and amendments thereto) where it is necessary to obtain a cost breakdown in order to establish reasonableness of price (see OPI24-603 for instances in which cost breakdown is not normally required).
* $ $ * $
Note : The above maximum limitations on delegated authority will not be used by contracting officers to increase rates of profit or fee indiscriminately, but are intended to provide an adequate range of profit and tbe opportunity to include provision for incentives and recognition of outstanding performance and contractor efficiency in effecting significant cost reductions, particularly at time of pricing continuity orders. In accordance witb previous policy, profit considered in pricing initial production should not be so high that subsequent provision for incentive is rendered impracticable. Emphasis will continue to be placed on total price in contract negotiations and not on individual components of price, it being the objective of the Ordnance Corps to take full advantage of competition and encourage lower prices by provision for incentive profits. * * *
113. (a) Plaintiff’s profit on a fully adjusted cost basis on Contract 1216, as supplemented, assuming that it recovers the $1,780,375.20 claimed in its petition and assuming that the defendant does not recover on its counterclaims herein, would be as follows:

*962
Percent to salea

Sales proceeds_ $50, 347,480. 72 100.0
Cost:
Factory cost_ $47, 380,361.23 94.1
General and adminis-tra ti v e expense (2.63% X cost)_ 1,247,293.82 2. 5
Total cost_ 48,627,655.05 96.6
Profit (before taxes)_ [47]1,719,825.67 3.4
(b) If defendant is entitled to retain the sums of $1,529,-137.90 and $249,919.47 concerning the 1955 Bockwell refund and excise tax issues, respectively, plaintiff will sustain a loss (again on a fully adjusted cost basis) of $98,873.39 on Contract 1216, as supplemented, as follows:
Sales proceeds_ $50,347,480. 82
Less excise tax_ 249, 919.47
Net sales proceeds_ 50,097, 561.35
Cost:
Factory cost_ $47,380,361.23
Plus Rockwell refund_ 1, 529,737 .90
48,910, 099.13
Plus general and administrative
expense (2.63% X cost)_ 1, 286,335 .61
- 50,196,434.74
Loss_ [48]98,873.39
*963 (c) In the event defendant prevails on its first counterclaim as well as on the 1955 Rockwell refund and excise tax issues, plaintiff’s loss (on a fully adjusted cost basis) on Contract 1216, as supplemented, would be as follows:
Loss (as set forth in paragraph (b) above)- $98,873.39
Amount in first counterclaim_ 490,533. 08
Total loss_[49] 589, 406.47
As previously found (finding 32(a)), on the basis of its bid plaintiff was prepared to sustain a loss on a fully adjusted cost basis on the 3,150 vehicles included in this contract of as much as $1,319,031.86.
114. (a) Plaintiff’s profit on the entire Contract 1216 with costs applicable to the 3,150 vehicles being computed on a specific or out-of-pocket cost basis, assuming that it recovers the $1,780,375.20 claimed in its petition, and assuming that the defendant does not recover on its counterclaims herein, would be as follows:

*964
Percent to Salee

Sales proceeds_ $50, 347,480.72 100. 0
Cost:
Factory costs and general and administrative expense (exclusive of wrecker bodies cost)_ $40,149, 906. 21
Wrecker bodies cost_ 5,116,130. 64
Total cost_ [50] 45,266, 036. 85 89.9
Profit (before taxes)_ 5,081,443.87 10.1
The profit of $5,081,443.87 is equal to 12.66 percent of the actual specific or out-of-pocket costs (exclusive of wrecker bodies cost) of $40,149,906.21 in comparison to tbe profit rate of 4 percent of estimated specific or out-of-pocket costs (exclusive of estimated wrecker bodies cost on which no profit was to be calculated) utilized by plaintiff to arrive at the prices it submitted in its bid proposal.[51]
(b) If defendant is entitled to retain the sums of $1,529,-737.90 and $249,919.47 concerning the 1955 Rockwell refund *965 and excise tax issues, respectively, plaintiff’s profit on the entire Contract 1216, with costs applicable to the 8,750 vehicles being computed on a specific or out-of-pocket basis, would be as follows:

Percent to net salea

Sales proceeds_ $50,847,480. 82
Less excise tax_ 249,919.47
Net sales proceeds_ 50, 097, 561.35 100. 0
Cost:
Factory costs and general and administrative expense (exclusive of wrecker bodies cost)_ [52] $41, 722,323. 80
Wrecker bodies cost_ 5,116,130. 64
Total cost_ [53]46,838,454.44 93.5
Profit (before taxes)_ 3,259,106,91 6.5
The profit of $3,259,106.91 is equal to 7.81 percent of the actual specific or out-of-pocket costs of $41,722,323.80 in comparison to the profit rate of 4 percent of such estimated specific or out-of-pocket costs utilized by plaintiff to arrive at the prices it submitted in its bid proposal.[54]
*966 (c) In the event defendant prevails on its first counterclaim as well as on the 1955 Rockwell refund and excise tax issues, plaintiff’s profit on the entire Contract 1216, with costs applicable to the 3,750 vehicles being computed on a specific or out-of-pocket costs basis, would be as follows:

Percent to net sales

Profit (as set forth in paragraph (b) above) _ [55] $3,259,106.91
Less amount in first counterclaim_ 490, 533.08
Profit_ 2,768,573. 83 5.5
Said profit of $2,768,573.83 is equal to 6.64 percent of the actual specific or out-of-pocket costs of $41,722,323.80 in comparison to the profit rate of 4 percent of such estimated specific or out-of-pocket costs utilized by plaintiff to arrive at the prices it submitted in its bid proposal.[56]
115. It is not now possible to determine whether, had plaintiff set forth the bid data in the form defendant contends was proper (i.e., with a 4 percent profit, with reduced overhead components, and with accurate materials figures), or had the price analyst been given the data defendant contends should have been furnished to him (i.e., the records showing such bid data as well as the current cost data on such reduced bases), a formal demand for price redetermi-nation proceedings would actually have been made by defendant on or about September 20, 1954. Similarly, had such price redetermination proceedings been initiated, it is *967 not now possible to determine when they would have been completed, what would have been the future events (such as the 1955 Nockwell refund herein involved) the parties would have anticipated and considered in formulating prospective or “forward” cost estimates, whether the price redetermination supplement to the contract would have reserved any matters for future consideration, and what, if any, specific amount would have been determined as an appropriate price adjustment. In addition to considering prospective costs, arriving at redetermined prices, including an appropriate profit amount, also involved a consideration of certain intangible factors, such as the risks assumed by the contractor, its efficiency, and its technical contribution to the defense effort. Furthermore, regardless of technical legality or power to so redetermine under the facts herein involved, and considering only the question of defendant’s practice or policy, the record shows no instance in which prices were reduced in situations where profits on a fully adjusted cost basis were very low or nonexistent, or where, to reduce them, would throw the contractor into a loss position on such cost basis.
Defendant contends that any uncertainties concerning the institution of price redetermination proceedings or the price adjustment that may have resulted therefrom arise only because plaintiff acted in such a way as to have frustrated defendant’s opportunity to have made elections or decisions in these respects, that electing to initiate formal price re-determination proceedings would have been appropriate and proper, and that the price redetermination figures herein-above set forth would also have been permissible and justified under the circumstances. In effect, the price redeter-mination amount defendant seeks in its First Counterclaim only gives defendant the benefit of the reductions in materials costs which occurred during the performance of the contract and leaves plaintiff in substantially the same profit position on the specific cost calculation as upon which it bid. The record does not indicate that any of such cost reductions came about primarily as a result of plaintiff’s own efforts or operations. As already found (finding 49(c)), despite plaintiff’s efforts as set forth in finding 32(b), there is also no indication in the record that there was any other cost reduc *968 tion which resulted primarily from such efforts or operations, such as the institution of any specific manufacturing economy.[57]
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that judgment should be entered as follows:
1. On the Rockwell payment claim of $1,529,737.90, the petition is dismissed.
2. On the excise tax claim, plaintiff is entitled to judgment in the amount of $717.83. The petition as to the balance of the claim in the amount of $249,919.47 is dismissed.
3. The first counterclaim of $490,533.08 is dismissed.
4. On the second counterclaim, defendant is entitled to judgment in the amount of $35.09.
5. On the third counterclaim, defendant is entitled to judgment in the amount of $24,806.21.
6. The fourth counterclaim is dismissed.
Accordingly, judgment is entered for defendant in the total amount of $24,123.47.

 Contract DA — 11-022-OKD-2200, hereinafter referred to as Contract 2200, with amendments.

 Contract DA — 11-022-ORD-1216, referred to hereinafter as Contract 1216, with amendments.

 Contract 8292 was a much earlier contract between plaintiff and defendant. It was entered into December 4, 1950. It was quite similar to the later contracts (Contracts 297 and 983) between the parties.

 Sinee we Rave now reacted the date when Timken and Standard merged to form Rockwell, we will hereinafter refer to plaintiff’s axle supplier as Rockwell.

 Defendant’s second and third counterclaims, along with an offset are being determined in this issue. Defendant’s first and fourth counterclaims will be examined in conjunction with the Price Redetermination Issue.

 In January of 1954, defendant did request an explanation from plaintiff as to the reason for the inclusion of the excise tax on the M-62’s. Plaintiff informed defendant that a ruling on all models under Contract 1216-had not yet been received from the Bureau of Internal Revenue. The Commissioner found that plaintiff had presumably forgotten about the specific ruling received on the M — 62 when it made this statement.

 See Binding 76, which reads :
Article 2, paragraph 10 of Contract 1216, provided in pertinent part:
10. FEDERAL, STATE, AND LOCAL TAXES ■ . . * * * * *
(b) Federal Taxes. Except as may be otherwise provided in this contract, .the contract price includes all applicable Federal taxes in effect on the contract date.
*****
(e) Price Adjustment. If, after the contract date, the Federal Government or any State or local government either (i) imposes or increases (or removes an exemption with respect to) any direct tax, or- any tax directly applicable to the materials or components used in the manufacture or furnishing of the completed supplies or services covered by this contract, or (ii) refuses to accept the evidence of exemption, furnished under paragraph (d) hereof, with respect to any direct tax excluded from the contract price, and if under either (i) or (ii) the Contractor is obliged to and does pay or bear the burden .of any such tax ,and does not secure a refund thereof), the oontract price shall be correspondingly increased. If, after the contract date,' the Contractor is relieved in whole or in part from the payment or the burden of any direct tax included in the contract price, or any tax directly applicable to the mate-.tials or components used in the manufacture or furnishing of the .completed .supplies or services covered by this contract, the Contractor agrees, promptly to notify the Contracting Officer of such relief,, and the contract price shall be correspondingly decreased or the amount of. such, relief paid over’ to the Government. Invoices or vouchers covering.any increase or decrease in contract price pursuant to the provisions of this paragraph, shall state the amount .thereof, as a separate added or deducted item, and shall identify the particular tgx .imposed, increased, eliminated, or decreased,’

 Paragraph 10 of Supplement 3 to Contract 1216 provided:
10. The provisions of this paragraph shall be applicable only to Items 5 through 19 of paragraph (a) of Article 1 of the Contract as amended.
Changes. The Contracting Officer may at any time, by a written order, and without notice to the sureties make changes of any one or more of the following types: (a) changes in the directions as to shipment and packing of any supplies ; (b) increases in the quantity of supplies to be furnished hereunder, the total increase not, however, to exceed a quantity of 1000 vehicles; (c) changes in the drawings or specifications, where the supplies to be furnished are to be specifically manufactured in accordance with drawings and specifications; * * *
If such changes cause an increase or decrease in the amount of work under this contract or in the cost of performance of this contract or in the.time required for its performance an equitable adjustment shall be made which adjustment may include in any instance an adjustment (i) in the purchase price, including (but not limited to) any adjustment in unit price fair in the light of any change in volume caused by such order, and (ii) in the delivery time of schedule, or (iii) in either the price or delivery schedule and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 30 days from the date the change is ordered, provided, however, that the Contracting Officer, if he determines that the facts justify such action, may receive, consider and adjust any such claims asserted at any time prior to the date of final settlement of the contract. If the parties fall to agree upon the adjustment to be made, the dispute shall be determined as provided in paragraph 12 of General Provisions entitled “Disputes” hereof. But nothing provided in this paragraph shall'excuse the Contractor, from proceeding with the Contract as changed.

 The formal change order pertaining to the six XM-246 vehicles designated these vehicles as M-246’s. This was merely a change in nomenclature, however, and as we have stated, the change consisted of merely adding six more of these vehicles to the total to be manufactured.

 As will be remembered from the discussion of the Kockwell Issue, Supplement 3 of Contract 1216 contained a “downward and forward” only price redetermination provision to be made pursuant to written demand by either party, after which said parties would negotiate the proposed redetermination.

 Only defendant’s first counterclaim will be considered in our discussion of this issue. Defendant’s fourth counterclaim will n-ot be examined, as it merely provides for alternative sums of recovery in the event defendant does not prevail in either or both the Rockwell Issue or the Excise Tax Issue.

 By Supplemental Agreement No. 6 dated May 26, 1952, the contract price ■was increased to $14,452,805.30, •with the limit on a price adjustment increase being $15,609,029.72. By a final Supplemental Agreement No. 7 dated October 30,1952, the contract price was fixed at said upper limit.

 Supplemental Agreements Nos. 5 and 6, 'dated November 1 and 30, 1951, respectively, made further adjustments in the consideration, increasing it to $169,252,849.94, with the upper limit on a revised price being $211,566,062.42. The last Supplemental Agreement, No. 22, was dated May 2, 1960. As finally modified, Contract 8292 provided for a total contract price of $168,305,987.54.

 Part of the production under this contract was, as will hereinafter appear, subsequently transferred to another contract so that, as finally modified by Supplemental Agreement No. 20, dated May 2, 1960, Contract 297 provided for a total contract price of $54,142,110.28 for the production of 2,626 vehicles plus spare parts.

 Such lower costs were subsequently reflected In the costs plaintiff submitted to defendant in price redetermination proceedings on Contract 8292.

 As hereinbefore mentioned, this was referred to as the Form II B Price Redetermination clause, which permitted a price increase or decrease, retroactively and prospectively, with no limit on downward revision but a fixed limit on upwarfd revision.

 As was the situation with Contract 297, part of the production under this contract was later transferred to another contract so that, as finally modified by Supplemental Agreement No. IS dated May 2, 1960, Contract 983 provided for a total contract price of 130,887,075.13 for the production of 1,514 vehicles plus spare parts.

 Actually, the balance figure of $8,032.72 also necessarily included the $62 amount plaintiff had included in its specific cost price calculation for “Special Tooling” and “Engineering” (finding 27(b) (5)), since the prices as constructed on its cost breakdown sheets submitted with its bid contained no items so designated, and the “Material” Item was simply a resulting catch-all balance. Therefore, the unrealistic amount actually allocated to “Material” on its M-52 bid was $7,970.72 ($8,032.72 —$62) instead of its worksheet accurate amount of $8,427.55.

 As finally modified by Supplemental Agreement No. 21 dated May 2, I960, Contract 1216 provided for a total contract price of $50,539,342.07 for the production of 3,924 vehicles plus spare parts.

 Such a “downward and forward” only price redetermination provision, made pursuant to a demand, was referred to as a Form II-A provision to distinguish it from the upward or downward, retroactive or prospective, Form II — B provision, which was effective, without a demand, after a certain production point was reached.

 Rockwell Spring and Axle Company subsequently changed its name to Rockwell-Standard Corporation.

 It is not dear, however, why plaintiff felt certain it could retain the full benefit of such refund if it had decided to keep it because such retention would have necessitated an adjustment in its books and records to reflect lower costs on such contract by the amount of the credit applicable to such contract. Such lower costs would then necessarily be reflected in the costs plaintiff would submit in any future price redetermination proceeding on the contract (unless, of course, the contract be interpreted as precluding the consideration of such refunds in any future price redetermination proceeding). As shown, plaintiff had already gone through two price redetermination proceedings on this contract, and the $317,391.97 credit memoranda which plaintiff had received from Timken on August 31, 1951, were reflected in its lower costs submitted with respect thereto (finding 9(b)). Actually, plaintiff did go through a third price redetermination proceeding on this contract which was consummated by Supplemental Agreement No. 21 dated October 10, 1957, and which reduced the then contract price of $169,026,311.35 by $718,410, to the new contract price of $168,307,901.35.

 There is some question as to proper identification of this contract. Rockwell’s letter of December 10, 1953, refers to the contract as one providing for a Power Takeoff. However, the only Power Takeoff contract in evidence is a contract dated September 8, 1953, and numbered DA-11-070-ORD-9335. In any event, there is no dispute between the parties that the contract involved, whether it be 8841 or 9335, was a fixed price contract for certain spare parts which had no Price Redetermination or Repricing of Subcontracts or Purchase Orders provision.

 For instance, the three above reductions amount to $62.50 per vehicle. On 3,750 vehicles the material savings would thus be $234,375. However, the reduced Timken price remained applicable only to 2,000 sets. After April 29, 1954, the price was increased.

 As shown in finding 32(a), on a fully adjusted cost basis plaintiff was prepared to take a loss of over $1,300,000.

 Tills figure is the total of those parts of the three refunds, made by Rockwell or Timken to plaintiff which were allocated to Contract 983, i.e., $30,734.58 (finding 42), $170,520.36 (finding 48(b)) and $29,719.81 (finding 53).

 This figure refers only to the previous refunds made with respect to Contract 8292. As shown by finding 42, of the $1,845,338.09 refunded by plaintiff on October 22, 1953, $817,522.34 was applicable to Contract 8292. Also, as shown by finding 48(b), of the $371,172 refunded by plaintiff on December 14, 1953, $67.68 was applicable to said contract. This made a total of $817,590.02 applicable to Contract 8292.

 As finally revised by Supplemental Agreement No. 13, dated May 2, 1960, the total contract price was $43,763,231.58 ior the production of 3,243 vehicles plus spare parts.

 As will hereinafter appear, prior to this date plaintiff had received a ruling from the Internal Revenue Service that the 8 percent excise tax on the body and chassis of certain vehicles was not applicable to the vehicles involved in Supplement 3 of Contract 1216. Plaintiff had not, as a result, paid such tax on the vehicles produced under this contract. However, plaintiff failed to inform the price analyst of this ruling and the analyst, assuming the applicability of the tax, erroneously Included this figure. Other excise taxes on tires and six minor accessories were applicable and on this vehicle amounted to $99.14, which was the correct figure the analyst should have shown. However, had he shown such figure, his ultimate conclusion that plaintiff was producing the vehicle at a loss, if its costs were calculated on a fully adjusted cost basis, would not have changed. Of course, the exclusion of $848.74 from plaintiff’s costs would have resulted in plaintiff’s loss being shown as much less.
Plaintiff’s failure to advise the analyst of the above situation is inexplicable in view of the fact that the analyst showed to and reviewed with plaintiff’s representatives at the Port Wayne Works the above figures. These representatives, who were fully familiar with the status of the excise tax matter, agreed to the accuracy of the analyst’s figures.

 As shown, the quoted price of $3,240 per axle set for Supplement 3 of Contract 1216, subsequently adjusted to $3,213.50 (finding 49(a)), and then to $3,290 (finding 55), was approximately $400 lower than the $3,675 most recent axle price on the previous Contracts 297 and 983. Thus this reduction would alone more than account for the decrease in the cost of major components.

 Nor were any such proceedings instituted on this contract at any time thereafter.

 After following this procedure, Rockwell could not allocate the total amount of the refund exactly to all the purchases during the period. There was an overallocation in the amount of $1.44, which was deducted to balance the total of the price revisions to the amount of the refund check.

 This is the total of those parts of the refunds made by Rockwell to plaintiff which were allocable to Contract 297, i,e., $997,081.17 (finding 42), $200,583.96 (finding 47(b).) and $138,150.67 (finding 50(b)).

 Rockwell’s fiscal year was on a calendar year basis as distinguished from Timken’s which was, as shown, on a June 30 basis. Supplements 2, 3, and 4 to Contract 11448 had covered the repricing of the Timken-Roekwell sales through December 81, 1953, the latter two agreements covering only quarterly periods in order to bring the periods up to Rockwell’s new calendar fiscal year.

 As finally modified by Supplemental Agreement No. 12 dated February 11, 1958, the total contract price was $17,307,183.67.

 The excise taxes on tires and certain other minor accessory Items were computed by the tire and parts manufacturers and included in their invoices to prime contractors. Plaintiff, as prime contractor, in turn included these excise taxes in its price to the Government.

 This ruling related to 2%-ton Model M — 108 vehicles procured under some contract other than Contract 1216, which contract involved the procurement of 5-ton vehicles.

 Supplement 4 of Contract 1216 executed on December 11, 1953, added Model M-55 to those being produced under Contract 1216, as will be discussed hereinafter.

 As shown, plaintiff’s letter of December 22, 1953, to the Bureau of Internal Revenue concerning various models did not Include the M— 62 since plaintiff had already received a ruling on that vehicle (finding 81). Therefore, the information given by these representatives of plaintiff was erroneous. Presumably they had forgotten about the specific ruling on this one model and thought that plaintiff’s letter of December 22, 1953, covered that model also.

With the exception of one vehicle, Model M-41, not pertinent to this proceeding.

 Those payments to ¡defendant, in the amounts of $2,779,739.61 on Contract-297 and $2,111,093.88 on Contract 983, were reflected in Supplemental Agreement No. 19 to Contract 297 and Supplemental Agreement No. 12 to Contracfr 983, both dated April 18, 1958.

 All of tlie vehicles being produced under Supplements 3 and 4 to Contract 1216 required tires and certain minor accessory items, such as spark plugs, •which were subject to the 8 percent Federal excise tax placed thereon by the parts manufacturer. In view of the favorable rulings, plaintiff’s excise tax liability was limited to the tax on these tires and six minor accessory items, which is recognized and not in dispute between the parties.

 As shown by Supplemental Agreement No. 19 to Contract 1216, plaintiff has paid to (defendant the sum of $2,689,885.93 concerning the balance of said vehicles which represents the amount of said body and chassis excise tax plaintiff concedes it was relieved from paying on said vehicles as a result of the Bureau’s rulings.

 As shown, the reduction for 10,000 concurrent production of 2%-ton axle sets was, under the contract, $265 (exclusive of tax). ¡The record does not explain the $4 discrepancy between this figure and the $261 figure agreed upon in Supplement 4.

 The M-54 Item 11 vehicle was not equipped with a hand brake control valve (Supplement 3, Item 11) so it was not necessary to give any credit for such •elimination.

 On the Change Form Questionnaire, however, this figure was Inserte® under the component labeled “Other Expenses.”

 This contract change was consummated by Supplemental Agreement No. 8 to Contract 1216 dated May 6,1954, incorporating the changes as related above. By Supplemental Agreement No. 11 to Contract 1216 executed January 6, 1955, said $133.27 price reduction was subsequently eliminated on Item 19(a) vehicles to be produced.

 In connection "with a previous change order dated March 11, 1954, plaintiff, as shown by its Change Form Questionnaire dated April 14, 1954, reducejd the price of the M — 62 by $45.52 to reflect the elimination of the fire extinguishers which were now to be supplied by defendant.

 The record does not explain the basis for the exact difference in the amount of $203.61 between this $13,892.91 unit price and the previously mentioned $13,689.30 unit price pertaining to the M — 55 vehicle. The 15 vehicles being covered by the change were to be delivered after June 30, 1954, so that the $250 price increase previously mentioned would be applicable. The addition of said figure to the old price of $13,689.30 results in the figure of $13,939.30, which is still $46.39 over the newly quoted price. This difference is obviously attributable to minor equipment changes.
An exact tracing of the composition of the newly quoted price is unnecessary, however, in view of the parties’ agreement that both the $13,689.30 and the $13,892.91 prices originally contained the body and chassis excise tax in the amount of $1,018.57, the real issue being (apart from the proper interpretation of the “Changes” article) whether plaintiff’s allocation of the latter amount to materials serves to effectively eliminate said item from the price.

 As hereinabove pointed out, defendant has, however, been paid the bulk of this tax, leaving only the relatively small amount in issue in this ease.

 Plaintiff contends it is not proper to base the price redetermination date as of September 20, 1954, because that was the date of the price analyst’s visit. It assumes some time would elapse for his superiors to study his report and to Initiate such proceedings. However, had he obtained the data in question and had it convinced him to recommend such proceedings, it does not appear under the contract provisions that any substantial period of time need elapse. The analyst first requested the data in early September. Had he been given the data, a trip as late as September 20, 1954, might not have been necessary. The contract permits such proceedings on “a written demand.” Such demand might well have been made prior to September 20, 1954. Accordingly, the selection of the September 20, 1954, date would appear to be reasonable and, if anything, favorable to the plaintiff.

 Trice redetermination negotiations were often long drawnout affairs, frequently extending throughout the entire period of contract performance. Such negotiations would necessarily consider all reductions occurring through the termination of the proceedings. In addition, it was possible to hold more than one price redetermination proceeding. It was also possible for the parties to agree to reserve for future consideration matters or contingencies not yet fully resolved. For instance, such reservation clauses were inserted in the price redetermination Supplemental Agreement No. 18 to Contract 8292, dated September 1,1953. Also see findings 52 and 54.

 As hereinbefore set forth, defendant set off and retained from amounts due under another contract the total amount of $1,780,375.20 to reimburse Itself for the $1,529,737.90 Rockwell refund and the $250,637.30 excise tax amount It originally claimed was owed by plaintiff. Sinca defendant concedes the tax withholding was excessive by $717.83, such amount could be deducted from the $490,533.08, leaving a net judgment of $489,815.25. If defendant is, in addition, entitled to recover the $35.09 and the $24,806.21 claimed in the Second and Third Counterclaims respectively, the total amount of the judgment would be $514,656.55.

 under this alternative, such judgment of $1,399,175.25 could be satisfied from said amount of $1,780,375.20 already retained, with the balance being returned to plaintiff.

 Said amount too could be satisfied from the amount of $1,780,375.20 already ■withheld by defendant, again with the balance to be returned to plaintiff.

 Since only $1,780,375.20 has been withheld, the balance In the amount of $474,891.43 would hare to be awarded as an affirmative judgment. Furthermore, If defendant Is also entitled to the sums of $35.09 and $24,806.21 claimed in its Second and Third Counterclaims respectively, said affirmative judgment should be increased by the amounts of these counterclaims to a total of $499,735.73. Thus, ¡defendant would receive under this alternative a total of $2,280,110.93, consisting of the $1,780,375.20 already retained plus the affirmative judgment in the amount of $499,735.73.

 The parties have also requested extensive findings concerning regulations which were published In the Federal Register and, the Code of Federal Regulations. Since the court can take judicial notice of them, findings with respect thereto are omitted.

 TMs Is the amount of profit on all 3,924 vehicles, spare parts and miscellaneous items produced under Contract 1216 presently shown on plaintiff’s boohs of accounts, which are kept on a fully adjusted cost basis. The amounts for which plaintiff sues herein are shown on Its books as sums duo plaintiff under Contract 2200. The items other than the 3,750 vehicles covered by Supplement 3 were purchased on a noncompetitive basis and apparently with plaintiff’s customary 8 percent profit added thereto. The fully adjusted costs of said other Items, consisting of 174 vehicles, spare parts and miscellaneous Items, totaled $2,833,006.14. Applying plaintiff’s usual profit rate of 8 percent to these costs would result In the profit amount of $226,640.49 (8% of $2,833,006.14), making a total of $3,059,646.63 of sales proceeds (costs and profit) applicable to said other items and ,$47,287,834.09 of sales proceeds applicable to the 3,750 vehicles. The profit on the 3,750 vehicles would amount to $1,493,185.18 ($1,719,825.67 less $226,640.49). Thus the percent of profit to sales proceeds on the 3,750 vehicles would be 3.16 percent.

 This amount is the overall loss based on the entire 3,924 vehicles, spare parts and miscellaneous items produced under Contract 1216. As related In footnote 47, allowance would have to be made for the customary 8 percent profit *963 on the original contract Items to determine the amount of loss applicable to the 3,750 vehicles, utilizing the same figures as contained in footnote 47, the loss applicable to the 3,750 vehicles would be $325,513.88. On an overall contract basis this loss would be reduced to $08,873.39 by the profit on the other contract items of $226,640.49.
The costs and profit applicable to the original contract items produced under Contract 1216 cannot be exactly computed as the Rockwell refund related to all axles sold in 1954, which could include all or part of the axles for said original contract vehicles. If so, the cost of those vehicles would be affected by the refund.

 This loss is based on total costs for all vehicles, spare parts and miscellaneous items produced under Contract 1216. Again this computation would have to be adjusted! by the profit on the other items produced under Contract 1216 to determine the loss applicable to the 3,750 vehicles. As related in footnote 48, the loss applicable to said vehicles would be $325,513.88 after taking out a computed 8 percent profit on the 174 vehicles and other items ($226,640.49) produced under Contract 1216. The price redetermination counterclaim of $490,533.08, being applicable to 1,728 of the 3,750 vehicles, would increase the loss on the 3,750 vehicles under this alternative to a total of $816,046.96 ($325,513.88 plus $490,533.08).
Said loss on an overall contract basis is reduced by the 8 percent computed profit on other items of $226,640.49 to a net loss of $589,406.47 as shown above.
As also explained in footnote 48, the costs and profit applicable to the 174 vehicles and other items produced under Contract 1216 cannot be exactly computed.

 As to tile 3,750 vehicles, the component of “material adjustment” was eliminated; “Works general and administrative expense” was reduced to $28.65 per vehicle; and wrecker bodies cost was deducted before application of “General Office general and administrative expense,” with said expense further reduced by $90 per unit. The wrecker bodies cost (with no “General Office general and administrative expense” computed thereon) was added back to arrive at a total cost of $45,266,036.85.
.The total cost figure also includes the fully adjusted costs of $2,833,006.14 applicable to the 174 vehicles and other items additionally produced under Contract 1216. Removing this figure and a computed 8 percent profit thereon of $226,640.49 so as to reflect, on a specific cost basis, the sales proceeds, costs and profit with regard to the 3,750 vehicles, would give the following result:

Percent to Sales

Sales proceeds (60,347,480.72 — 3,059,646.63)_$47,287,834.09 100.0
Less:
Total cost (45,266,036.85 — 2,833.006.14) __ 42,433,030.71 89.7
Profit (5,081,443.87 — 226,640.49)_ 4,854,803.38 10.3

The above profit and cost figures again include therein the fully adjusted costs and a computed 8 percent profit thereon applicable to the 174 vehicles and other items additionally produced under Contract 1216. Removing these amounts from the above figures to arrive at the profit and costs applicable to the 3,750 vehicles on the specific or out-of-pocket cost basis would result in a profit of $4,854,803.38 (5,081,443.87 — 226,640.49) and cost (exclusive of wrecker bodies cost) of $37,316,900.07 (40,149,906.21 — 2,833,006.14). This profit of $4,854,803.38 is equal to 13.01 percent of said costs of $37,316,900.07.

This figure includes the 1955 Rockwell refund of $1,529,787.90 with the 1955 “General Office general and administrative expense” rate of 2.79 percent applicable thereon in the amount of $42,679.69.

As previously noted, saidi total cost includes the fully adjusted costs applicable to the 174 vehicles and other items also produced under Contract 1216. Removing this cost and an 8 percent computed profit thereon so as to reflect the sales proceeds, costs and profits with regard to the 3,750 vehicles, on a specific or out-of-pocket cost basis, would give the following result:

Percent to sales

Sales proceeds_ $47, 037, 914. 72 100. 0
Less : Total costs_ 44, 005, 448. 30 93. 6
Profit_ 3, 032, 466. 42 6. 4
Again, as previously explained, the cost and profit applicable to the 174 vehicles and other items produced under Contract 1216 cannot be exactly computed as the Rockwell refund could apply to all or part of the axles used in the production of said 174 vehicles and the cost of producing these vehicles could therefore be affected by the refund.

Again as previously noted, the above figures include the fully adjusted costs and a computed 8 percent profit thereon applicable to the 174 vehicles and other items also produced under Contract 1216. Removing said fully adjusted amounts from the above figures to arrive at the profit and costs applicable to the 3,750 vehicles on a specific or out-of-pocket cost basis would result in a profit of $3,032,466.42 (3,259,106.91 — 226,640.49) and costs of $38,889,317.66 (41,722,232.20 — 2,883,006.14). This profit of $3,032,46.6.42 is equal to 7.80 percent of said costs of $38,889,317.66.

 As related in footnote 54, said profit applicable to the 3,750 vehicles amounts to $3,032,466.42 after removal of that portion applicable to the 174 vehicles and other items also produced under Contract 1216. Since the price redetermination counterclaim relates to 1,728 of the 3,750 vehicles, the profit amount would be reduced by the $490,533.08 figure to the sum of $2,541,933.34. The profit of $2,541,933.34 on the 3,750 vehicles is equal to 5.4 percent of the sales proceeds of $47,037,914.72 applicable to such vehicles.
Again as previously explained, the costs and profit applicable to the 174 vehicles and other items produced under Contract 1216 cannot be exactly computed.

As previously noted, these figures include the fully, adjusted costs and a computed 8 percent profit thereon applicable to the 174 vehicles and other items also produced uiider Contract 1216. Removing these amounts from the above figures to arrive at the profit and costs applicable to, the 3,750 vehicles on a specific or out-of-po.ctet cost basis would result in a profit of $2,541,933.34 (2,768,573.83-226,640.49) and factory costs of $38,889,317.66 (41,722,-323.80 — 2,833,006.14). This profit of $2,541,933.34 Is equal to 6.54 percent of said costs.

 The cost reductions involved consist primarily of the 1955 Rockwell refund, the excise taxes in issue, and such relatively minor reductions in the prices of materials as the $26.50 reduction in axle prices (finding 49(a)), the $21 Delco Remy reduction, and the $15 Budd Wheel Company reduction (finding 49(b)).